**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re: | Chapter 11 |
| ARCH THERAPEUTICS, INC., *et al.*,[1] | Case No. 25-40409 |
| Debtors. | Joint Administration Requested |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION SECURED
FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE,
(B) USE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION,
(IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL
HEARING, AND (VI) GRANTING RELATED RELIEF
[Expedited Determination Requested]**

Arch Therapeutics, Inc. ("**Arch**") and, its subsidiary, Arch Biosurgery, Inc. ("**ABS**"), as

debtors and debtors in possession (collectively, the "**Debtors**") in their chapter 11 cases, file this

motion (this "**Motion**")[2] for (i) authorization to obtain certain secured term loan facility in an

aggregate principal amount not to exceed $2,000,000.00 in loan commitments (the "**DIP

Facility**") from Vivex Biologics, Inc.  and/or its designees or its assignees (the "**DIP Lender**")

and the loans under the DIP Facility (the "**DIP Loans**"), as set forth herein, and (ii) entry of the

interim order, substantially in the form attached hereto as **Exhibit A** (the "**Interim Order**"), and

a final order (the "**Final Order**" and, together with the Interim Order, collectively, the "**DIP

Orders**").  In support of this Motion, the Debtors state as follows:

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal identification number, as applicable are: Arch Therapeutics, Inc. (4102) and Arch Biosurgery, Inc. (5710).
[2]  Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the DIP Term Sheet or the Interim Order, as applicable.

**EXPEDITED DETERMINATION**

1.        Pursuant to MLBR 9013-1 (g), the Debtors request for an expedited hearing on

the Motion because the Debtors have critical cash/funding needs that it cannot otherwise obtain

without contingencies which the Debtors believe compromise a competitive bidding process for

the enterprise value of the Debtors to recognize optimum value and disposition of the Debtor's

assets.

2.        Pursuant to Bankruptcy Rule 4001(c) and MLBR 4001-2(e)(2), the Court may

conduct a preliminary hearing, pending a final hearing, on DIP financing motions such as this

one to the extent necessary to avoid immediate and irreparable harm.  The Debtors request that

such interim hearing be held on an expedited basis and seeks immediate authority to borrow

funds from the DIP Lender (as defined below) as set forth in the Motion to prevent immediate

and irreparable harm to the Debtors' estates pending a final hearing.  Without this DIP Facility,

the Debtors will not be able to continue to fund its critical operations to preserve and maximize

its value in furtherance of its sale efforts for which the Debtor have selected a stalking horse

bidder and are in process of drafting pleadings to be filed for bid procedures and a competitive

marketing process.  The Interim Order (as defined below) will give the Debtors the necessary

funding and flexibility to continue their operations, implement a Chapter 11 sale process, and

bring these chapter 11 cases to a value-maximizing conclusion.

3.        Pursuant to MLBR 9013-1(g)(1)(C), the Debtors have made a reasonable good

faith effort to advise the U.S. Trustee's office, and the secured creditors and noteholders of the

substance of the Motion for relief, and the request for an expedited determination, prior to filing

2

the Motion.  The undersigned counsel has contacted such parties via Email on or about April 18, 2025.

## JURISDICTION

4.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

5.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The statutory bases for relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of Title 11 of the United States Code (the "**Bankruptcy Code**"); Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); and MLBR 4001-2 and 9013-1.

## BACKGROUND

7.      On April 18, 2025 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

8.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.      No trustee, examiner or official committee of unsecured creditors has been appointed.

10.     The events leading up to the Petition Date are set forth in the Affidavit of Terrence W. Norchi, MD, the President of Arch, in support of the chapter 11 cases [Doc. No. 25-40409 and 25-40410 (the "**Norchi Affidavit**").

## A.  Business Information and Operations

11.      Arch is a public company trading under the symbol "ARTH" on the OTC Pink Limited Stock Market. Arch's corporate structure is comprised of itself and ABS as a wholly-owned subsidiary.

12.      Arch is a Nevada corporation, and doing business in Framingham, MA. Arch's predecessor, Almah, Inc., was incorporated under the laws of the State of Nevada on September 16, 2009.  As part of a certain 2013 merger transaction (the "**2013 Merger**"),[3] Almah, Inc. changed its name to Arch Therapeutics, Inc. and abandoned both its prior business plan and operations in order to adopt those of ABS.

13.      ABS is a Massachusetts corporation.  ABS was incorporated on March 6, 2006 as Clear Nano Solutions, Inc., and changed its name to Arch Therapeutics, Inc. on April 7, 2008, which was later changed to ABS as part of the 2013 Merger.

14.      As of the Petition Date, the Debtors had one salaried employee engaged in research, clinical development, regulatory affairs, and quality assurance, supply chain management, intellectual property development and protection, and commercial sales, with the support of many consultants and advisors.

15.      Arch is a commercial stage medical device company developing and marketing products based on its innovative AC5® self-assembling technology platform to (i) manage surgical, traumatic, or chronic wounds, such as pressure sores, leg ulcers, and diabetic ulcers; (ii)

_____

[3] The June 26, 2013 merger involved three entities previously known as Arch Biosurgery, Inc., Almah, Inc., and Arch Acquisition Corporation.

stop bleeding (hemostasis); and (iii) control leaking (sealant) (the "**Products**"). The first Product

for wounds have received FDA clearance and EU CE Mark.

16.     Since inception, the Debtors have devoted their resources primarily to research

and development, intellectual property development and defense, commercialization, and support

of obligations related to being a publicly traded company.  This has been a capital intensive

process, causing the Debtors to generate a substantial accumulated deficit from the beginning

through the Petition Date.  The Debtors have not generated sufficient revenue to meet operating

expenses over the years.  The Debtors' business plan contemplated infusion of additional

investment capital to support a commercial launch and presence for the Products in the United

States and Europe in order to generate revenues and realize the full economic value.

### B.  Debt Structure; Secured Creditors

17.     The Debtors have primarily raised capital through debt borrowings, the issuance

of convertible debt, and the issuance of units consisting of shares of common stock and warrants

to purchase common stock.

18.     In addition to substantial unpaid trade debts and other amounts, the Debtors are

obligated to various noteholders under certain secured and unsecured note purchase transactions.

19.     The following noteholders have filed UCC-1 financing statements before the

Petition Date (the "**Prepetition Secured Parties**").[4]

_____

[4] Nothing herein shall be deemed to be an admission as to the validity, priority, enforceability, or perfection of any
lien or security interest.

| Secured Creditors/ Lienholders | Security Interest | Debtor | Listed Collateral |
|---|---|---|---|
| Oasis Capital, LLC,[5] as collateral agent | UCC statement filed 7/8/22 (Nevada)[6] | Arch Therapeutics, Inc. | All assets of Arch; 100% of the outstanding share of Biosurgery. |
| Oasis Capital, LLC, as collateral agent | UCC statement filed 7/11/22 (Massachusetts) | Arch Biosurgery, Inc. | All assets of Biosurgery. |
| Brandt and Mona Wilson | UCC statement filed 4/23/24 (Nevada) | Arch Therapeutics, Inc. | All assets of Arch. |
| Brandt and Mona Wilson | UCC statement filed 4/23/24 (Massachusetts) | Arch Biosurgery, Inc. | All assets of Biosurgery. |

20.     During the weeks immediately preceding the Petition Date, the Debtors had exhausted all cash.  The only source of funding available to the Debtors that would allow the Debtors to continue their operations for the benefit of all stakeholders was the DIP Lender.  Prior to the Petition Date, the DIP Lender loaned $120,476 to the Debtors on a secured basis, allowing the Debtors to continue to operate as a going concern.  The DIP Lender's prepetition loan is secured by security interest in all assets of the Debtors that is junior to the interests of the Prepetition Secured Parties.

_____

[5] Upon information and belief, Oasis Capital's position was sold or transferred to Tiburon Opportunity Fund LP on or about August 1, 2024.

[6] Upon information and belief, Oasis Capital also filed a UCC-1 financing statement in Massachusetts on 7/11/22 with respect to Arch Therapeutics which is ineffective.

### C.  Assets: Arch and ABS

21.     Arch's primary tangible assets are (i) inventory related to goods in process for Arch's commercial product, and (ii) certain common law trademarks for AC5-G, AC5-P, Crystal Clear Surgery, NanoDrape and NanoBioBarrier.

22.     ABS owns certain trademarks (related to Arch's underlying self-assembling patent technology platform and a related product), and patents or patent applications (concerning self-assembling peptides and self-assembling peptidomimetics).  ABS is the owner of various other active and inactive patents issued or pending, including  in the United States, Asia, and Europe.

23.     Upon information and belief, no separate IP security agreement is recorded with the United States Patent and Trademark Office by any secured creditor with respect to the patents and trademarks.

24.     ABS is the licensee under a certain Amended and Restated Exclusive Patent License Agreement, effective as of May 23, 2011, between Massachusetts Institute of Technology ("**MIT**"), and Arch Therapeutics, Inc. (f/k/a Clean Nano Solutions, Inc. and k/n/a ABS) (as amended on May 15, 2012, February 1, 2013, and April 30, 2013 and in effect from time to time, the "**MIT License Agreement**").  This is a non-exclusive royalty-bearing license under the Patent Rights A, and a royalty-bearing exclusive license under the Patent Rights B (both as defined in the MIT License Agreement).  As of the Petition Date, the Debtors owed approximately $252,000 (including $34,000 of interest) for expense reimbursement, maintenance fees, royalties, and interest under the MIT License Agreement.

25.     ABS is also a sub-licensee under a certain Nonexclusive Patent Sublicense Agreement, effective as of January 31, 2011, among MIT, Arch Therapeutics, Inc. (n/k/a ABS),

and 3D Matrix, LTD (as amended on February 28, 2011 and in effect from time to time, the "**3D Agreement**").  This is a free, fully-paid up, royalty-free non-exclusive sublicense under the Patent Rights (as defined in the 3D Agreement).  The Debtors have not used the 3D License since approximately 2014.

26.      The terms of the MIT License Agreement and the 3D Agreement shall remain in effect until the expiration or abandonment of all issued patents and filed patent applications within the Patent Rights (as defined therein), unless earlier terminated in accordance with the provisions of the applicable MIT License Agreement or the 3D Agreement.

## SUMMARY TERMS OF THE DIP FACILITY

27.      The chart below summarizes material terms of the DIP Facility[7]  under the debtor-in-possession financing term sheet by and among the Debtors and the DIP Lender, attached hereto as **Exhibit B** (as amended, restated, and in effect from time to time, the "**DIP Term Sheet**").  The relevant sections of the DIP Term Sheet are also indicated below.

| Provision | Summary | Location |
|---|---|---|
| **DIP Borrowers** | Arch Therapeutics, Inc. and its subsidiary, Arch Biosurgery, Inc. | DIP Term Sheet, § 1 |
| **DIP Lender** | Vivex Biologics, Inc.  and/or its designees or its assignees. | DIP Term Sheet, § 2 |
| **Facility Type and Amount** | A DIP Facility in an aggregate principal amount not to exceed $2,000,000.00 in loan commitments. | DIP Term Sheet, §§ 3–4 |

---

[7]  The following summary of the terms of the DIP Facility is qualified by the express terms of the referenced documents, including the DIP Term Sheet and the Interim DIP Order.   If there are any inconsistencies between the summary below and such documents, the terms of such documents shall control.

|  | Upon the Court's entry of the Interim Order and satisfaction of all applicable conditions precedent described in the DIP Term Sheet, the DIP Lender shall make available the Initial Draw in the amount of $900,000.00 |  |
|  | The closing of definitive DIP Documents shall occur as soon after the first Initial Draw as reasonably possible but in any event no later than two (2) business days prior to the hearing to consider entry of the Final Order. |  |
| **Interest Rate; Default Interest** | The DIP Loans shall bear interest at a per annum rate equal to 10.5% payable in cash on the first day of each month in arrears.  After the occurrence and during the continuance of an Event of Default, the DIP Loans shall bear interest at the per annum rate of 15.5%. | DIP Term Sheet, § 8 |
| **Fees** | The Borrowers shall pay to the DIP Lender a commitment fee equal to 3% of the total amount of the DIP Commitments (the "**Commitment Fee**").   The Commitment Fee shall be fully earned, non-refundable, and allowed upon entry of the Interim Order, and shall be payable out of the proceeds of the Initial Draw.

The Borrowers shall pay to the DIP Lender an exit fee equal to the sum of 6.0% of (i) upon entry of the Interim Order and before entry of the Final Order, the total amount of DIP Loans then outstanding, and (ii) upon entry of the Final Order, the total amount of the DIP Commitments, which, in each case, shall be fully earned, non-refundable, and allowed upon the Court's entry of the Interim Order (the "**Exit Fee**").   The Exit Fee shall be due and payable upon the earliest of (x) the DIP Termination Date, (y) Payment in full of the DIP Obligations, and (z) on a *pro rata* basis for any Voluntary Prepayment of the DIP | DIP Term Sheet, § 9 |

| | | |
|---|---|---|
| | Obligations, as further set forth in the DIP Term Sheet. | |
| **Other Costs and Expenses** | Subject to the DIP Documents, all documented out-of-pocket accrued and unpaid fees, costs, disbursements, and expenses of the DIP Lender, including the fees and expenses of Kilpatrick Townsend & Stockton LLP, as counsel to the DIP Lender, incurred in connection with the DIP Facility and the chapter 11 cases shall be paid on a current basis. | DIP Term Sheet, § 26 |
| **Prepayments** | Voluntary prepayments of the DIP Loans shall be permitted at any time, subject to (i) payment of the ratable portion of the Exit Fee due thereon, which shall be due and payable on the date of such voluntary prepayment; (ii) accrued interest on the amount prepaid; and (iii) in minimum amounts of at least $250,000 of principal. | DIP Term Sheet, § 11 |
| **Maturity Date** | The "Maturity Date" will be the earliest to occur of: (i) July 18, 2025; (ii) the effective date of any chapter 11 plan with respect to the Borrowers; (iii) the consummation of any sale or other disposition of assets of the Borrowers pursuant to section 363 of the Bankruptcy Code; (iv) the date of acceleration or termination following the occurrence of an Event of Default; (v) dismissal or conversion of the chapter 11 cases; and (vi) 45 days after the Petition Date, unless the Final Order has been entered by the Bankruptcy Court on or before such date. | DIP Term Sheet, § 7 |
| **Events of Default** | The DIP Documents shall contain customary Events of Default and acceptable to the DIP Lender and the Borrowers, as set forth in the DIP Term Sheet, including, without limitation:<br><br>i.   the entry of the Final Order shall have not occurred, subject to the availability of the Court, within 45 days after the Petition Date: | DIP Term Sheet, § 25 |

| | | |
|---|---|---|
| | ii.     any action by any Debtor to (a) challenge the rights and remedies of the DIP Lender under the DIP Facility in any of the chapter 11 cases or acting in a manner inconsistent with the DIP Documents or (b) avoid or require disgorgement by the DIP Lender of any amounts received in respect of the obligations under the DIP Facility. | |
| | iii.    entry of an order without the express written consent of the DIP Lender obtaining additional financing from a party other than the DIP Lender under section 364(d) of the Bankruptcy Code except if such financing provides for the Payment in full of the DIP Obligations. | |
| | iv.    the Debtors file a motion for the Bankruptcy Court to approve a sale of the DIP Collateral pursuant to section 363 of the Bankruptcy Code which proposed sale is not acceptable to the DIP Lender in its sole discretion. | |
| **Remedies** | Upon the occurrence and during the continuation of an Event of Default under the DIP Documents, all remedies customarily available in the chapter 11 cases, including, without limitation, those remedies customarily available to a senior secured, administrative expense claim of a debtor-in-possession lender, will be available to the DIP Lender, as set forth in the DIP Term Sheet.<br><br>Any exercise of remedies by the DIP Lender shall be subject in all respects to the terms of the DIP Orders. | DIP Term Sheet, § 14 |
| **Use of Funds/ Proceeds** | The proceeds of the DIP Facility shall be used only for: (i) working capital and other general corporate purposes, (ii) professional fees and expenses of administering the chapter 11 cases, (iii) fees and expenses payable under the DIP Facility, and (iv) | DIP Term Sheet, § 10 |

| | interest and other amounts payable under the DIP Facility. | |
|---|---|---|
| **DIP Liens/ Security** | As discussed below, as security for the DIP Obligations, the Debtors shall grant to the DIP Lender certain DIP Liens and DIP Superpriority Claims on all DIP Collateral. | DIP Term Sheet, §§12-13<br><br>Interim Order ¶ 7-8 |
| **DIP Collateral** | DIP Collateral shall include: all assets and property of such Debtor and its estate, real (both leasehold and fee) or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all contracts, contract rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, accounts receivables (including healthcare insurance receivables), chattel paper, letters of credit and letter of credit rights, investment property (including, without limitation, all equity interests owned by any Debtor in its current and future subsidiaries), commercial tort claims, arbitration awards, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, fixtures, all interests in leaseholds and real properties, all patents, copyrights, trademarks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), all governmental and private grants, all claims, rights, interests, proceeds, products, accessions, additions, improvements, substitutions, rents and profits, and books and records, of or in respect of any of the foregoing (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of New York).<br><br>As mentioned below, DIP Collateral shall include Avoidance Actions (as defined in the Interim DIP Order). | DIP Term Sheet, § 12<br><br>Interim DIP Order, ¶ 5 |

| OTHER PROVISIONS: | | |
|---|---|---|
| **DIP Budget** | The DIP Lender shall receive an extended weekly budget commencing with the week during which the Interim Order is entered, containing line items of sufficient detail to reflect the consolidated operating cash flow of the Debtors for the period from the Petition Date through and including the end of the thirteenth (13th) calendar week thereafter (the "**Initial DIP Budget**"). Such Initial DIP Budget may be amended as set forth in the DIP Term Sheet. | DIP Term Sheet, § 21 |
| **Variance Reporting** | On a weekly basis the Borrowers shall deliver to the DIP Lender a variance report as set forth in the DIP Term Sheet. | DIP Term Sheet, § 21 |
| **Conditions Precedent to Effectiveness (Initial Draw)** | Conditions precedent to the Initial Draw are as follows:<br><br>i.   Entry of the Interim Order within 4 business days of the Petition Date, which order shall not be stayed or subject to appeal;<br><br>ii.   Delivery of the Initial DIP Budget acceptable to the DIP Lender in its reasonable discretion;<br><br>iii.   All out-of-pocket costs, fees and expenses required to be paid to the DIP Lender pursuant to the DIP Term Sheet, the DIP Documents, or the Interim Order shall have been paid (provided that the Commitment Fee and the DIP Lender's | DIP Term Sheet, § 15 |

| | | |
|---|---|---|
| | legal fees and expenses shall be paid out of or offset against the proceeds of the Initial Draw); | |
| | iv. The representations and warranties of the Debtors under the DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects); | |
| | v. No Material Adverse Effect shall have occurred and be continuing; | |
| | vi. The Debtors shall be in compliance in all respects with the Interim Order; | |
| | vii. No Event of Default shall have occurred and be continuing under the DIP Term Sheet; | |
| | viii. No order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner adverse to the DIP Lender or the Interim Order; and | |
| | The entry of the Interim Order shall constitute the borrowing notice for the Initial Draw. | |
| **Conditions Precedent to Credit Extension (Other Draws)** | Certain customary conditions precedent to each subsequent draw are as set forth in the DIP Term Sheet, including: | DIP Term Sheet, § 16 |
| | i. Execution and delivery of a DIP Credit Agreement and other DIP Documents evidencing and securing the DIP Facility, in each case, which shall be in form and substance substantially consistent with the DIP Term Sheet and otherwise in form and substance acceptable to the DIP Lender and the Debtors. | |

14

| | | |
|---|---|---|
| | ii.  All costs, fees, expenses (including, without limitation, legal fees and expenses) set forth in the DIP Documents or otherwise to be paid to the DIP Lender shall have been paid when due. | |
| **Other Deadline** | The Bankruptcy Court shall have entered a Final Order approving the DIP Facility not later than 45 days following the Petition Date, which Final Order shall be in the form of the Interim Order with such changes as are customary for a final order or otherwise are acceptable to the DIP Lender.<br><br>The DIP Documents shall contain certain Milestones relating to the chapter 11 cases, which may be extended by the DIP Lender in its sole discretion, failure to comply with shall constitute an Event of Default:<br><br>(i) Within three (3) days after the Petition Date, the Debtors shall have filed a motion seeking an order the form and substance of which shall be reasonably satisfactory to the DIP Lender governing the solicitation of bids for the purchase (and an auction) of substantially all assets of the Debtors;<br><br>(ii) Within 21 days after the Petition Date, the Bankruptcy Court shall have entered the order sought in (i) above.<br><br>(iii) Within 85 days after the Petition Date, the Bankruptcy Court shall have entered a final order approving the sale of substantially all of the Debtors' assets. | DIP Term Sheet, § 16 |
| **Affirmative Covenants** | The DIP Documents shall contain usual and customary affirmative covenants and as are acceptable to the DIP Lender and the Borrowers. | DIP Term Sheet, § 19 |

| **Negative Covenants** | The DIP Documents shall contain usual and customary negative covenants as are acceptable to the DIP Lender and the Borrowers; provided that the DIP Documents will permit the Debtors to continue to pursue a sale process for all or substantially all of the Borrowers' assets and consummate any sale or sales related thereto as set forth in the DIP Term Sheet. | DIP Term Sheet, § 20 |

## STATEMENT UNDER BANKRUPTCY RULE 4001

28.     The provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi) are set forth or

discussed below.

| *(i) Grant of Priority or Lien on Property of the Estate* | All obligations of the Debtors under the DIP Obligations shall be entitled to certain DIP Liens and DIP Superpriority Claims:<br><br>(a) Subject to the Carve Out, perfected first-priority senior priming liens and security interests under section 364(d)(1), (b) perfected first-priority liens and security interests under section 364(c)(2), and (c) perfected junior liens and security interests under section 364(c)(3), as set forth in the Interim Order (the "**DIP Liens**").<br><br>(b)  Subject to the Carve Out, superpriority administrative expense claims in the chapter 11 cases and any successor case (the "**DIP Superpriority Claims**"). | DIP Term Sheet, §§12-13<br><br>Interim Order ¶ 7-8 |
| *(ii) Adequate Protection for a Secured Claim that Arose Before the Petition Date* | As adequate protection, solely to the extent of any diminution of asserted interest in the Prepetition Collateral (as defined below) resulting from the subordination of the Prepetition Liens to the DIP Liens and the Carve Out, the Prepetition Secured Parties will receive adequate protection, including | Interim Order ¶ 13 |

16

| | | |
|---|---|---|
| | the following Adequate Protections Liens, and Adequate Protection Superpriority Claims:<br><br>(i)   continuing valid, binding, enforceable and perfected postpetition replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the Carve Out, and the DIP Liens (the "**Adequate Protection Liens**") and which (a) shall otherwise be senior to all other security interests in, liens on, or claims against the Prepetition Collateral (as defined below), and (b) shall not otherwise be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the chapter 11 cases or any successor case and shall be valid and enforceable against any trustee appointed in the chapter 11 cases or any successor case, and shall not be subject to sections 510, 549 or 550 of the Bankruptcy Code, without waiver of any of the Debtors' or any other party's right to assert any and all challenges, causes of action, and claims against the Prepetition Secured Parties.<br><br>(ii) subject and junior to the Carve Out, and the DIP Liens, the DIP Superpriority Claims, and the indefeasible repayment in full in cash of all DIP Obligations, immediately upon entry of this Interim Order, the Prepetition Secured Parties are to be granted pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, allowed superpriority administrative expense claims (the "**Adequate Protection Superpriority Claims**") in the chapter 11 cases and any successor case. | |
| *(iii) Determination of the Validity, Enforceability, Priority, or Amount of a Secured Claim* | This Motion and DIP Term Sheet do not address such provisions with respect to the Prepetition Secured Parties. | DIP Term Sheet, §3<br><br>Interim Order ¶ 3 |

| | | |
|---|---|---|
| *that Arose Before the Petition Date* | The Interim Order shall provide that the pre-petition Roll Up Loans of the DIP Lender shall be converted to DIP Loans under the DIP Documents. | |
| *(iv) Waiver or Modification of the Automatic Stay* | The Final Order shall include terms and conditions customary for final DIP financing orders and shall be reasonably acceptable to the DIP Lender, including, without limitation, waiver of the automatic stay. | DIP Term Sheet, §28 |
| *(v) Waiver of Right Regarding Filing of Plan and/or to Request Authority to Obtain Credit from Others* | As mentioned above, an Event of Default shall include: entry of an order without the express written consent of the DIP Lender obtaining additional financing from a party other than the DIP Lender under section 364(d) of the Bankruptcy Code except if such financing provides for the Payment in full of the DIP Obligations. | DIP Term Sheet, §25 |
| *(vi) Plan Related Deadlines* | This Motion and DIP Term Sheet do not address such provisions. | |
| *(vii) Waiver Relating to Non-bankruptcy Law* | The Interim Order and Final Order shall include terms and conditions customary for final DIP financing orders and shall be reasonably acceptable to the DIP Lender, including, "no marshaling" provisions and other similar doctrines. | DIP Term Sheet, §22; §28<br><br>Interim Order ¶ 31 |
| *(viii) Release, Waiver, or Limitation on any Claim or Cause of Action Belonging to the Estate* | The DIP Orders shall include a customary release of the DIP Lender, with respect to any and all claims and causes of action arising from or related to the DIP Facility. | DIP Term Sheet, § 27 |
| *(ix) Indemnification of Any Entity* | The DIP Documents shall contain customary indemnification provisions for the benefit of the DIP Lender, and its related parties, including, without limitation, indemnification against losses, claims, damages, liabilities or expenses incurred in respect | DIP Term Sheet, § 26 |

| | | |
|---|---|---|
| | of the financing contemplated by the DIP Documents or the use or the proposed use of proceeds thereof. | |
| *(x) Release, Waiver or Limitation on Rights under Section 506(c)* | The Interim Order and Final Order shall include terms and conditions customary for final DIP financing orders and shall be reasonably acceptable to the DIP Lender, including, waivers of the imposition of costs or right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, in each case, to the extent applicable. | DIP Term Sheet, §22; §28<br><br>Interim Order ¶ 31 |
| *(xi) Liens Granted on Claims Arising Under Chapter 5* | Effective upon entry of the Final Order, DIP Collateral shall include all Avoidance Actions, including any claims and causes of actions arising under sections 544, 545, 547, 548, and 550 of the Bankruptcy Code and similar such claims and causes of action under applicable non-bankruptcy law, and the proceeds thereof.<br><br>Effective upon entry of the Interim Order, DIP Collateral shall include all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and any proceeds thereof. | DIP Term Sheet, §12<br><br>Interim Order ¶ 5 |

## STATEMENT UNDER MLBR 4001-2

29.    The following provisions set forth additional information required to be disclosed pursuant to MLBR 4001-2(a), as applicable, to the extent not already set forth above:

(a)    <u>Loan Funding Amount</u>: See Paragraph 26 above.

(b)    <u>Use of Funds</u>: See Paragraph 26 above.

(c)    <u>Proposed Budget for Use of Funds</u>: See Paragraph 26 above. The Debtors' Initial DIP Budget is attached hereto as **<u>Exhibit C</u>**.

(d)    <u>Pricing and Economic Terms</u>: See Paragraph 26 above.

(e)      Adequacy of Budget to Pay Administrative Expenses: The liens and security interests in the DIP Collateral shall be subject to a certain Carve Out for professional fees of the Debtors' counsel and creditors' committee (if appointed). *See* DIP Term Sheet, §24; Interim Order ¶ 24.

(f)      Prepetition Secured Creditors with Interests in Collateral: See Paragraph 19 above.

(g)      Value of Collateral Securing Prepetition Creditors' Interests: As discussed above, the Debtors' assets are primarily (i) commercial inventory related to goods in process for the Debtors' product (held among three different suppliers), which has a book value of $1,348,475.00, but without corresponding intellectual property rights and financial obligations to maintain the peptide is LIKELY worth significantly less than its book value; and (ii) certain intellectual property assets, some expiring in two years; the other requiring further payment, development, prosecution and investment to maintain. Moreover, to optimize value, both the inventory and the intellectual property require preservation of the Debtors' license which will terminate without adequate funding as proposed herein.

(h)      Adequate Protection to the Pre-petition Secured Creditors: See Paragraph 27 above.

(i)      Choice of Law Provision: The DIP Term Sheet and DIP Documents shall be governed by the Bankruptcy Code and, to the extent not preempted thereby, New York state law. *See* DIP Term Sheet, §30; Interim Order ¶ 5.

30.      Pursuant to MLBR 4001-2(d), the unenforceable provisions under MLBR 4001-2(c) contained in the DIP Term Sheet or the Interim Order are highlighted in the DIP Term Sheet and/or the Interim Order.  The DIP Term Sheet and/or  Interim Order provide where such terms and conditions vary from the requirements of MLBR 4001-2(c).

## **RELIEF REQUESTED**

31.      By this Motion, the Debtors seek entry of the DIP Orders granting, among other things, the following relief:

(i)      Authorizing the DIP Loans pursuant to the DIP Facility subject to the terms and conditions set forth in the DIP Term Sheet, of which $900,000.00 will be available upon entry of the Interim Order (the "**Initial Draws**"), with the remainder to be available subject to and following entry of the Final Order.

(ii)      Authorizing the Debtors to execute, deliver, and perform under the DIP Term Sheet, the DIP Orders, and all other related agreements and documents creating, evidencing,

or securing indebtedness or obligations of any of the Debtors to the DIP Lender on account of the DIP Facility or granting or perfecting liens or security interests by any of the Debtors in favor of and for the benefit of the DIP Lender, on account of the DIP Facility, as the same now exists or may hereafter be amended, modified, or supplemented (collectively, the "**DIP Documents**").

(iii)    Authorizing the Debtors to pay fees and reimburse expenses under the DIP Documents, and perform such other and further acts as required in connection with the DIP Documents.

(iv)    Granting to the DIP Lender, and authorizing the Debtors to incur valid, binding, enforceable, non-avoidable, and automatically and properly and fully perfected DIP Liens in all DIP Collateral pursuant to sections 364(c)(2), (c)(3), and priming liens pursuant to section 364(d), to secure the DIP Loans and all obligations and indebtedness of any of the Debtors to the DIP Lender under the DIP Documents (collectively, the "**DIP Obligations**"), which DIP Obligations shall be subject and subordinate only to the Carve Out, as provided for in the Interim Order (the "**Carve Out**").

(v)    Granting to the DIP Lender, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code against each of the Debtors in respect of all DIP Obligations.

(vi)    Granting automatically perfected liens, security interests and other adequate protection to the Prepetition Secured Parties for any diminution in value of their respective interests in the applicable assets of the Debtors to the extent set forth under the Prepetition Credit Documents or such applicable law (all such assets, the "**Prepetition Collateral**"), including all property constituting "cash collateral," as defined in section 363(a) of the Bankruptcy Code ("**Cash Collateral**").

(vii)    Subject to entry of the Final Order, except to the extent of the Carve Out, waiving all rights to surcharge any DIP Collateral or Prepetition Collateral under sections 506(c) or 552(b) of the Bankruptcy Code or any other applicable principle of equity.

(viii)    Subject to entry of the Final Order, waiving the equitable doctrine of "marshaling" and other similar doctrines with respect to (a) the DIP Collateral for the benefit of any party other than the DIP Lender and (b) the Prepetition Collateral for the benefit of any party other than the Prepetition Secured Parties.

(ix)    Vacating and modifying the automatic stay of section 362 of the Bankruptcy Code to the extent provided to permit the parties to implement and effectuate the terms and provisions of the DIP Orders and the DIP Documents and to deliver any notices of termination described below and as further set forth herein.

(x)     Scheduling the Final Hearing of the entry of the Interim Order and approving notice with respect thereto in accordance with Bankruptcy Rule 4001(c)(2).

**<u>BASIS FOR RELIEF</u>**

32.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses, as specified in section 503(b) or 507(b) of the Bankruptcy Code, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c).

33.     In addition, pursuant to section 364(d) of the Bankruptcy Code, a court may authorize a debtor to obtain postpetition credit secured by a lien that is equal or senior in priority to existing liens on encumbered property (*i.e.*, a "priming" lien) when a debtor is unable to obtain credit on other terms and the interests of existing lienholders are adequately protected, or if the existing lienholders consent to such priming.

34.     Under sections 364(c) and (d) of the Bankruptcy Code, courts have considered the following factors in determining whether to approve such post-petition financing:

(i) That the proposed financing is an exercise of sound and reasonable business judgment.

(ii) That the financing is in the best interests of the estate and its creditors.

(iii) That the credit transaction is necessary to preserve the assets of the estate, and is necessary, essential, and appropriate for the continued operation of the debtors' business.

(iv) That the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

(v) That the financing agreement was negotiated in good faith and at arm's length between the Debtors, on the one hand, and the Agents and the Lenders, on the other hand.

(vi) That no alternative financing is available on any other basis.

In re Farmland Indus., Inc., 294 B.R. 855, 879-881 (Bankr. W.D. Mo.  2003).

## A.  Exercise of Business Judgment

35.     Entry into agreement for post-petition financing is an exercise of a debtor's business sound and reasonable business judgment.  The Court should authorize the Debtors, in an exercise of their sound business judgment, to enter into the DIP Documents and obtain access to the DIP Facility.

36.     If an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts give debtors considerable deference in acting in accordance with their sound business judgment in obtaining postpetition credit.  Courts presume that debtors make financing decisions on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company, and will not "second-guess a business decision, so long as corporate management exercised a minimum level of care in arriving of the decision."  In re Los Angeles Dodgers LLC, 457 B.R. 308, 313 (Bankr. D. Del. 2011).

37.     The business judgment standard as a flexible one, which will be satisfied if a debtor articulates a business justification and the decision furthers the interests of the Debtors and other parties in interest.  See, ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.), 650 F.3d 593, 601 (5th Cir. 2011) (in the context of section 363 of the Bankruptcy Code).  To determine whether the business judgment test is met, "the court is required to examine whether a reasonable business person would make a similar decision under similar circumstances."  In re Dura Auto. Sys. Inc.,

2007 Bankr. LEXIS 2864, 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted) (order authorizing sale of assets).

38.     While the bankruptcy court maintains a significant amount of discretion regarding whether to approve the use of debtor-in-possession financing, courts grant debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit.  See In re Estrada, 2016 Bankr. LEXIS 573, 2016 WL 745536, at *3 (Bankr. S.D. Tex. Feb. 24, 2016) ("In determining whether to approve a motion to obtain credit, courts generally permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties."); In re Barbara K. Enters., Inc., 2008 Bankr. LEXIS 1917, 2008 WL 2439649, at *40 (Bankr. S.D.N.Y. June 16, 2008) (courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

39.     The Debtors negotiated the DIP Documents with the DIP Lender in good faith, and at arm's length.  The Debtors believe that they have obtained the best financing available in an amount sufficient to fund operations and the costs of these chapter 11 cases, and on reasonable terms. Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

**B.  Unable to Obtain Alternative Financing**

40.     The Debtors had been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b), or in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1).  The Debtors did not receive any other formal offer for postpetition financing or other financial accommodations from any alternative prospective lender on more favorable terms and conditions than those for which approval is sought herein.

41.     Prepetition, the Debtors considered other sources of potential funding as discussed in the Norchi Affidavit.  No financing party was willing to provide adequate financing with certainty and/or without contingencies that could compromise  the value of the Debtors or their fiduciary obligations by conditioning the funding component to a non-competitive sales transaction of the assets.

42.     The Debtors were unable to find alternative financing that preserved the Debtors as going-concern operations.  Accordingly, the Debtors focused their efforts on negotiating the terms and provisions of the DIP Facility.  The DIP Term Sheet is the sole financing proposal that would allow the Debtors to continue their going-concern operations for any reasonable period of time after the Petition Date without restraints of a lock-up an insufficient funding amount and/or methodologies lacking in clarification.

43.     The DIP Facility is the product of good-faith, arm's-length negotiations among the Debtors and the DIP Lender.  The Debtors actively negotiated the terms and provisions of the DIP Facility leading up to the Petition Date, including on material terms of the proposed financing, ultimately resulting in the deal embodied in the DIP Term Sheet.

44.    Section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien.  In re Ames, 115 B.R. at 37; In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) (to show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without the senior lien."); In re 495 Central Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most banks lend money only in return for a senior secured position").  See also, In re Reading Tube Indus., 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) (given the "time is of the essence" nature of this type of financing, we would not require this or any debtor to contact a seemingly infinite number of possible lenders).

45.    Based on negotiations among the parties, the Debtors respectfully submit that the DIP Facility represents the best financing option reasonably available to the Debtors under the current circumstances.  The claim priority, liens, and other protections to be granted to the DIP Lender pursuant to the DIP Facility, were essential features of the facility, without which the DIP Lender would not have committed to provide funding for the Debtors.

46.    The Debtors submit that the circumstances of this case require the Debtors to obtain financing pursuant to sections 364(c)(2) and (3), and section 364(d) of the Bankruptcy Code.

**C.  Pre-petition Secured Creditors Are Adequately Protected**

47.    Section 364(d)(1) requires that a debtor provides some form of adequate protection to the holder of existing liens when the debtor seeks post-petition financing on a priming basis.

In re Seven Falls, LLC, 2010 Bankr. LEXIS 5228, *18 (Bankr. W.D.N.C. July 6, 2010) (citing to In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986)).   While bankruptcy courts have recognized the importance of protecting a secured creditor's interest, no brightline test exists to define the term "adequate protection."  In re Seven Falls, LLC, 2010 Bankr. LEXIS 5228, at *19 (referring to examples of how a secured creditor may be adequately protected under section 361 of the Bankruptcy Code).

48.     The Prepetition Secured Creditors' interests in the Prepetition Collateral will be enhanced through the use of the DIP Facility by the Debtors, preserving the enterprise value of the business and the value of the Debtors' assets while the Debtors pursue a sale through the bankruptcy process.

49.     Also, the Debtors are offering their Prepetition Secured Creditors adequate protection in the form of replacement liens on all assets of the Debtors (subject and subordinate to the Carve Out, and the DIP Liens).  Further, the Prepetition Secured Creditors are expected to have significantly higher recoveries if the Debtors gain access to the DIP Facility and through an open competitive bidding process.

50.     The DIP Facility provides the Debtors with the funding required to pay necessary expenses discussed herein while they pursue a value-maximizing sale transaction.  In the absence of this financing, the Debtors would not have the option to pursue a planned sale transaction.  The preservation, maintenance, and enhancement of the going-concern value of the Debtors that will result from the DIP Facility will enable the Debtors to proceed with the bankruptcy sale process and will inure to the benefit of the Prepetition Secured Parties and the Debtors' estates.

51.     Priming the Prepetition Secured Parties is appropriate under the circumstances because the Debtors' operations have no better alternative in the absence of the DIP Facility.

**D.  <u>The DIP Financing is Necessary and in the Best Interest of Estate</u>**

52.     Approval of the DIP Facility is necessary, essential, and appropriate for the preservation of the Debtors' estates.  The DIP Loans will enable the Debtors to maintain and preserve their assets while preparing for a bankruptcy sale intended for the benefit of the estates and all their creditors.

53.     As set out above, the Debtors were unable to procure adequate and sufficient financing in the form of unsecured credit, which would be allowable under section 503(b)(1) or as an administrative expense, in accordance with sections 364(a) or (b) of the Bankruptcy Code. *See* 11 U.S.C. §§ 364(a)–(b).

54.     Approval of the DIP Facility will provide the Debtors with immediate and ongoing access to borrowing availability to avoid harm to the Debtors' estates and erosion of the enterprise value of the Debtors' business.  As discussed herein, the Debtors do not have sufficient available sources of working capital to continue to operate and preserve their value in the absence of the DIP Facility as the Debtors will be unable to pay necessary expenses as set forth herein and as provided in the Initial DIP Budget.  Unless the Debtors have immediate access to such additional funds, the going concern value of the Debtors' business would likely be depleted.

55.     The terms of the DIP Loans are reasonable under the circumstances and provide for financing on terms that are likely comparable to other DIP facilities and generally consistent with market terms for companies facing similar critically economic circumstances as the Debtors.  Also, the DIP Facility was negotiated at arm's length and in good faith.

56.     Accordingly, the Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.

### E.  Other Aspects of the DIP Funding

57.     Milestones. The DIP Term Sheet contains certain Milestones that the Debtors must meet throughout these chapter 11 cases.  The Milestones were negotiated by the Debtors and the DIP Lender as a condition to providing the DIP Facility and are the result of good-faith and arm's-length negotiations between the Debtors and the DIP Lender.  The Milestones provide the Debtors with sufficient time to effectuate the contemplated sale transactions while balancing the need for an expeditious resolution of these chapter 11 cases.

58.     Economic Terms. The claim priority, liens, and other protections include the waiver of section 506(c), waiver of marshalling, and granting of liens on Avoidance Actions (as defined in the Interim DIP Order) and the proceeds thereof upon entry of the Final Order. The Debtors have also agreed to pay certain interest and fees in connection with the DIP Facility, which are integral to the DIP Facility financing package.

59.     The DIP Facility and the accompanying economic terms were the product of good-faith, arm's-length negotiations among the Debtors and the DIP Lender.  Such economic terms are essential features of the DIP Facility without which the DIP Lender would not have committed to provide funding for the Debtors.  Under the circumstances, the Debtors did not and could not obtain more favorable funding terms despite repeated efforts with other potential lenders and/or acquirers.  The Debtors believe that authorization to pay the fees is warranted.

60.     <u>Scope of Carve Out</u>. The DIP Liens and the DIP Superpriority Claims, and the Adequate Protection Claims and Adequate Protection Liens are subject to the Carve Out.  Without the Carve Out, the Debtors' estates or other parties in interest could be irreparably harmed because the services that professionals might otherwise provide in these chapter 11 cases could be restricted. <u>See</u> <u>In re Ames Dep't Stores</u>, 115 B.R. at 38 (observing that courts insist on Carve Outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Also, the Carve Out protects against administrative insolvency during the pendency of the chapter 11 cases by ensuring that funds are available to pay U.S. Trustee's fees and professional fees of the Debtors and any creditors' committee (if appointed).

61.     <u>Modification of the Automatic Stay</u>. The relief requested herein contemplates a modification of the automatic stay to the extent necessary to permit the DIP Lender to exercise all rights and remedies, and to take certain actions without further order of or application to the Court, upon the occurrence of a DIP Termination Event (as defined in the Interim Order).  Upon the occurrence of a DIP Termination Event, the DIP Lender may: (a) deliver a written notice, as further described in the Interim Order; (b) declare the termination, reduction or restriction of any commitments under the DIP Facility (including the DIP Commitment) to the extent any such commitment remains; (c) declare all DIP Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtors; (d) declare the termination, restriction or reduction of the DIP Facility and the DIP Term Sheet as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims, or the DIP Obligations; (e) charge default interest at the default rate

set forth in the DIP Term Sheet; and (f) declare the termination, restriction, or revocation of the ability of the Debtors to use Cash Collateral, if applicable.

62.     These provisions were part of the negotiations over the terms and conditions of the DIP Facility.  Notably, the exercise of remedies (including remedies with respect to prepetition claims and collateral) will be subject to five days' notice (or otherwise extended by the Court) to allow the Debtors to seek other relief.  Under these circumstances, the Debtors believe that the extent of the modifications to the automatic stay under the Interim Order is reasonable and should be approved.

**F.   Good Faith Requirement.**

63.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its rights with respect to liens securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section 364 of the Bankruptcy Code to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

64.     The Debtors and the DIP Lender have engaged in arms'-length negotiations with respect to the terms and conditions of the DIP Facility, and no alternative financing is available on equal or better terms.  As discussed above, with respect to this factor, a debtor need only

demonstrate that it made a "reasonable effort" to obtain alternative financing.  In re Ames Dep't

Stores, 115 B.R. at 40.

65.     The DIP Lender and the Debtors believe that negotiations of the DIP Facility were

conducted in good faith and at arm's length.  The proceeds of the DIP Facility will be used only

for purposes that are permissible under the Bankruptcy Code.  Accordingly, the Court should find

that the DIP Lender a "good faith" lender within the meaning of section 364(e) of the Bankruptcy

Code, and therefore entitled to all of the protections afforded by that section.

**G.  Use of Cash Collateral**

66.     The Debtors' use of property of their estates, including the Cash Collateral, is

governed by section 363 of the Bankruptcy Code, which provides:

> The trustee may not use, sell, or lease cash collateral…unless—
>
> A.    Each entity that has an interest in such cash collateral consents; or
>
> B.    The court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Furthermore, section 363(e) provides that "on request of an entity that

has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with

or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide

adequate protection of such interest."  11 U.S.C. § 363(e).

67.     Here, the DIP Lender has consented to the use of Cash Collateral, to the extent

applicable.  The Debtors have satisfied the standards of section 363(c)(2) of the Bankruptcy

Code.  Also, the Debtors intend to provide the Prepetition Secured Parties with certain forms of

adequate protection to compensate for any postpetition diminution in value of their interests on

Prepetition Collateral.  The Debtors submit that the proposed adequate protection will be (a) fair

and reasonable, (b) necessary to satisfy the requirements of sections 363(c)(2) and 363(e) of the

Bankruptcy Code, and (c) in the best interests of the Debtors and their estates.

## **INTERIM APPROVAL**

68.     The Debtors request expedited determination for this Motion pursuant to

Bankruptcy Rule 4001(c),[8] which provides as follows:

> *(A) Preliminary and Final Hearings.* The court may begin a final hearing on the motion
> no earlier than 14 days after it has been served. If the motion so requests, the court may
> conduct a preliminary hearing before that 14-day period ends. After a preliminary hearing,
> the court may authorize obtaining credit only to the extent necessary to avoid ***immediate
> and irreparable harm*** to the estate pending a final hearing.

Bankruptcy Rule 4001(c)(2). Also, under MLBR 4001-2(e)(2), the Court may conduct a

preliminary hearing, pending a final hearing, on DIP financing motions such as this one to the

extent necessary to avoid immediate and irreparable harm.

69.     The Court is empowered to conduct a preliminary expedited hearing with respect

to this Motion and authorize the obtaining of credit to the extent necessary to avoid immediate

and irreparable harm to the Debtors' estates pending a final hearing for the reasons discussed

herein.

70.     In examining requests for interim relief, courts generally apply the same business

judgment standard applicable to other business decisions.  Here, the Debtors and their estates will

suffer immediate and irreparable harm, including lack of qualified personnel if the interim relief

requested herein is not granted during the first 7 days of these chapter 11 cases.

_____

[8] Reference is also made to Bankruptcy Rule 6003 which empowers a court to grant relief within the first 21 days
after the commencement of a chapter 11 case if "needed to avoid immediate and irreparable harm" with respect to
the "use…property of the estate," or to "incur any other obligation regarding the property of the estate."  This rule
does not apply to a motion under Rule 4001.

71.     Approval of the DIP Facility will not only provide critical, essential and timely funding, but should provide the Debtors with sufficient liquidity to execute a sale of their businesses at their highest enterprise value and to the benefit of all key stakeholders and creditors by preserving and maximizing the Debtors' going-concern value.  Accordingly, the Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 4001 and request that the Court approve the relief requested in this Motion on an expedited basis.

## WAIVER OF BANKRUPTCY RULE 6004

72.     To implement the foregoing successfully, to the extent applicable, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

73.     Nothing contained herein or any action taken pursuant to relief requested is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim or interest under applicable law or nonbankruptcy law; (c) a promise or requirement to pay any claim; (d) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (e) a request for or granting of approval for assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code; or (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's

order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute such claim.

## NOTICE

74.     The Debtors will provide notice of the filing of the Motion to: (i) the Office of the united States Trustee for the District of Massachusetts, (ii) the DIP Lender, (iii) the Prepetition Secured Creditors, (iv) the Debtors' 20 largest unsecured creditors, (v) governmental authorities, (vi) any party requesting notice of all pleadings pursuant to Bankruptcy Rule 2002, and (vii) any other parties designated in the service list by the Debtors to receive notice.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is required.

**WHEREFORE**, the Debtors respectfully request entry of the Interim Order, and pending a final hearing, the Final Order, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

ARCH THERAPEUTICS, INC.
ARCH BIOSURGERY, INC.

By proposed bankruptcy counsel,

/s/ Alan L. Braunstein
Alan L. Braunstein (BBO #546042)
RIEMER & BRAUNSTEIN LLP
100 Cambridge Street
Boston, Massachusetts 02114
Tel: (617) 523-9000
Email: abraunstein@riemerlaw.com

DATED: April 18, 2025

<u>Exhibit A</u>

[Proposed Interim Order]

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re: | Chapter 11 |
| ARCH THERAPEUTICS, INC., *et al.*,[1] | Case No. 25-40409 |
| Debtors. | Jointly Administered |

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) OBTAIN
POSTPETITION SECURED FINANCING PURSUANT TO SECTION 364 OF
THE BANKRUPTCY CODE, (B) USE CASH COLLATERAL, (II) GRANTING
LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
(III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING THE
AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING,
AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of Arch Therapeutics, Inc. and Arch Biosurgery, Inc., as

debtors and debtors in possession (collectively, the "Debtors") in their chapter 11 cases (the

"Chapter 11 Cases"), pursuant to sections 105, 361, 362(d), 363(c), 364(c)(1), 364(c)(2), 364(c)(3),

364(d)(1), 503(b), 506, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the

"Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and MLBR 4001-2 and 9013-1, the Debtors are seeking entry

of an interim order (together with all exhibits hereto, this "Interim Order") that, among other

things:

      i.      authorizes the Debtors, jointly and severally, to obtain a non-amortizing priming
super-priority senior secured postpetition credit facility ("DIP Facility," and the
loans issued thereunder, the "DIP Loans") in an aggregate principal amount of up
to $2,000,000 (the "DIP Commitment") of which, upon entry of this Interim Order
and satisfaction or waiver of the borrowing conditions set forth in the DIP Term
Sheet (as defined below) and this Interim Order, $900,000 (the "Interim Amount")
shall be made available to the Debtors and may be drawn in one or more draws (in
an aggregate minimum amount of $100,000 or multiples thereof), and the
remainder of the DIP Commitment will, subject to and upon the date of entry of the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, as applicable are: Arch Therapeutics, Inc. (4102) and Arch Biosurgery, Inc. (5710).

Final Order (as defined below), be available through additional draws, in each case subject to the terms and conditions set forth in the DIP Term Sheet or, as applicable, a Debtor-in-Possession Loan and Security Agreement (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement" and, together with any ancillary, collateral or related documents and agreements, including this Interim Order, the "DIP Documents"),[2] among the Debtors, as Borrowers, and Vivex Biologics, Inc. or its designees or assignees, as Lender (the "DIP Lender"), which DIP Credit Agreement shall be consistent with the terms set forth in the attached Debtor-in-Possession Term Loan Facility Summary of Terms and Conditions attached hereto as Exhibit 1 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and this Interim Order, the "DIP Term Sheet");[3]

ii.    approves the terms of the DIP Term Sheet, and authorizes the Debtors to execute, deliver, and perform under the DIP Term Sheet and any other DIP Documents;

iii.   authorizes the Debtors, on an interim basis, to issue, incur, and guarantee all loans, notes, advances, extensions of credit, financial accommodations, reimbursement obligations, fees and premiums (including the Commitment Fee, the Exit Fee, and any other fees payable pursuant to the DIP Term Sheet), and all other obligations due or payable to or for the benefit of the DIP Lender under the DIP Term Sheet and the other DIP Documents (collectively, the "DIP Obligations"), and to perform such other acts as may be required or appropriate in connection therewith;

iv.    authorizes and directs the Debtors, on an interim basis, to use the proceeds of the DIP Facility and the Cash Collateral (as defined below) solely in accordance with the DIP Term Sheet and this Interim Order to (a) fund the postpetition working capital needs of the Debtors pending the Final Hearing (as defined below); (b) pay fees, costs and expenses of the DIP Facility on the terms and conditions described in this Interim Order and the DIP Term Sheet; and (c) pay the allowed administrative costs and expenses of the Chapter 11 Cases, in each case, solely in accordance with the DIP Term Sheet, the Initial DIP Budget (as defined below), and this Interim Order;

v.     authorizes the Debtors to grant to the DIP Lender, on an interim basis, valid, enforceable, non-avoidable, and automatically and fully perfected and priming security interests, liens, and superpriority claims, including (a) allowed superpriority administrative expense claims pursuant to sections 364(c)(1) of the Bankruptcy Code, subject only to the Carve Out (as defined below), and (b) liens in the DIP Collateral (as defined below) and all proceeds thereof, including, without limitation, all property constituting "cash collateral," as defined in section 363(a) of the Bankruptcy Code, ("Cash Collateral"), pursuant to sections 364(c)(2),

---

[2] Capitalized terms used but not otherwise defined herein have the meaning set forth in the Motion or the DIP Term Sheet, as applicable.

[3] References to the "DIP Term Sheet" herein shall be construed to encompass the other DIP Documents, if any, that the DIP Lender and the Debtors execute, deliver, or otherwise enter into before the entry of the Final Order.

364(c)(3), and 364(d)(1) of the Bankruptcy Code, to secure all DIP Obligations, subject only to the Carve Out;

vi.    authorizes the Debtors to grant to the Prepetition Secured Parties (as defined below), as adequate protection of their respective interest in the Prepetition Collateral (as defined below), valid, enforceable, non-avoidable, and automatically and fully perfected security interests and replacement liens in the DIP Collateral and allowed superpriority administrative expense claims pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, solely to the extent of any Diminution (as defined below) of the Prepetition Secured Parties' respective interest in the Prepetition Collateral, as more fully set forth in this Interim Order, subject and subordinate only to the Carve Out, the DIP Liens (as defined below), and DIP Superpriority Claims (as defined below), without waiver of the Debtors' right to assert any and all challenges, causes of action, and claims against the Prepetition Secured Parties;

vii.    authorizes the DIP Lender to take all commercially reasonable actions to implement and effectuate the terms of this Interim Order and the DIP Term Sheet;

viii.    authorizes payment of the DIP Fees (as defined below) at the times and in the amounts set forth in the DIP Term Sheet;

ix.    upon entry of the Final Order, a waiver of (a) the Debtors' right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise; and (b) the equitable doctrine of "marshaling" and other similar doctrines with respect to any DIP Collateral;

x.    modifies the automatic stay imposed by section 362(a) of the Bankruptcy Code to the extent set forth herein and as necessary to permit the Debtors and the DIP Lender to implement and effectuate the terms and provisions of the DIP Term Sheet and this Interim Order, and authorizes the DIP Lender, upon the occurrence and continuation of an Event of Default (as set forth herein and in the DIP Term Sheet, including section 25 thereof), to deliver any notices and exercise rights and remedies, as contemplated in this Interim Order and the DIP Term Sheet;

xi.    waives any applicable stay (including under Bankruptcy Rule 6004) and provides for immediate effectiveness of this Interim Order; and

xii.    schedules a final hearing (the "Final Hearing") to consider final approval of the DIP Facility pursuant to a proposed final order (the "Final Order"), as set forth in the Motion and the DIP Term Sheet.

This Court, having considered the relief requested in the Motion, the exhibits attached thereto, the Norchi Declaration (as defined in the Motion), the DIP Term Sheet, the other papers filed with this Court, the evidence submitted and arguments made at the interim hearing held before

this Court on April [ __ ], 2025 (the "Interim Hearing"); and due and sufficient notice of the Interim

Hearing having been given in accordance with Bankruptcy Rules 2002 and 4001(b), (c), and (d)

and all applicable local rules of the United States Bankruptcy Court for the District of

Massachusetts (the "Local Rules"); and the Interim Hearing having been held and concluded; and

all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved,

or overruled by the Court; and it appearing that the interim relief requested in the Motion is fair

and reasonable and in the best interests of the Debtors and their estates, necessary to avoid

immediate and irreparable harm to the Debtors and their estates, and essential for the continued

operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and

it appearing that the Debtors' entry into the DIP Term Sheet and the other DIP Documents is a

sound and prudent exercise of the Debtors' business judgment; and after due deliberation and

consideration, and good and sufficient cause appearing therefor,

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND
CONCLUSIONS OF LAW BASED UPON THE MOTION, THE REPRESENTATIONS OF
COUNSEL AND THE EVIDENCE SUBMITTED DURING THE HEARING:[4]**

a.    **Petition Date**.  Commencing on April 18, 2025 (the "Petition Date"), each of the

Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court,

commencing these Chapter 11 Cases.

---

[4]  The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant
to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014, and shall take effect
and be fully enforceable nunc pro tunc to the Petition Date immediately upon entry hereof.  To the extent that any of
the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the
following conclusions of law constitute findings of fact, they are adopted as such.

b.      **Debtors in Possession**.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of the Chapter 11 Cases.

c.      **Jurisdiction and Venue**.  The Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 201 of the *Local Rules of the United States District Court for the District of Massachusetts*.  This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

d.      **Notice**.  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Notice of the Motion has been provided in a manner sufficient under the circumstances and no other or further notice of the Motion or the entry of this Interim Order shall be required. The interim relief granted herein (and as identified in the Initial DIP Budget) is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

e.      **Committee Formation**.  As of the date hereof, the Office of the United States Trustee for Region 1 (the "United States Trustee") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Creditors' Committee").

f.      **No Credit Available on More Favorable Terms**.  Given their current financial condition, financing arrangements, and capital structure, and the circumstances of the Chapter 11 Cases as demonstrated at the Interim Hearing, the Debtors are unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility.  The Debtors are unable to procure sufficient financing in the form of unsecured credit allowable as an administrative expense.  The Debtors are also unable to obtain sufficient secured credit without (i) granting to the DIP Lender the DIP Liens and the DIP Superpriority Claims and (ii) granting the

5

Adequate Protection Liens (as defined below), in each case subject and subordinate to the Carve

Out, as set forth herein and in the DIP Term Sheet.

g.     **Good Faith**.  Based upon the papers filed and the proceedings of record in these

Chapter 11 Cases, (i) the extension of credit and financial accommodations (including the use of

Cash Collateral) under the DIP Facility, as provided by the DIP Term Sheet, are fair, reasonable,

in good faith, negotiated at arm's length, reflect the Debtors' exercise of prudent business judgment

consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair

consideration; (ii) the DIP Facility and the DIP Loans thereunder are being provided by the DIP

Lender in "good faith" within the meaning of section 364(e) of the Bankruptcy Code in express

reliance on the protections offered thereby; (iii) the liens, claims, and other covenants and

payments as set forth in the DIP Term Sheet or this Interim Order, as well as the protections

afforded parties acting in "good faith" under section 364(e) of the Bankruptcy Code are integral,

critical and essential components of the DIP Facility provided by the DIP Lender to the Debtors;

and (iv) the DIP Facility, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection

Liens, and the Adequate Protection Superpriority Claims shall be entitled to the full protection of

section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof

is vacated, reversed, or modified, on appeal or otherwise.

h.     **Good Cause**.  Good cause has been shown for the entry of this Interim Order, and

the entry of this Interim Order is in the best interests of the Debtors, their estates, their creditors,

and other parties in interest.  The relief requested in the Motion is in the best interest of the Debtors

and their estates.

i.     **Prepetition Bridge Loan**.  Prior to the Petition Date, the DIP Lender made a

secured bridge loan in the aggregate principal amount of $120,476 to the Debtors (the "**Roll Up**

6

Loans"), the proceeds of which were used by the Debtors to fund payments to their legal counsel in respect of fees and to pay other obligations.

j.     **Need for Postpetition Financing and Use of Cash Collateral**.  The Debtors do not have sufficient and reliable sources of working capital to continue to operate their business in the ordinary course without the financing requested in the Motion.  The financing provided pursuant to this Interim Order and the DIP Term Sheet and the authority to use Cash Collateral granted herein will permit the Debtors to, among other things, (i) pay the fees, costs, and expenses incurred in connection with the Chapter 11 Cases; (ii) fund any obligations benefiting from the Carve Out; (iii) continue the orderly continuation of the operation of their businesses; (iv) maintain business relationships with customers, vendors, and suppliers; (v) make payroll for their employees; and (vi) satisfy other working capital and operational needs.

k.     **Willingness to Provide Financing**.  The DIP Lender has committed to provide financing to the Debtors subject to: (i) entry of this Interim Order; (ii) approval of the terms and conditions of the DIP Facility, the DIP Term Sheet, and the other DIP Documents; (iii) satisfaction of the closing conditions set forth in the DIP Term Sheet; and (iv) findings by this Court that the DIP Lender is extending credit to the Debtors pursuant to this Interim Order and the DIP Term Sheet in good faith, and that the DIP Lender's claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the DIP Term Sheet will have the protections provided by section 364(e) of the Bankruptcy Code.

l.     **Priming of Prepetition Liens; Adequate Protection**.  As of the Petition Date, the Debtors were indebted to the existing secured creditors identified in Schedule 2 of the DIP Term Sheet (the "Prepetition Secured Parties") under their respective loan documents (the "Prepetition Credit Documents") or other applicable law, and such obligations were secured by liens and

7

security interests granted by the Debtors or otherwise arising under applicable law, including the "Existing Liens" identified in Schedule 2 of the DIP Term Sheet, (all such liens and security interests, the "Prepetition Liens"), on and in the assets of the Debtors to the extent set forth under the Prepetition Credit Documents or such applicable law (all such assets, the "Prepetition Collateral," and notwithstanding anything to the contrary herein or in the DIP Term Sheet, Prepetition Collateral as used herein and the DIP Term Sheet includes only the collateral that constitutes property of the Debtors' estates (as defined in section 541 of the Bankruptcy Code)). The priming of the security interests in and liens on the Prepetition Collateral and any other interests of the Debtors in property under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Term Sheet and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their business for the benefit of their estates and creditors, and the Debtors would not be able to obtain postpetition financing in a sufficient amount without granting such priming liens.  Consistent with the requirements of section 364(d) of the Bankruptcy Code, and without waiving the Debtors' or any other parties' right to assert any and all challenges, causes of action, and claims against the Prepetition Secured Parties, the Prepetition Secured Parties shall receive adequate protection as set forth in this Interim Order, pursuant to sections 361, 363, and 364 of the Bankruptcy Code, solely to the extent of any decrease in the value of its interest, if any, in the Prepetition Collateral resulting from (i) the use, sale, or lease by the Debtors of the Prepetition Collateral during the pendency of the Chapter 11 Cases; (ii) the DIP Liens and the Carve Out pursuant to this Interim Order and the DIP Term Sheet; or (iii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such actual diminution, collectively, "Diminution").

m.      **DIP Budget**.  The Debtors have prepared and delivered to the DIP Lender and its advisors an initial budget attached hereto as <u>Exhibit 2</u> (together with any additional line-item or other detail and supplements as may be provided pursuant to the terms of the DIP Term Sheet, the "<u>Initial DIP Budget</u>").  The Initial DIP Budget reflects, among other things, for the 13-week period commencing on or about the Petition Date, the Debtors' projected operating receipts, operating disbursements, non-operating disbursements, net operating cash flow and liquidity for each one-week period covered thereby.  The Initial DIP Budget may be modified, amended, extended, and updated from time to time in accordance with the DIP Term Sheet or the other DIP Documents, and such modified, amended, extended and/or updated budget, once approved (or deemed approved) by the Debtors and the DIP Lender, shall modify, replace, supplement or supersede, as applicable, the Initial DIP Budget for the periods covered thereby (the Initial DIP Budget and each subsequent approved budget shall constitute, without duplication, an "<u>Approved Budget</u>").  The Initial DIP Budget has been prepared by the Debtors and their management, and the Debtors believe that the Initial DIP Budget is reasonable under the circumstances.  The DIP Lender is relying, in part, upon the Debtors' agreement to comply with the Approved Budget (subject only to Permitted Variances) and the terms of the DIP Term Sheet in determining to enter into the DIP Facility and to consent to the use of Cash Collateral provided for in this Interim Order.

n.      **Use of Cash Collateral and Proceeds of DIP Facility**.  As a condition to the Debtors' entry into the DIP Term Sheet and the other DIP Documents and the extension of credit under the DIP Facility, including the use of Cash Collateral, the Debtors have agreed that the proceeds of the DIP Facility and Cash Collateral shall be used solely in accordance with the terms and conditions of this Interim Order, the DIP Term Sheet, and the Approved Budget (subject to Permitted Variances).  Upon entry of this Interim Order, all of the Debtors' cash, including the

9

Debtors' cash and other amounts on deposit or maintained in any banking, checking, or other deposit accounts by the Debtors, any amounts generated by the collection of accounts receivable or other disposition of the DIP Collateral or deposited into the Debtors' banking, checking, or other deposit accounts as of the Petition Date, and the proceeds of any of the foregoing, wherever located, is the DIP Lender's Cash Collateral.

o.      **Section 506(c) and Marshaling**.  As material inducement to the DIP Lender's agreement that its liens and superiority claims shall be subject to payment of the Carve Out, upon entry of the Final Order, the DIP Lender is entitled to (i) a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral and the DIP Obligations in favor of the DIP Lender; and (ii) a waiver of the provisions of section 506(c) of the Bankruptcy Code with respect to the DIP Collateral.

p.      **Requisite Authority**.  Subject to entry of this Interim Order, each Debtor has all requisite corporate or entity power and authority to execute and deliver the DIP Term Sheet and the other DIP Documents to which it is a party and to perform its obligations thereunder.

q.      **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).  Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed as set forth in the Norchi Declaration.  Consummation of the DIP Facility and the permitted use of Prepetition Collateral in accordance with this Interim Order and the DIP Term Sheet, are therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

NOW, THEREFORE, based upon the foregoing findings and conclusions, the Motion, and the record before this Court, and after due consideration, and this Court having found good and sufficient cause therefor,

**IT IS HEREBY ORDERED THAT:**

1.      **Motion Granted**.  The relief sought in the Motion is GRANTED on an interim basis as set forth herein. Entry into the DIP Term Sheet and, as applicable, the other DIP Documents is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case, subject to the terms and conditions set forth in this Interim Order and in the DIP Term Sheet, including the Interim DIP Budget (subject to Permitted Variances). All objections to the Motion to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.

2.      **Authorization of the DIP Facility**. The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Term Sheet and the other DIP Documents (as applicable), and to incur and perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Term Sheet, and to execute, deliver, and perform (and to cause the DIP Loan Parties to execute, deliver, and perform) under all instruments, certificates, agreements, and documents which may be required or necessary for their performance under the DIP Term Sheet, and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Term Sheet.  Each of the Debtors is hereby authorized to pay any principal, interest, fees, expenses, and other amounts subject to and in accordance with the DIP Term Sheet and this Interim Order, as such amounts become due and owing, without further Court approval (except as otherwise provided herein or in the DIP Term Sheet), including, without limitation, the Commitment Fee and the Exit Fee, as well as any reasonable and documented fees and expenses of counsel to the DIP Lender, as set forth herein and in the DIP Term Sheet, subject to paragraph 26 of this Interim Order, and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order and

11

the DIP Term Sheet.  Upon execution and delivery, the DIP Term Sheet and, as applicable, the

other DIP Documents shall represent legal, valid, and binding obligations of the Debtors,

enforceable against the Debtors and their estates in accordance with their terms.  All provisions of

the DIP Term Sheet are incorporated herein and approved in their entirety.  Each officer of the

Debtors acting individually is hereby authorized to execute and deliver each of the DIP Term Sheet

and the other DIP Documents.

3.       **DIP Obligations**.  The DIP Term Sheet and this Interim Order shall constitute and

evidence the validity and binding effect of the DIP Obligations.  All DIP Obligations shall be

enforceable against the Debtors, their respective estates, and any successors thereto, including

without limitation, any trustee appointed in the Chapter 11 Cases, or in any case under chapter 7

of the Bankruptcy Code upon the conversion of the Chapter 11 Cases, or in any other proceeding

superseding or related to any of the foregoing (the "Successor Case").  Upon entry of this Interim

Order, the DIP Obligations shall include, but not be limited to, (a) the payment by the Debtors of

(i) the unpaid principal amount of and interest on the DIP Loans, as and when due, whether at

maturity, by acceleration, or otherwise, (ii) the Roll Up Loans, and (iii) all other monetary

obligations of the Debtors to the DIP Lender under the DIP Term Sheet and this Interim Order, and

(b) the payment and performance of all covenants, duties, agreements, obligations and liabilities

of the Debtors to the DIP Lender under the DIP Term Sheet and this Interim Order.  The Debtors

and their successors shall be jointly and severally liable for repayment of any funds advanced

pursuant to the DIP Term Sheet and the DIP Obligations.  The DIP Obligations shall become due

and payable, without notice or demand, on the Maturity Date (as set forth in section 7 of the DIP

Term Sheet).  No obligation, payment, transfer, or grant of collateral as security hereunder or under

the DIP Term Sheet (including any DIP Obligation or DIP Liens) to the DIP Lender shall be stayed,

restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law, or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination, claim, counterclaim, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.  **[This provision may vary from the requirements of MLBR 4001-2(c)(6).]**

4.      **Authorization to Borrow**.  The Debtors are hereby authorized to execute, deliver, enter into and, as applicable, comply with and perform all of their obligations, and to pay all fees, costs, expenses, indemnities, and other amounts contemplated, under the DIP Term Sheet (and any other DIP Documents) and to take such other and further acts as may be necessary, appropriate or desirable in connection therewith.  Upon entry of this Interim Order, the Debtors are authorized to borrow up to aggregate amount of the Interim Amount, in each case, in accordance with the DIP Term Sheet, and the DIP Obligations are hereby approved (as and when such amounts become earned, due, and payable in accordance with the DIP Term Sheet) without the need to seek further Court approval.  The borrowing of DIP Loans under this Interim Order and the DIP Term Sheet shall permanently decrease the DIP Commitment and, once repaid, the DIP Loans incurred may not be re-borrowed.

5.      **DIP Collateral**.  The term "DIP Collateral" means, collectively, each Debtor's right, title, and interest in, to and under all such Debtor's assets, including, but not limited to the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located: all assets and property of such Debtor and its estate, real or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all contracts, contract rights, licenses, general intangibles,

instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, accounts receivables, chattel paper, letters of credit and letter of credit rights, investment property (including, without limitation, all equity interests owned by such Debtor in its current and future subsidiaries), commercial tort claims, arbitration awards, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, fixtures, all interests in leaseholds and real properties, all patents, copyrights, trademarks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), together with all books and records relating to the foregoing, all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of New York) and (i) effective upon entry of the Interim Order, all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and any proceeds thereof, and (ii) effective upon entry of the Final Order, all Avoidance Actions[5] and the proceeds thereof.  **[This provision may vary from the requirements of MLBR 4001-2(c)(3).]**

6.    **Disposition of Collateral**.  Notwithstanding anything otherwise provided herein, it shall be deemed an Event of Default under the DIP Term Sheet and, as applicable, the other DIP Documents if the Debtors sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, other than in the ordinary course of business or in connection with the payments contemplated under this Interim Order or the Approved Budget (subject to the Permitted

---

[5] For the purposes of this Interim Order, "Avoidance Actions" means any and all avoidance, recovery, subordination or other claims, actions or remedies that may be brought by or on behalf of the Loan Parties or their estates or other authorized parties in interest under the Bankruptcy Code or other applicable law, including actions or remedies under sections 544, 545, 547, 548, and 550 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

14

Variances), without the prior written consent of the DIP Lender, which consent shall not unreasonably be withheld or delayed.  Notwithstanding anything otherwise provided herein, 100% of any net cash proceeds of any sale of DIP Collateral outside of the ordinary course of business shall, subject to the satisfaction of the Carve Out and the lien priorities set forth herein and in the DIP Term Sheet, be used to immediately satisfy the DIP Obligations.

7.      **DIP Liens**.  To secure the DIP Obligations, immediately upon and effective as of entry of this Interim Order, the DIP Lender is hereby granted, on an interim basis, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens on the DIP Collateral (the "<u>DIP Liens</u>") as follows, in each case subject to the Carve Out:

a.   **Liens Priming the Prepetition Liens**.  Pursuant to section 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable and automatically and fully perfected first-priority senior priming liens and security interests in all assets and interests in property of the Debtors that are subject to Prepetition Liens (including the Prepetition Collateral), regardless of where located, which senior priming liens and security interests in favor of the DIP Lender shall be senior to the Prepetition Liens; **[This provision may vary from the requirements of MLBR 4001-2(c)(7).]**

b.   **Liens on Unencumbered Property**.  Pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable, and automatically and fully perfected first-priority liens on and security interests in all DIP Collateral that is not otherwise subject to any valid, enforceable, and non-avoidable liens or security interests; and

15

c. **Liens Junior to Certain Other Liens**.  Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable, and automatically and fully perfected junior liens on and security interests in all DIP Collateral (other than as set forth in clauses 7(a) and 7(b)), junior only to the Prepetition Liens.

For the avoidance of doubt, the liens and security interests granted in paragraphs a. through c. above are only with respect to property of the Debtors' estates (as defined in section 541 of the Bankruptcy Code), which for the avoidance of doubt includes all cash, cash equivalents and receivables owned by and/or owed to the Debtors.  Other than as set forth herein or in the DIP Term Sheet, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Case, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Case, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Case. The DIP Liens shall not be subject to section 510, 549, or 550 of the Bankruptcy Code.

8.    **DIP Superpriority Claims**.  Subject to the Carve Out, immediately upon entry of this Interim Order, the DIP Lender is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in the Chapter 11 Cases and any Successor Case (collectively, the "DIP Superpriority Claims") for all DIP Obligations with priority over any and all administrative expense claims and unsecured claims against the Debtors' or their estates in the Chapter 11 Cases and any Successor Case, as provided under section 364(c)(1) of the Bankruptcy Code, and which shall be senior to the rights of the Debtors, their estates, and their successors or other representatives to the extent permitted by law.  The DIP

16

Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property and assets of the Debtors and the estates and all DIP Collateral and all proceeds thereof.

9.      **No Obligation to Extend Credit**.  The DIP Lender shall have no obligation to make any loan or advance under the DIP Term Sheet unless (a) all of the conditions precedent and other terms under the DIP Term Sheet and this Interim Order have been satisfied in full or waived by the DIP Lender (in its sole discretion), and (b) no Event of Default under the DIP Term Sheet or the other DIP Documents (including this Interim Order) has occurred and is continuing.

10.     **Use of DIP Facility Proceeds**.  The Debtors shall be permitted to use DIP Loans under the DIP Facility only for the purposes specifically set forth in this Interim Order and the DIP Term Sheet.  Notwithstanding anything herein, the extensions of credit under the DIP Facility shall not constitute Cash Collateral of the Prepetition Secured Parties.

11.     **No Monitoring Obligation**.  The DIP Lender shall not have any obligation or responsibility to monitor any Debtor's use of the DIP Facility, and the DIP Lender may rely upon each Debtor's representation that the use of the DIP Facility at any time is in accordance with the requirements of this Interim Order and the DIP Term Sheet, including the Approved Budget (subject to the Permitted Variances).

12.     **Authorization to Use Cash Collateral**.  Subject to the terms and conditions of this Interim Order and the DIP Term Sheet, and in accordance with the Approved Budget (subject to the Permitted Variances), the Debtors are authorized to use Cash Collateral until the DIP Termination Declaration Date.

13.     **Adequate Protection for Prepetition Secured Parties**.  As adequate protection:

    a.    solely to the extent of any Diminution of the Prepetition Secured Parties' asserted interest in the Prepetition Collateral resulting from the subordination of the

17

Prepetition Liens to the DIP Liens and the Carve Out, the imposition of the automatic stay, and the use, sale or lease by the Debtors of the Debtors' assets that constitute Prepetition Collateral during the pendency of these Chapter 11 Cases, the Prepetition Secured Parties shall receive:

(i)      continuing valid, binding, enforceable and perfected postpetition replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the Carve Out and the DIP Liens (the "Adequate Protection Liens") and which (a) shall otherwise be senior to all other security interests in, liens on, or claims against the DIP Collateral, and (b) shall not otherwise be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Case and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Case, and shall not be subject to sections 510, 549 or 550 of the Bankruptcy Code, without waiver of any of the Debtors' or any other party's right to assert any and all challenges, causes of action, and claims against the Prepetition Secured Parties; and

(ii)      Subject and junior to the Carve Out, the DIP Liens, the DIP Superpriority Claims, and the indefeasible repayment in full in cash of all DIP Obligations, immediately upon entry of this Interim Order, the Prepetition Secured Parties are hereby granted pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, allowed superpriority administrative

18

expense claims (the "Adequate Protection Superpriority Claims") in the

Chapter 11 Cases and any Successor Case.

b. the Debtors shall provide to the Prepetition Secured Parties the Updated Budgets

and any other reports required to be delivered to the DIP Lender hereunder at the

same time such items are provided to the DIP Lender.

14.   **Modification of DIP Term Sheet**.   The Debtors and the DIP Lender are hereby

authorized to implement, in accordance with the terms of the DIP Term Sheet any non-material

modifications of the DIP Term Sheet without further notice, motion or application to, order of or

hearing before, this Court.  Any material modification or amendment to the DIP Term Sheet shall

only be permitted pursuant to an order of this Court, after being submitted to this Court upon five

(5) days' notice to the United States Trustee and the Prepetition Secured Parties; provided that any

forbearance from, or waiver of, (a) a breach by the Debtors of a covenant representation or any

other agreement or (b) a default or an Event of Default, in each case under the DIP Term Sheet

shall not require an order of this Court.  In the event of any inconsistency between this Interim

Order and the DIP Term Sheet, this Interim Order shall control.

15.   **DIP Facility Reporting**.  Except as otherwise provided herein or approved by the

DIP Lender, the proceeds from the DIP Facility shall be used only in compliance with the terms of

the DIP Term Sheet and in accordance with the Approved Budget.  The Debtors shall comply with

the reporting requirements and obligations set forth in the DIP Term Sheet.

16.   **Perfection of DIP Liens and Adequate Protection Liens**.  This Interim Order

shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all

liens granted herein, including the DIP Liens and the Adequate Protection Liens, without the

necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other

19

instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Adequate Protection Liens or to entitle the DIP Lender and the Prepetition Secured Parties to the priorities granted herein. Notwithstanding the foregoing, the DIP Lender and the Prepetition Secured Parties are authorized, but not required, to file, as each deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens and other similar documents to perfect or otherwise evidence the DIP Liens and the Adequate Protection Liens in accordance with applicable non-bankruptcy law, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Adequate Protection Liens. The DIP Lender and the Prepetition Secured Parties may, in their respective sole discretion, file an electronic copy or photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments. To the extent that a Prepetition Secured Party is, with respect to the DIP Collateral, a secured party under any Prepetition Credit Documents or is listed as loss payee, lenders' loss payee or additional insured under any Debtor's insurance policies, the DIP Lender shall also be deemed to be the secured party or mortgagee, as applicable, under such documents or to be the loss payee or additional insured, as applicable.

17.    **Modification of Automatic Stay**.   The automatic stay of section 362 of the Bankruptcy Code is hereby modified to the extent necessary to permit the Debtors and the DIP Lender to accomplish the transactions contemplated by this Interim Order.

18.     **Proceeds of Subsequent Financing**.  If any of the Debtors, any trustee, any examiner, or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Case, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code in violation of the DIP Term Sheet or otherwise at any time prior to the indefeasible repayment in full in cash of all DIP Obligations (other than unasserted contingent obligations that expressly survive termination of the DIP Term Sheet) and the termination of the DIP Lender's obligation to extend credit under the DIP Facility, then, after satisfaction of the Carve Out, and unless otherwise agreed by the DIP Lender, all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lender to be distributed in accordance with this Interim Order and the DIP Term Sheet.

19.     **Payments Held in Trust**.  Except as expressly permitted in this Interim Order, the DIP Term Sheet, or otherwise ordered by this Court, including in respect of the Carve Out, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Term Sheet, and termination of the DIP Facility in accordance with the DIP Term Sheet, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust and shall immediately turn over such proceeds to the DIP Lender, for application in accordance with this Interim Order, the DIP Term Sheet, or the applicable DIP Documents.

20.     **Maintenance of DIP Collateral**.  Until the payment in full of the DIP Obligations, the Debtors shall: (a) insure the DIP Collateral as required under the DIP Term Sheet; and (b) maintain the cash-management system consistent with the terms and conditions of any order(s) governing the Debtors' cash-management systems and the DIP Term Sheet.

21

21.     **Right to Credit Bid**.  Subject to section 363(k) of the Bankruptcy Code, the DIP Lender may credit bid all or any portion of its claims, including, without limitation, the DIP Obligations and the DIP Superpriority Claim, in connection with any proposed sale of any, all, or substantially all of the Debtors' assets, whether occurring pursuant to section 363 of the Bankruptcy Code or included as part of a reorganization plan under section 1123 of the Bankruptcy Code, including a plan subject to confirmation under section 1129(b)(2)(A)(ii) of the Bankruptcy Code, or a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code.  In connection with any such credit bid by the DIP Lender, the Debtors shall, upon reasonable advance notice by the DIP Lender, provide for the assignment of such DIP Lender's right to purchase the acquired assets to one or more of the applicable DIP Lender's sub-agents or a newly formed acquisition vehicle.

22.     **DIP Termination Event; Exercise of Remedies**.

a.     **DIP Termination Event**.  For purposes of this Interim Order, the term "DIP Termination Event" shall mean: (i) the occurrence of the Maturity Date, (ii) the occurrence of any material breach or Event of Default under the DIP Term Sheet or this Interim Order, or (iii) the acceleration of the DIP Obligations or termination of the DIP Commitment in accordance with the terms of the DIP Term Sheet or the other DIP Documents.

b.     **Exercise of Remedies**.  Upon the occurrence of a DIP Termination Event, without further notice to, hearing of, application to, or order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to take any of the following actions, at the same or different time: (i) deliver a written notice (which

22

may be via email) to counsel for the Debtors, the United States Trustee, counsel for the Prepetition Secured Parties, and counsel for the Creditors' Committee, if appointed, (the "Remedies Notice") declaring the occurrence of a DIP Termination Event (such date, the "DIP Termination Declaration Date") and deliver a Carve Out Trigger Notice; (ii) declare the termination, reduction or restriction of any commitments under the DIP Facility (including the DIP Commitment) to the extent any such commitment remains; (iii) declare all DIP Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtors; (iv) declare the termination, restriction or reduction of the DIP Facility and the DIP Term Sheet as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims, or the DIP Obligations; (v) charge default interest at the default rate set forth in the DIP Term Sheet; and (vi) declare the termination, restriction, or revocation of the ability of the Debtors to use Cash Collateral. **[This provision may vary from the requirements of MLBR 4001-2(c)(4).]**

c.  **Waiting Period Procedures**.  The Debtors may seek an emergency hearing solely during the period beginning on the DIP Termination Declaration Date and prior to the expiration of the five (5) days following the DIP Termination Declaration Date (such period, the "Waiting Period").  If, notwithstanding the foregoing, a hearing cannot be scheduled prior to the expiration of the Waiting Period, the Waiting Period shall be deemed automatically extended until such time as the matter can be heard by the Court. At any hearing regarding a Remedies Notice, the Court may only consider whether an Event of Default has occurred or is continuing. During

23

the Waiting Period, the Debtors shall continue to have the right to use DIP Collateral (including Cash Collateral) in accordance with the terms of this DIP Order and the Approved Budget, solely to pay any expenses which are necessary to (i) preserve the Debtors' going-concern value or (ii) contest, in good faith, the occurrence of the Event of Default (other than, for the avoidance of doubt, the occurrence of the Maturity Date under the DIP Term Sheet); provided, however, that the professional fees and expenses of the Professional Persons (as defined below) shall be governed by paragraph 24 and subject to the Approved Budget.

d.   **Rights and Remedies Following Termination Date**.   Following a DIP Termination Declaration Date and unless this Court has entered an order prior to the expiration of the Waiting Period finding that an Event of Default has not occurred or is not continuing, the DIP Lender shall be entitled to exercise all rights and remedies in accordance with this Interim Order, the DIP Term Sheet, the other DIP Documents (if any), applicable law, and the automatic stay of section 362 of the Bankruptcy Code shall automatically, without further order of this Court, be lifted, to allow the DIP Lender to pursue all rights and remedies in accordance with the DIP Term Sheet, the other DIP Documents (if any), this Interim Order, and applicable law.   **[This provision may vary from the requirements of MLBR 4001-2(c)(4).]**

23.   **No Waiver by Failure to Seek Relief**.   The rights and remedies of the DIP Lender specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lender may have under this Interim Order, the DIP Term Sheet, applicable law, or otherwise.   The failure or delay on the part of the DIP Lender to seek relief or otherwise exercise its rights and remedies

24

under this Interim Order, the DIP Term Sheet, or applicable law shall not constitute a waiver of any of its respective rights.  Except as expressly set forth herein, none of the rights or remedies of the DIP Lender under this Interim Order, the DIP Term Sheet shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the DIP Lender.  No consents required hereunder by the DIP Lender shall be implied by any inaction or acquiescence by the DIP Lender.

24.    **Carve Out**.

a.    **Priority of Carve Out**.  The DIP Liens and the DIP Superpriority Claims shall be subject and subordinate to payment of the Carve Out.  The Carve Out shall be senior to all claims and liens over all assets of the Debtors, including any DIP Collateral, as set forth in the DIP Orders.

b.    **Carve Out**.  The term "Carve Out" shall mean the sum of (i) all fees required to be paid to the Clerk of the Court and to the United States Trustee under 28 U.S.C. § 1930(a), together with any interest thereon pursuant to 31 U.S.C. § 3717 ("Statutory Fees"), which shall not be subject to the Approved Budget; (ii) Court-allowed fees and expenses of a trustee appointed under section 726(b) of the Bankruptcy Code in an amount not to exceed $25,000, (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") or persons or firms retained by the Creditors' Committee (if appointed) pursuant to sections 328 or 1103 of the Bankruptcy Code (together with the Debtor Professionals, the "Professional Persons"), at any time before or on the

25

first calendar day following delivery by the DIP Lender of a Carve Out Trigger

Notice (as defined below), whether allowed by the Court prior to or after delivery

of a Carve Out Trigger Notice (the "Pre-Trigger Date Fees"), subject to the

Approved Budget and any limits by the DIP Orders, provided that Professional

Persons may carry forward budgeted but unused disbursements set forth in the

Approved Budget for any week for use in any subsequent week; and (iv) Allowed

Professional Fees of Professional Persons in an aggregate amount not to exceed

$25,000 incurred after the first calendar day following delivery by the DIP Lender

of the Carve Out Trigger Notice (the "Trigger Date"), to the extent allowed at any

time, whether by interim order, procedural order, or otherwise (the amounts set

forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"); provided,

however, that nothing herein shall be construed to impair the ability of the DIP

Lender to object to the fees, expenses, reimbursement or compensation described

in clauses (iii) or (iv) above, on any grounds.  In the event that Allowed Professional

Fees exceed or are expected to exceed the amounts provided in the Approved

Budget, the parties will negotiate in good faith (but without further obligation)

regarding a proposed amendment to the Approved Budget to address such

additional Allowed Professional Fees.  For purposes of the foregoing, "Carve Out

Trigger Notice" shall mean a written notice delivered by email (or other electronic

means) by the DIP Lender or its counsel to the Debtors, their bankruptcy counsel,

the United States Trustee, counsel to the Prepetition Secured Parties, and counsel

to the Creditors' Committee (if appointed), which notice may be delivered

following the occurrence and during the continuation of an Event of Default and

26

acceleration of the DIP Loans, stating that the Post-Carve Out Trigger Notice Cap
has been invoked.

c.   **Carve Out Trigger Notice Reserve**.  The Debtors shall deposit the Pre-Trigger
Date Fees in a segregated account in trust to pay such then unpaid Allowed
Professional Fees (the "Carve Out Trigger Notice Reserve") prior to any and all
other claims.  The Carve Out Trigger Notice Reserve shall be funded on a weekly
basis, and shall contain an amount equal to the amount of fees reflected in the
Approved Budget for Professional Persons from the Closing Date through the
weekly date of funding.

d.   **Carve Out Draw**.  Subject to exhaustion of the DIP Commitments, the Debtors
shall be permitted to draw on the DIP Facility in the amount of the Carve Out less
the Carve Out Trigger Notice Reserve, notwithstanding any default, Event of
Default, or the occurrence of a Trigger Date.  Any Carve Out Trigger Notice shall
be deemed a consent by the DIP Lender to the Debtors depositing DIP Facility
proceeds into the Carve Out Trigger Notice Reserve in an amount equal to the sum
of the Post-Carve Out Trigger Notice Cap and any budgeted Pre-Trigger Date Fees
reflected in the Approved Budget through the date of the Carve Out Trigger Notice
that have not been deposited in the Carve Out Trigger Notice Reserve.

e.   **Payment of Allowed Professional Fees Prior to the Trigger Date**.  Any payment
or reimbursement made prior to the occurrence of the Trigger Date in respect of
any Allowed Professional Fees shall not reduce the Carve Out.

f.   **No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object
to Fees**.  The DIP Lender shall not be responsible for the direct payment or

reimbursement of any fees or disbursements of any of the Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in the DIP Orders or otherwise shall be construed to obligate the DIP Lender in any way to pay compensation to, or to reimburse expenses of, any of the Professional Persons, or to guarantee that the Debtors or their estates has sufficient funds to pay such compensation or reimbursement. Nothing herein shall be construed as consent to the allowance of any fees and/or expenses of Professional Persons of any of the Debtors, the Creditors' Committee, any other official or unofficial committee in these Chapter 11 Cases or any Successor Cases, or of any other person or entity, or shall affect the right of the DIP Lender to object to the allowance and payment of any such fees and expenses.

25.     **Approval of DIP Fees**. In consideration for the DIP Facility, the DIP Lender shall be paid all fees, expenses and other amounts payable under the DIP Term Sheet as such become due, including, without limitation, the Commitment Fee (which shall be fully earned and allowed upon entry of this Interim Order and paid in full in cash from the proceeds of the "Initial Draw," as that term is defined in the DIP Term Sheet), the Exit Fee, and the reasonable and documented fees and expenses of the DIP Lender in connection with the DIP Facility (all such fees, together, the "DIP Fees"). Upon entry of this Interim Order, the DIP Fees are approved, on a final basis, and are deemed to be allowed, fully earned, non-refundable, and payable in accordance with the terms of the DIP Term Sheet without the need for any further order of this Court. The DIP Fees shall be part of the DIP Obligations.

26.    **DIP Lender's Professionals' Fees**.  Professionals for the DIP Lender (Kilpatrick Townsend & Stockton LLP and any other professionals retained by the DIP Lender), collectively, the "DIP Lender's Professionals"), shall provide summary copies of any invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, the attorney work product doctrine or any other evidentiary privilege or protection recognized under applicable law) with: (i) a summary of the work performed during the relevant compensation period; (ii) the name of, hourly rate (if applicable) of, and number of hours worked by each professional and paraprofessional who worked on the matter during the relevant compensation period; and (iii) the total fee amount being requested by electronic mail to the United States Trustee and counsel to the Creditors' Committee (if appointed) contemporaneously with the delivery of such fee and expense statements to the Debtors.  The Debtors shall promptly pay in full all such invoiced fees and expenses at the conclusion of the Review Period (as defined below) other than the Disputed Invoiced Fees (as defined below).  Any objections raised by the Debtors, the United States Trustee, or the Creditors' Committee (if appointed) with respect to such invoices (the "Disputed Invoiced Fees") must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within 10 days of the receipt of such invoice (the "Review Period") (to be followed by the filing with this Court, if necessary, of a motion or other pleading, with at least 10 days' prior written notice by the submitting party of any hearing on such motion or other pleading).  Notwithstanding the foregoing, on or about the Closing Date, the Debtors shall pay fees and expenses of the DIP Lender's Professionals incurred prior to such date, without need to first deliver

29

a copy of its invoice as provided herein.  No DIP Lender's Professionals shall be required to file an application seeking compensation for services or reimbursement of expenses with this Court. **[This provision may vary from the requirements of MLBR 4001-2(c)(12).]**

27.     **Indemnification**.  The DIP Lender (and its affiliates and respective officers, directors, employees, advisors, and agents, solely in such capacity) (each such person, an "Indemnitee") will have no liability for, and will be indemnified and held harmless by the Debtors and their estates against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith or willful misconduct of the relevant indemnified person (or any of its affiliates or any of its or its respective officers, directors, employees, advisors or agents). Such indemnity shall not be available (a) to the extent arising from a material breach of any obligation of such Indemnitee under the DIP Term Sheet or (b) to the extent arising out of any loss, claim, damage, liability or expense that does not involve an act or omission of the Debtors and that is brought by an Indemnitee against another Indemnitee.

28.     **Proofs of Claim**.  The DIP Lender shall not be required to file a proof of claim in the Chapter 11 Cases or Successor Case, and the entry of this Interim Order shall be deemed to constitute a timely filed proof of claim.  Any order entered by this Court in relation to the establishment of a bar date for any claim (including without limitation, administrative claims) in the Chapter 11 Cases or Successor Case shall not apply to the DIP Lender.  Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, file (and amend or supplement) a proof of claim or aggregate proofs of claim in the Chapter 11 Cases for any claim allowed herein.

30

29.    **Limitations on Use of DIP Proceeds, Cash Collateral, the Carve Out and Other**

**Funds**.  Except as otherwise permitted in this Interim Order and the Approved Budget, the DIP

Facility, the DIP Collateral, the Cash Collateral, and the Carve Out may not be used, directly or

indirectly, by any of the Debtors, the Creditors' Committee (if appointed) or any trustee or other

estate representative appointed in the Chapter 11 Cases (or any Successor Case) or any other person

or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection

therewith) in connection with (a) preventing, hindering, or delaying any of the DIP Lender's

enforcement or realization upon any of the DIP Collateral; (b) using or seeking to use Cash

Collateral without the permission of the DIP Lender or selling or otherwise disposing of DIP

Collateral without the prior written consent of the DIP Lender or as permitted by the DIP Term

Sheet; (c) using or seeking to use any insurance proceeds constituting DIP Collateral without the

prior written consent of the DIP Lender; (d) seeking to amend or modify any of the rights granted

to the DIP Lender under this Interim Order or the DIP Term Sheet, including seeking to use Cash

Collateral or DIP Collateral on a contested basis; (e) litigating, objecting to, challenging or

contesting in any manner in any way the DIP Liens, DIP Obligations, DIP Superpriority Claims,

DIP Collateral (including Cash Collateral) or any other claims held by or on behalf of the DIP

Lender; (f) litigating, objecting to, challenging, or contesting in any manner, or raising any

defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP

Obligations, the DIP Liens, or any other liens or interests of the DIP Lender; (g) seeking to

subordinate, recharacterize, disallow or avoid the DIP Obligations; or (h) any other prohibited or

otherwise restricted use of proceeds as set forth in the DIP Term Sheet; provided, however, that,

upon an Event of Default or DIP Termination Event, nothing herein shall limit the Debtors' right

31

to move for an order of the Court authorizing the use of Cash Collateral absent the DIP Lender's consent. **[This provision may vary from the requirements of MLBR 4001-2(c)(9).]**

30.     **Releases**.  Upon entry of this Interim Order, the Debtors, on their own behalf and on behalf of their estates, forever and irrevocably: (a) release, discharge, and acquit the DIP Lender and each of its respective former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, in each case solely in their capacity as such, from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation of and entry into the DIP Term Sheet and the other DIP Documents; and (b) waive, discharge and release any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations.

31.     **Waivers**.

    a.  **Limitation on Charging on Expenses**.  Subject to entry of the Final Order, no costs or expenses of administration of the Chapter 11 Cases or any Successor Case shall be charged against or recovered from or against the DIP Lender with respect to the DIP Collateral pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender.  **[This provision may vary from the requirements of MLBR 4001-2(c)(4).]**

    b.  **No Marshaling**.  Subject to entry of the Final Order, in no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine

with respect to the DIP Collateral or the DIP Obligations and all proceeds shall be received and applied in accordance with this Interim Order and the DIP Term Sheet. **[This provision may vary from the requirements of MLBR 4001-2(c)(4).]**

32.     **No Lender Liability**.  In determining to make any loan (whether under the DIP Term Sheet or otherwise) or to permit the use of Cash Collateral, the DIP Lender shall not owe any fiduciary duty to the Debtors or their respective creditors, shareholders, or estate, and the DIP Lender shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors by virtue of making the DIP Loans.  Furthermore, nothing in this Interim Order shall impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their affiliates, if any (as defined in section 101(2) of the Bankruptcy Code).  **[This provision may vary from the requirements of MLBR 4001-2(c)(4), (14).]**

33.     **Limitation of Liability**.  Nothing in this Interim Order, the DIP Term Sheet, the Prepetition Credit Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of (a) any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts or (b) any fiduciary duties to the Debtors, their respective creditors, shareholders, or estates.  The DIP Lender shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person and all risk of loss, damage, or destruction of the DIP

Collateral shall be borne by the Debtors. **[This provision may vary from the requirements of MLBR 4001-2(c)(14).]**

34.      **No Third-Party Beneficiaries**.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any Professional Person, third party, creditor, landlord, lessor, equity holder, or any direct, indirect, or incidental beneficiary.

35.      **Insurance Proceeds and Policies**.  The DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as an additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

36.      **No Waivers or Modifications of Interim Order**.  The Debtors have agreed not to and shall not seek any modification or extension of this Interim Order without the prior written consent of the DIP Lender and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.

37.      **Binding Effect of this Interim Order**.  Immediately upon entry of this Interim Order by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Lender, the Prepetition Secured Parties, all other creditors of any of the Debtors, the Creditors' Committee (if appointed), and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Chapter 11 Cases, any Successor Case, or upon dismissal of any of the Chapter 11 Cases or any Successor Case; provided that the DIP Lender shall not have any obligation to permit the use of DIP Collateral (including Cash Collateral) by or extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the Debtors' estates.

38.     **Discharge**.  Except as otherwise agreed in writing by the DIP Lender, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan.

39.     **Survival**.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any chapter 11 plan in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Case; or (d) pursuant to which this Court abstains from hearing the Chapter 11 Cases or Successor Case. The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Lender pursuant to this Interim Order and the DIP Term Sheet, and the adequate protection provided to the Prepetition Secured Parties pursuant to this Interim Order, shall continue in the Chapter 11 Cases, in any Successor Case, or following dismissal of any of the Chapter 11 Cases or any Successor Case, and shall maintain their priority as provided by this Interim Order until, in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP Term Sheet and this Interim Order, have been paid in full (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).  The terms and provisions concerning the indemnification of the DIP Lender shall continue in the Chapter 11 Cases, in any Successor Case, following dismissal of any of the Chapter 11 Cases or any Successor Case, following termination of the DIP Facility or the indefeasible repayment of the DIP Obligations.

40.     **Necessary Actions**.  The Debtors are authorized and directed to take such actions as are reasonable or appropriate to implement the terms of this Interim Order and the DIP Term Sheet.

41.     **Enforceability**.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry thereof.   Notwithstanding Bankruptcy Rules 4001(a)(4), 6004(h), or 7062, any applicable Local Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

42.     **Interim Order Controls**.  In the event of any conflict between or among the terms or provisions of this Interim Order and the DIP Term Sheet, the terms and provisions of this Interim Order shall govern and control.

43.     **Headings**.  All paragraph headings used in this Interim Order are for ease of reference only and shall not affect the construction or interpretation hereof.

44.     **Retention of Jurisdiction**.  This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of the DIP Term Sheet or this Interim Order.

45.     **Final Hearing**.  The Final Hearing on the Motion shall be held on [____**], April [__], 2025 at _:__ p.m.** (prevailing Eastern Time) in the United States Bankruptcy Court for the District of Massachusetts, ____.  Any objections or responses to entry of a final order on the Motion shall be filed on or before **[___], April _, 2025, at 4:00 p.m.** (prevailing Eastern Time) and served on the following parties: (a) the Debtors; (b) proposed attorneys for the Debtors, Riemer & Braunstein LLP, 100 Cambridge Street, 22nd Floor, Boston, MA 02114-2527, Attn: Alan L..

36

Braunstein (abraunstein@riemerlaw.com),  (c) attorneys for the DIP Lender, Kilpatrick Townsend & Stockton, LLP, 1100 Peachtree Street NE, Suite 2800, Atlanta, GA 30309, Attn: Colin M. Bernardino (cbernardino@ktslaw.com); (d) the Office of the United States Trustee for Region 1, Office of the U.S. Trustee, 446 Main Street, 14th Floor, Worcester, MA 01608, Attn: Richard King, Esq. (USTPRegion01.WO.ECF@USDOJ.GOV); and (e) counsel to any official committee appointed in these chapter 11 cases (collectively, the "Notice Parties").  In the event no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

46.    The requirements set forth in Bankruptcy Rule 6003(b) are satisfied.  Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion under the circumstances, and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

47.    Notwithstanding the applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

48.    All time periods set forth in this Interim Order shall be calculated in accordance with Bankruptcy Rule 9006(a).


_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1 – DIP Term Sheet**

**Exhibit 2 – Initial DIP Budget**

4322435.2

<u>Exhibit  B</u>

[DIP Term Sheet]

*[Execution Version]*

April 18, 2025

**Arch Therapeutics, Inc.**
**$2,000,000**
**Debtor-in-Possession Term Loan Facility**
**Summary of Terms and Conditions**

**This term sheet (together with the exhibits and schedules hereto, the "Term Sheet") sets forth a summary of the terms and conditions with respect to the DIP Facility (as defined below) from and after, and subject to, the entry of the Interim Order (as defined below). This Term Sheet shall be a binding agreement from and after, and subject to, the entry of the Interim Order with respect to the DIP Loans (as defined below) but does not purport to summarize all of the terms, conditions, representations and other provisions with respect to the DIP Facility, which will be set forth in the DIP Documents (as defined below). The obligation of the DIP Lender (as defined below) to provide financing pursuant to this Term Sheet is conditioned upon the execution and delivery of signature pages to this Term Sheet by each of the parties hereto and shall be subject to the conditions precedent and other terms and conditions set forth herein. In the event of any conflict between this Term Sheet and the terms of the Interim Order or the Final Order (as defined below), the terms of the Interim Order or the Final Order, as applicable, shall govern.**

| 1. | *Borrowers* | • Arch Therapeutics, Inc., a Nevada corporation, *et. al.*[1] (the "**Borrower**" and together with all of the Borrower's existing and future, direct or indirect domestic or foreign subsidiaries and affiliates that become debtors and debtors-in-possession in the Chapter 11 Cases, the "**Borrowers**", each a "**Loan Party**" and collectively, the "**Loan Parties**"). The Loan Parties are expected to be debtors and debtors-in-possession in the anticipated chapter 11 cases (such cases, the "**Chapter 11 Cases**", and the Borrower and its applicable subsidiaries and affiliates shall be referred to herein under the Chapter 11 Cases, each as a "**Debtor**" and collectively, as the "**Debtors**") under chapter 11 of title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") to be commenced in the United States Bankruptcy Court for the District of Massachusetts (the "**Bankruptcy Court**") on or around April 18, 2025 (the actual date of commencement, the "**Petition Date**"). |
|---|---|---|
| 2. | *DIP Lender* | • Vivex Biologics, Inc. and/or its designees or its assignees. |
| 3. | *Type and Amount of the DIP Facility* | • A non-amortizing priming, super-priority senior secured term loan facility in an aggregate principal amount not to exceed (including Roll Up Loans (as defined below)) $2,000,000 in term loan commitments (the "**DIP Facility**"; the DIP Lender's commitments under the DIP Facility, the "**DIP Commitments**"; and the loans under the DIP Facility, the "**DIP Loans**"). **[This provision may vary from the requirements of MLBR 4001-2(c)(7).]** |
| | | • Prior to the Petition Date, the DIP Lender made a secured bridge loan in the aggregate principal amount of $120,476 to the Borrowers, the proceeds of which were used by the Borrowers to fund payments to their legal counsel in respect of fees and to pay other obligations (the "**Roll Up Loans**"). Subject to approval of the Bankruptcy Court, the Interim Order |

---

[1] Additional borrowers are listed on **Schedule 1.**

1

Docusign Envelope ID: 47AD1CD4-8C29-4291-96AA-1D45ED939D73

*[Execution Version]*

| | | |
|---|---|---|
| | | shall provide that the Roll Up Loans shall be converted to DIP Loans under the DIP Documents. **[This provision may vary from the requirements of MLBR 4001-2(c)(6).]** |
| | | • The borrowing of DIP Loans shall permanently decrease the DIP Commitments, and DIP Loans repaid may not be reborrowed. |
| | | • Initial net proceeds of the DIP Loans shall be funded in accordance with Budget. |
| | | • Subsequent DIP Loan proceeds to be funded into the Borrowers' bank debtor-in-possession account to be opened in connection with the filing of the Borrowers' bankruptcy petitions (the "**DIP Bank Account**") and the Loan Parties shall obtain a satisfactory control agreement in favor of the DIP Lender to be entered into within 15 business days of the entry of the Final Order subject to a 15-day cure period if the Loan Parties are using commercially reasonable efforts to obtain a satisfactory control agreement; underline provided that the Carve-Out (as defined below) shall be funded as described in the Interim Order. The Borrowers shall permit only the DIP Loan proceeds to be maintained in the DIP Bank Account, segregated from all other funds and utilized only in accordance with the terms and conditions of the DIP Documents. |
| 4. | *Initial Availability* | • Upon the Bankruptcy Court's entry of the Interim Order, and satisfaction of all applicable conditions precedent described in Section 15 herein, the DIP Lender shall make available an aggregate amount of $900,000 of the DIP Loans and the Borrowers shall be entitled to make draws of the DIP Loans as described in Section 6 below immediately upon entry of the Interim Order (the "**Initial Draws**," the date of such first Initial Draw shall be referred to herein as the "**Closing Date**"). The closing of definitive DIP Documents shall occur as soon after the first Initial Draw as reasonably possible but in any event no later than two (2) business days prior to the hearing to consider entry of the Final Order. |
| 5. | *Full Availability* | • Upon (i) the Bankruptcy Court's entry of the Final Order (as defined below) and (ii) the satisfaction of all applicable conditions described in Sections 15 and 16 herein (or, as the case may be, the other applicable DIP Documents), the full amount of the DIP Facility shall be available to the Debtors, subject to compliance with the terms, conditions, and covenants described in the DIP Documents, in additional draws in accordance with Section 6 below (each an "**Other Draw**" and collectively, the "**Other Draws**", and together with the Initial Draws, and each Other Draw, each a "**Draw**" and collectively, the "**Draws**"). |
| 6. | *Draws* | • Subject to satisfaction of the conditions precedent to the Initial Draws or Other Draws, as applicable, and availability under the DIP Commitments, the Borrowers shall be entitled to make Draws of the DIP Loans in accordance with the Budget (as defined below). |
| | | • Each Draw shall be made (in an aggregate minimum amount of $100,000 (and multiples thereof) upon two (2) business days' written notice, up to the aggregate amount of the undrawn DIP Commitments at any time prior to two (2) business days before the DIP Termination Date (as defined below); underline provided that the first Initial Draw shall be in the amount of |

*[Execution Version]*

| | | |
|---|---|---|
| | | $600,000 and deemed requested in accordance with the terms of this Term Sheet, and funded within one (1) business day following the entry of the Interim Order and shall not require any further advance written notice but shall require a customary notice of borrowing. |
| 7. | ***Maturity and Termination*** | • All DIP Obligations (as defined below) shall be due and payable in full in cash ("**Payment in Full**"[2] or such other form of consideration as the DIP Lender and the Borrowers may mutually agree) on the earliest of: |
| | |     i.    July 18, 2025; |
| | |     ii.    the effective date of any chapter 11 plan with respect to the Borrowers (a "**Plan**"); |
| | |     iii.    the consummation of any sale or other disposition of all or substantially all of the assets of the Borrowers pursuant to section 363 of the Bankruptcy Code; |
| | |     iv.    the date of the acceleration of the DIP Loans and the termination of the DIP Commitments following the occurrence and during the continuation of an Event of Default in accordance with the DIP Documents; |
| | |     v.    dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code; and |
| | |     vi.    Forty-five days after the Petition Date (or such later date as agreed to by the DIP Lender) or as dictated by the availability of the Bankruptcy Court, unless the Final Order has been entered by the Bankruptcy Court on or prior to such date (such earliest date, the "**DIP Termination Date**"). |
| | | • The occurrence of the DIP Termination Date shall terminate the ability of the Borrowers to borrow the Draws and shall terminate any further obligation the DIP Lender has to make any DIP Loans under the DIP Documents.· |
| | | • For the avoidance of doubt, any of the above conditions from (i) through (vi) automatically triggers the Maturity Date. |
| 8. | ***Interest Rate*** | • The DIP Loans shall bear interest at a per annum rate equal to 10.5% payable in cash on the first day of each month in arrears (the "**Non-Default Interest**"). |
| | | • Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default (as defined below), the DIP Loans shall bear interest at the per annum rate of 15.5%, in each case payable in |

---

[2] For purposes hereof, the term "Payment in Full" means, with respect to the DIP Obligations, the irrevocable and indefeasible payment in full in cash of all DIP Obligations, other than continuing indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder shall have irrevocably, permanently and finally expired or shall have been terminated, cancelled and discharged.

*[Execution Version]*

| | | |
|---|---|---|
| | | cash, together with the Non-Default Interest, on the first day of each month in arrears. |
| 9. | ***Commitment Fee, Exit Fee and Other Fees*** | • The Borrowers shall pay to the DIP Lender a commitment fee equal to 3.0% of the total amount of the DIP Commitments (the "**Commitment Fee**"). The Commitment Fee shall be fully earned, non-refundable, and allowed upon entry of the Interim Order, and shall be payable out of the proceeds of the Initial Draw. |
| | | • The Borrowers shall pay to the DIP Lender an exit fee equal to the sum of 6.0% of (i) upon entry of the Interim Order and before entry of the Final Order, the total amount of DIP Loans then outstanding, and (ii) upon entry of the Final Order, the total amount of the DIP Commitments, which, in each case, shall be fully earned, non-refundable, and allowed upon the Bankruptcy Court's entry of the Interim Order (the "**Exit Fee**"). The Exit Fee shall be due and payable upon the earliest of (x) the DIP Termination Date, (y) Payment in Full of the DIP Obligations, and (z) on a *pro rata* basis for any Voluntary Prepayment of the DIP Obligations; <u>provided, however</u>, that, if the DIP Termination Date has occurred solely as a result of the occurrence and continuation of an Event of Default under the DIP Documents, then the Exit Fee shall not be payable until the DIP Obligations have been accelerated by the DIP Lender. |
| | | • The Commitment Fee and the Exit Fee shall be approved on a final basis by the Bankruptcy Court as part of the Interim Order. If such fees are not approved on a final basis by the Bankruptcy Court, this Term Sheet shall automatically terminate and be of no further force and effect. |
| 10. | ***Use of Proceeds*** | • The proceeds of the DIP Facility shall be used only for the following purposes and, excluding payments pursuant to clauses (ii), (iii), and (iv) below, subject to the Budget and 15% permitted variances as set forth below: |
| | | i. working capital and other general corporate purposes of the Borrowers, and any other subsidiaries, if applicable if such subsidiaries are Loan Parties under the DIP Documents; |
| | | ii. professional fees and expenses of administering the Chapter 11 Cases (including fees incurred prior to the Closing Date) in accordance with the Bankruptcy Code and any orders of the Bankruptcy Court, as applicable; |
| | | iii. fees and expenses payable under the DIP Facility, including, without limitation, the Commitment Fee, the Exit Fee and legal fees and expenses of the DIP Lender (including fees and expenses incurred prior to the Closing Date); and |
| | | iv. interest and other amounts payable under the DIP Facility. |
| | | • Notwithstanding any other provision of this Term Sheet, from and after the Closing Date, no DIP Loans or DIP Collateral (as defined below), or any portion of the Carve-Out, may be used directly or indirectly by any Debtor, any official committee appointed in the Chapter 11 Cases, or any |

trustee or examiner appointed in the Chapter 11 Cases or any successor cases, including any chapter 7 cases, or any other person, party or entity:

    i.    in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation:

        a.    against the DIP Lender, or its respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens (as defined below), or DIP Claims (as defined below); or

        b.    challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the DIP Obligations and/or the liens, claims, rights, or security interests granted under the Orders (as defined below), the DIP Documents, including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise;

    ii.    to prevent, hinder, or otherwise delay the DIP Lender's enforcement or realization on the DIP Obligations, DIP Collateral, and the liens, claims, and rights granted to such parties under the Interim Order or the Final Order, as applicable, each in accordance with the DIP Documents and the Interim Order or the Final Order, as applicable; *provided, however,* that this shall not apply to (x) objections to the Final Order and (y) any challenge to whether a DIP Termination Event has occurred and/or the propriety of the DIP Lender's termination of the DIP Commitments and/or acceleration of the DIP Obligations or calculation of the amounts owed thereunder;

    iii.    to seek to modify any of the rights and remedies granted to the DIP Lender under the Orders (other than with the consents contemplated thereunder), or the DIP Documents, as applicable; or

    iv.    to apply to the Bankruptcy Court for authority to approve superpriority claims or grant liens (other than the Carve-Out and liens permitted pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens and DIP Claims, unless permitted under the DIP Documents or unless all DIP Obligations and claims granted to the DIP Lender under the Interim Order or the Final Order, as applicable, have been

| | | |
|---|---|---|
| | | refinanced or Paid in Full in cash or otherwise agreed to in writing by the DIP Lender. **[This provision may vary from the requirements of MLBR 4001-2(c)(9).]** |
| 11. | ***Voluntary Prepayments*** | • Voluntary prepayments of the DIP Loans shall be permitted at any time, subject to (i) payment of the ratable portion of the Exit Fee due thereon, which shall be due and payable on the date of such voluntary prepayment; (ii) accrued interest on the amount prepaid; and (iii) in minimum amounts of at least $250,000 of principal. |
| 12. | ***Security*** | • As security for the DIP Obligations, subject to the Carve-Out, each Loan Party shall grant to the DIP Lender a priming first lien security interest ("**Priming First Lien**") on all of such Loan Party's right, title and interest in, to and under all the Loan Parties' assets, including, but not limited to the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located: all assets and property of such Loan Party and its estate, real (both leasehold and fee) or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all contracts, contract rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, accounts receivables (including healthcare insurance receivables), chattel paper, letters of credit and letter of credit rights, investment property (including, without limitation, all equity interests owned by any Loan Party in its current and future subsidiaries), commercial tort claims, arbitration awards, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, fixtures, all interests in leaseholds and real properties, all patents, copyrights, trademarks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), all governmental and private grants, all claims, rights, interests, proceeds, products, accessions, additions, improvements, substitutions, rents and profits, and books and records, of or in respect of any of the foregoing (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of New York) and (i) effective upon entry of the Interim Order, all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and any proceeds thereof and (ii) effective upon entry of the Final Order, all avoidance actions, including any claims and causes of actions arising under sections 544, 545, 547, 548, and 550 of the Bankruptcy Code and similar such claims and causes of action under applicable non-bankruptcy law, and the proceeds thereof (collectively, the "**DIP Collateral**"). **[This provision may vary from the requirements of MLBR 4001-2(c)(3), (7).]**<br><br>• Negative pledge on all assets of the Loan Parties subject to permitted liens to be agreed upon by the Final Order.<br><br>• In addition to appropriate orders of the Bankruptcy Court granting and perfecting such liens, the Loan Parties shall take all other commercially reasonable steps (including the execution and filing of UCC financing |

| | | |
|---|---|---|
| | | statements, intellectual property security agreements, deposit account control agreements and leasehold mortgages) reasonably requested by DIP Lender. |
| 13. | ***Priority and Security*** | • Subject to the Carve-Out, all obligations of the Loan Parties under the DIP Documents, including, without limitation, all principal, accrued interest, costs, fees and premiums provided for therein, and all obligations of the Loan Parties under the DIP Facility (the "**DIP Obligations**") shall be entitled to (a) senior secured priming lien and (b) superpriority claim status pursuant to section 364(c)(1) and section 364(d)(1) of the Bankruptcy Code, with priority over any and all secured liens, administrative expense claims and unsecured claims, of any kind or nature whatsoever, now existing or hereafter arising under the Bankruptcy Code (the "**DIP Claims**").  **[This provision may vary from the requirements of MLBR 4001-2(c)(7).]** |
| | | • Subject to the Carve-Out, all DIP Obligations in respect of the DIP Facility shall be: |
| | |     i.    pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority claim status in the Chapter 11 Cases (which claims shall be payable from and have recourse to all DIP Collateral); and |
| | |     ii.    secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic first-priority lien on the DIP Collateral; and |
| | |     iii.    senior secured priming first liens on the DIP Collateral, pursuant to section 364(d)(1) of the Bankruptcy Code. |
| | | • The liens securing the DIP Facility (the "**DIP Liens**") shall mean the liens described above and in the priority set forth in the Interim Order and Final Order, as applicable. The DIP Liens described herein shall, to the fullest extent permitted by applicable law, be effected and perfected upon entry of the Interim Order and without the necessity of the execution or filing of mortgages, landlord agreements, security agreements, pledge agreements, control agreements, financing statements, leasehold mortgages or other agreements. |
| 14. | ***Remedies*** | • Upon the occurrence and during the continuation of an Event of Default under the DIP Documents, all remedies customarily available in the Chapter 11 Cases including, without limitation, those remedies customarily available to a senior secured, administrative expense claim of a debtor-in-possession lender, including, without limitation: |
| | |     i.    declare that the DIP Commitments are terminated, reduced or restricted, whereupon the DIP Commitments shall be terminated, reduced, or restricted on account of any further Draws; |
| | |     ii.    declare the unpaid amount of the DIP Obligations to be immediately due and payable, without presentment, demand, |

Docusign Envelope ID: 47AD1CD4-8628-4291-96AA-3D4E6D939D73

*[Execution Version]*

|   |   |   |
|---|---|---|
| | | protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties; |
| | | iii.     charge interest at the default rate under the DIP Documents; |
| | | iv.    declare the termination, restriction, or revocation of the ability of the Debtors to use Cash Collateral (as defined in the Orders); or |
| | | v.    take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Lender) permitted under the DIP Documents or by applicable law. |
| | | Any exercise of remedies by the DIP Lender shall be subject in all respects to the terms of the Orders. |
| 15 | ***Conditions Precedent to Initial Draw*** | • Subject to the availability of the Bankruptcy Court, entry of the Interim Order within four (4) business days of the Petition Date, which order shall not be stayed or subject to appeal; <br><br> • Delivery of the Initial Budget acceptable to the DIP Lender in its reasonable discretion; <br><br> • All out-of-pocket costs, fees and expenses required to be paid to the DIP Lender pursuant to this Term Sheet, the DIP Documents, or the Interim Order shall have been paid (<u>provided</u> that the Commitment Fee and the DIP Lender's legal fees and expenses shall be paid out of or offset against the proceeds of the first Initial Draw); <br><br> • *The representations and warranties of the Loan Parties under the DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects);* <br><br> • No Material Adverse Effect (as defined below) shall have occurred and be continuing; <br><br> • The Debtors shall be in compliance in all respects with the Interim Order; <br><br> • No Event of Default shall have occurred and be continuing under this Term Sheet; <br><br> • No order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner adverse to the DIP Lender the Interim Order; and <br><br> • The entry of the Interim Order shall constitute the borrowing notice for the Initial Draw. |
| 16. | ***Conditions Precedent to Availability of Other Draws; Milestones*** | • The Bankruptcy Court shall have entered a Final Order approving the DIP Facility not later than 45 days following the Petition Date, which Final Order shall be in the form of the Interim Order with such changes as are customary for a final order or otherwise are acceptable to the DIP Lender. |

- In addition, the DIP Documents shall contain such conditions precedent as are usual and customary in loan documents for similar debtor-in-possession financings and other conditions precedent deemed by the DIP Lender appropriate to the specific transaction, including, without limitation:

  i. execution and delivery of a credit agreement (the "**DIP Credit Agreement**") and other DIP Documents evidencing and securing the DIP Facility, in each case, which shall be in form and substance substantially consistent with this Term Sheet and otherwise in form and substance acceptable to the DIP Lender and the Loan Parties;

  ii. delivery of any Budget subsequent to the Initial Budget, acceptable to the DIP Lender in its reasonable discretion;

  iii. no trustee, examiner, or receiver shall have been appointed or designated with respect to the Loan Parties' business, properties or assets and no motion shall be pending seeking similar relief or any other relief, which, if granted, would result in a person other than the Loan Parties exercising control over their assets;

  iv. the representations and warranties of the Loan Parties under the DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects);

  v. the Borrowers shall have delivered to the DIP Lender a customary borrowing notice;

  vi. the Debtors shall be in compliance in all respects with the Final Order and the Loan Parties shall be in compliance in all respects with the DIP Documents;

  vii. no default or Event of Default shall have occurred and be continuing under the DIP Documents;

  viii. no order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner adverse to the DIP Lender the Interim Order or the Final Order, as applicable;

  ix. since the Petition Date, other than the Chapter 11 Cases, there shall not have occurred or there shall not exist any event, condition, circumstance or contingency that, individually, or in the aggregate, (a) has had or could reasonably be expected to have a material adverse effect on the business, operations, properties, assets, performance or financial condition of the Loan Parties taken as a whole, (b) has resulted in, or could reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or

9

Docusign Envelope ID: 47AD1CD4-8C28-4291-96AA-1D45ED239D73

*[Execution Version]*

|   |   | benefits available to the DIP Lender, or (c) has had or could reasonably be expected to have, a material adverse effect on the ability of the Loan Parties to perform their obligations under any DIP Document (each of the foregoing being a "**Material Adverse Effect**"); |
|---|---|---|
|   |   | x.  the Debtors shall have all insurance policies maintained by Loan Parties name the DIP Lender as additional insured; |
|   |   | xi.  all costs, fees, expenses (including, without limitation, legal fees and expenses) set forth in the DIP Documents or otherwise to be paid to the DIP Lender shall have been paid when due; and |
|   |   | xii.  a granting to the DIP Lender of a Priming First Lien for all DIP Obligations pursuant to section 364(d)(1) of the Bankruptcy Code. |
|   |   | • The DIP Documents shall contain the following milestones (the "**Milestones**") relating to the Chapter 11 Cases, which may be extended by the DIP Lender in its sole discretion, failure to comply with shall constitute an Event of Default: |
|   |   | (i)  Within three (3) days after the Petition Date, the Debtors shall have filed a motion seeking an order the form and substance of which shall be reasonably satisfactory to the DIP Lender governing the solicitation of bids for the purchase (and an auction) of substantially all assets of the Debtors; |
|   |   | (ii)  Within 21 days after the Petition Date, the Bankruptcy Court shall have entered the order sought in (i) above. |
|   |   | (i)  within 85 days after the Petition Date, the Bankruptcy Court shall have entered a final order approving the sale of substantially all of the Debtors' assets. |
| 17. | ***Documentation*** | • The DIP Documents and all other definitive financing documentation (including the Orders) with respect to the DIP Facility shall be satisfactory to the DIP Lender in its sole discretion. For the avoidance of doubt, DIP Documents (other than this Term Sheet and the Interim Order) shall be documented prior to entry of the Final Order. |
| 18. | ***Representations and Warranties*** | • The DIP Documents shall contain representations and warranties with respect to the Loan Parties as are usual and customary in loan documents for similar debtor-in-possession financings and as acceptable to the DIP Lender, including without limitation, due organization and authorization, enforceability, financial condition, no material adverse changes, title to properties, liens, litigation, payment of taxes, compliance with laws and regulations, employee benefit liabilities, environmental liabilities, and perfection and priority of liens securing the DIP Facility. |
|   |   | • Each Loan Party represents and warrants that none of its assets and properties are subject to any liens, security interests or encumbrances as of the Petition Date except for liens set forth on **Schedule 2** attached |

| | | |
|---|---|---|
| | | hereto and no Loan Party will grant or consent to liens, security interests or encumbrances on or after the Petition Date except to the extent expressly permitted by the DIP Documents. |
| 19. | ***Affirmative Covenants*** | • The DIP Documents shall contain affirmative covenants as are usual and customary with respect to the Loan Parties in loan documents for similar debtor-in-possession financings and as are acceptable to the DIP Lender and the Borrowers. |
| 20. | ***Negative Covenants*** | • The DIP Documents shall contain negative covenants with respect to the Loan Parties as are usual and customary in loan documents for debtor-in-possession financings and as are acceptable to the DIP Lender and the Borrowers; <u>provided</u> that the DIP Documents will permit: (i) the Debtors to continue to pursue a sale process for all or substantially all of the Borrowers' assets and consummate any sale or sales related thereto subject to Bankruptcy Court approval and provided that such sale or sales and/or related transactions, when taken in the aggregate, provide for the Payment in Full of the DIP Obligations; (ii) the ability to reject or modify contracts; (iii) postpetition employment arrangements subject to maximum thresholds agreed upon by the DIP Lender and the Borrowers; (iv) postpetition capital expenditures subject to maximum thresholds agreed upon by the DIP Lender and the Borrowers; and (v) provide for adequate protection in accordance with the Budget and reasonably acceptable to the DIP Lender. |
| 21. | ***DIP Budget / Variance Reporting*** | • The DIP Lender shall receive an extended weekly budget commencing with the week during which the Interim Order is entered, containing line items of sufficient detail to reflect the consolidated operating cash flow of the Debtors for the period from the Petition Date through and including the end of the thirteenth (13th) calendar week thereafter (the "**Initial Budget**") (the Initial Budget, as modified from time to time in accordance herewith, shall be the "**Budget**"). |
| | | • The Budget shall be updated and provided to the DIP Lender on the fourth Wednesday following the prior Budget's approval and every fourth Wednesday thereafter, or more frequently at the reasonable discretion of both the Borrowers and DIP Lender, with such updated Budget extending the term thereof and the DIP Lender, in its reasonable discretion, shall have the right to approve any such updates (or any amendments) by providing the Borrowers specific notice thereof within 5 business days after the delivery by the Borrowers of any such update or amendment ("**Updated Budget**") and, (ii) to the extent the DIP Lender provides written notice rejecting the updates (or any amendments), the then existing Budget shall continue to constitute the applicable Budget until such time as an update or amendment is approved by the DIP Lender. In the event the DIP Lender does not provide written notice of its rejection of the proposed Updated Budget within such five business day period, such Updated Budget shall become effective as the Budget. |
| | | • On a weekly basis after the delivery of the first Updated Budget, the Borrowers shall deliver to the DIP Lender a variance report for the four-week period ending the prior Friday comparing the difference/variance, expressed as a percentage (each, a "**Budget Variance**"), between actual |

<table>
<tr>
<td colspan="3">net operating cash flow for such period to projected net operating cash flow for such period as set forth in the Budget on a cumulative 4 week rolling basis (each a "**Measuring Period**") and explaining in reasonable detail all material variances, it being understood that any Net Operating Variance (as defined below) solely with respect to net operating cash flow that exceeds 15% shall be material and shall constitute an Event of Default under the DIP Documents (each such report, a "**Variance Report**," which shall be in a form reasonably satisfactory to the DIP Lender). For the avoidance of doubt, net operating cash flow shall not include professional fees and restructuring charges (including trustee fees or other statutory fees) related to the Chapter 11 Cases.</td>
</tr>
</table>

| | | |
|---|---|---|
| | | • For purposes of each Measuring Period, the Borrowers shall calculate: the numerical difference between "net operating cash flow" (such terms reflecting those line items illustrated in the Budget) for such period to "net operating cash flow" for such period as set forth in the Budget on a cumulative 4-week rolling basis, and to the extent the difference is a positive number, the percentage such difference is of the cumulative budgeted amount for such period (the "**Net Operating Variance**"). For purposes herein, a "**Permitted Variance**" shall be limited to not greater than 15% for budget variances with respect to the Net Operating Variance, each as set forth in the applicable Variance Report. For the avoidance of doubt, United States Trustee fees, professional fees of the DIP Lender, and certain other administrative expenses to be agreed, shall not be included in the Net Operating Variance calculation. |
| 22. | *Interim Order* | • The interim order approving the DIP Facility, which shall be in form and substance acceptable to the DIP Lender and its counsel (the "**Interim Order**"), shall, among other things, authorize and approve: |
| | |     i. the Initial Draws; |
| | |     ii. the making of the DIP Loans; |
| | |     iii. the granting of the superpriority claims and liens against the Debtors and their assets in accordance with this Term Sheet and the DIP Documents with respect to the DIP Collateral; |
| | |     iv. the payment of all fees and expenses (including the fees and expenses of outside counsel and any financial advisors) required to be paid to the DIP Lender as described herein under the heading "Indemnification and Reimbursement of Expenses" by the Debtors; |
| | |     v. the payment of the Commitment Fee upon the Closing Date and the payment of the Exit Fee as set forth in Section 9 of this Term Sheet, which Commitment Fee payment shall not be subject to reduction, setoff or recoupment for any reason, and shall be fully earned and allowed upon entry of the Interim Order; and |
| | |     vi. upon entry of the Final Order, the Debtors' waiver of (a) any right to surcharge the DIP Collateral pursuant to sections 105(a) |

|   |   |   |
|---|---|---|
|   |   | and 506(c) of the Bankruptcy Code or otherwise, and (b) the equitable doctrine of marshaling and other similar doctrines, in each case, with respect to the DIP Collateral and the DIP Obligations. |
| 23. | ***Final Order*** | • The final order approving the DIP Facility, which shall be substantially in the same form as the Interim Order (with such modifications as are necessary to convert the Interim Order into a final order) and otherwise in form and substance reasonably acceptable to the DIP Lender (the "**Final Order**" and together with the Interim Order, the "**Orders**"), shall, among other things, authorize and approve the DIP Facility on a final basis, the total amount of the DIP Commitments, and the payment of the Exit Fee, which Exit Fee payment shall not be subject to reduction, setoff or recoupment for any reason, and shall be fully earned and allowed upon entry of the Interim Order. |
| 24. | ***Carve-Out*** | • The liens and security interests in the DIP Collateral, and the superpriority administrative claims shall be subject in all respects to the Carve-Out, which shall be defined in the Orders and shall be on customary terms (the "**Carve-Out**"). |
|   |   | • The Carve-Out will include a covenant requiring the funding of a weekly segregated escrow account for professional fees (including earned transaction fees), with separate accounts for professional fees of the Debtors' professionals and Committee professionals. |
| 25. | ***Events of Default*** | • The DIP Documents shall contain events of default (collectively, "**Events of Default**") consistent with this Term Sheet and customary for debtor-in-possession financing facilities of this type and acceptable to the DIP Lender in its sole discretion, including, without limitation: |
|   |   | i. Non-payment, non-compliance with covenants set forth in the DIP Documents, judgements in excess of specified amounts, impairment of security interest in the DIP Collateral and other customary defaults, subject to any applicable grace and/or cure periods to be agreed for non-payment defaults only and as are customary for transactions of this nature; |
|   |   | ii. the entry of the Final Order shall have not occurred, subject to the availability of the Bankruptcy Court, within 30 days after the Petition Date; |
|   |   | iii. the failure of the Loan Parties to comply with any of the Milestones and the DIP Lender has not, in its sole discretion, extended such Milestone; |
|   |   | iv. the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; |



> v. non-compliance, subject to any applicable grace and/or cure periods, by any Loan Party with the terms of the Interim Order or the Final Order;
>
> vi. the entry of an order staying, reversing, vacating or otherwise modifying the Interim Order or the Final Order, in each case without the prior written consent of the DIP Lender;
>
> vii. the entry of an order appointing a trustee, responsible officer, or an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1104 of the Bankruptcy Code (other than a fee examiner) in the Chapter 11 Cases, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the DIP Lender in its sole discretion;
>
> viii. the entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure against any material assets of the Loan Parties, the fair market value of which, individually or in the aggregate, exceeds $50,000;
>
> ix. the entry of an order (a) surcharging any of the DIP Collateral under sections 105, 506(c), or any other section of the Bankruptcy Code, (b) allowing any administrative expense claim having priority over or ranking in parity with the DIP Claims or the rights of the DIP Lender (subject to the Carve-Out), or (c) otherwise adversely impacting the DIP Lender's liens and priority in the DIP Collateral as set forth in this Term Sheet;
>
> x. any action by any Debtor to (a) challenge the rights and remedies of the DIP Lender under the DIP Facility in any of the Chapter 11 Cases or acting in a manner inconsistent with the DIP Documents or (b) avoid or require disgorgement by the DIP Lender of any amounts received in respect of the obligations under the DIP Facility;
>
> xi. entry of an order without the express written consent of the DIP Lender obtaining additional financing from a party other than the DIP Lender under section 364(d) of the Bankruptcy Code except if such financing provides for the Payment in Full of the DIP Obligations;
>
> xii. the making of any material payments in respect of prepetition obligations other than (a) as permitted by the Interim Order or the Final Order, (b) as permitted by any "first day" or "second day" orders reasonably satisfactory to the DIP Lender, (c) as permitted by any other order of the Bankruptcy Court

|  |  | reasonably satisfactory to the DIP Lender, (d) as permitted under the DIP Documents in accordance with the Budget, or (e) as otherwise agreed to by the DIP Lender; |
|---|---|---|
|  | xiii. | entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Lender; |
|  | xiv. | the Debtors shall seek to, or support any other person's motion to, (a) disallow in whole or in part the DIP Obligations, (b) challenge the validity and enforceability of the DIP Liens, or (c) contest any material provision of any DIP Document; |
|  | xv. | the Debtors file a Plan that is not in form and substance satisfactory to the DIP Lender in its sole discretion, it being understood that a Plan will be satisfactory to the DIP Lender if it provides for the Payment in Full of the DIP Obligations pursuant to a signed commitment acceptable to the DIP Lender to lend from a recognized lender or another source of funding sufficient to allow for the indefeasible payment in cash of the full amount of the outstanding DIP Obligations on the Plan effective date; |
|  | xvi. | the Debtors file a motion seeking to settle a controversy or claim on account of the DIP Collateral without the prior written consent of the DIP Lender; **[This provision may vary from the requirements of MLBR 4001-2(c)(13).]** |
|  | xvii. | the Debtors file a motion for the Bankruptcy Court to approve a sale of the DIP Collateral pursuant to section 363 of the Bankruptcy Code which proposed sale is not acceptable to the DIP Lender in its sole discretion; **[This provision may vary from the requirements of MLBR 4001-2(c)(13).]** or |
|  | xviii. | the Debtors shall fail to execute and deliver to the DIP Lender any agreement, financing statement, trademark filing, copyright filing, notices of lien or similar instruments or other documents that the DIP Lender may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens created in favor of the DIP Lender, subject to the time periods and terms set forth in this Term Sheet. |
| 26. | ***Indemnification and Reimbursement of Expenses*** | • The DIP Documents shall contain customary indemnification provisions for the benefit of the DIP Lender, and its related parties, including, without limitation, indemnification against losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated by the DIP Documents or the use or the proposed use of proceeds thereof. |

Docusign Envelope ID: 47AD1CD4-8C29-4291-96AA-3D4E6D239D73

*[Execution Version]*

| | | |
|---|---|---|
| | | • Subject to the DIP Documents, all documented out-of-pocket accrued and unpaid fees, costs, disbursements, and expenses of the DIP Lender, including the fees and expenses of Kilpatrick Townsend & Stockton LLP as counsel to the DIP Lender, incurred in connection with the DIP Facility and the Chapter 11 Cases shall be paid on a current basis. |
| 27. | ***Release*** | • The Orders shall include a customary release of the DIP Lender, with respect to any and all claims and causes of action arising from or related to the DIP Facility. **[This provision may vary from the requirements of MLBR 4001-2(c)(4).]** |
| 28. | ***Waivers*** | • The Final Order shall include terms and conditions customary for final DIP financing orders and shall be reasonably acceptable to the DIP Lender, including, without limitation, waiver of the automatic stay, credit-bidding rights, "no marshaling" provisions and other similar doctrines, and waivers of the imposition of costs or right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, in each case, to the extent applicable. **[This provision may vary from the requirements of MLBR 4001-2(c)(4).]** |
| 29. | ***Press Releases*** | • Neither party shall issue a press release that mentions the other party's name (or its representatives, affiliates or related parties' names) without first obtaining that party's written consent. |
| 30. | ***Governing Law*** | • New York (and to the extent applicable, the Bankruptcy Code). |

Docusign Envelope ID: 47AD1CD4-8C29-4291-96AA-1D4E6D230D73

**IN WITNESS WHEREOF,** the parties hereto have caused this Term Sheet to be executed as of the date first set forth above.

Arch Therapeutics, Inc.,
  as a Borrower


By: _Terrence W. Norchi, MD_
Name:  Terrence W. Norchi
Title:   President


Arch Biosurgery, Inc.,
  as a Borrower


By: _Terrence W. Norchi, MD_
Name:  Terrence W. Norchi
Title:   President


Vivex Biologics, Inc.,
  as DIP Lender


By: _____
Name:  John A. McCallum
Title:   Executive Chairman

**Schedule 1 – Borrowers**

| Borrower/Debtor | State of Organization | EIN |
|---|---|---|
| Arch Therapeutics, Inc. | Nevada | 46-0524102 |
| Arch Biosurgery, Inc. | Massachusetts | 20-4425710. |

Docusign Envelope ID: 47AD1CD4-8C29-4291-96AA-1D4E6D939D73

## Schedule 2 – Petition Date Liens

As of the Petition Date, the Debtors' rights and interests in their respective properties and assets are subject to the liens evidenced, secured or perfected by the instruments listed below. The inclusion of any lien, claim, encumbrance, agreement or other instrument in this Schedule shall not be deemed an admission of the validity, perfection, or priority thereof, or the amount secured thereby.

Security interests as reflected on the UCC Financing Statements filed against each Debtor by:

Oasis Capital, LLC as collateral agent;
Brandt Wilson; and
Mona Wilson.

<u>Exhibit C</u>

[Initial DIP Budget]

4312309.11

**13 Week Budget**

| Item | 4/14/25 | 4/21/25 | 4/28/25 | 5/5/25 | 5/12/25 | 5/19/25 | 5/26/25 | 6/2/25 | 6/9/25 | 6/16/25 | 6/23/25 | 6/30/25 | 7/7/25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash | | $(516,994) | $(603,758) | $(699,996) | $(816,565) | $(943,349) | $(1,011,912) | $(1,117,891) | $(1,198,634) | $(1,451,793) | $(1,506,565) | $(1,570,525) | $(1,641,236) |
| Cash Inflows | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Cash Outflows for Operations | $516,994 | $86,764 | $96,238 | $116,568 | $126,784 | $68,564 | $105,979 | $80,743 | $253,159 | $54,772 | $63,961 | $70,711 | $146,532 |
| Ending Cash | $(516,994) | $(603,758) | $(699,996) | $(816,565) | $(943,349) | $(1,011,912) | $(1,117,891) | $(1,198,634) | $(1,451,793) | $(1,506,565) | $(1,570,525) | $(1,641,236) | $(1,787,769) |
| **Inflows** | | | | | | | | | | | | | |
| Lender | | | | | | | | | | | | | |
| A/R | | | | | | | | | | | | | |
| **Subtotal Inflows** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Subtotal People** | | | | | | | | | | | | | |
| CEO | $18,771 | | | $18,771 | | | $18,771 | | | $18,771 | | | $18,771 |
| Administrative support | | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 |
| Clinical advisors | | | | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | |
| Clinical affairs | | 3,000 | | 850 | 850 | 4,000 | 850 | 850 | 850 | 850 | 850 | 850 | 850 |
| Clinical data | | | | | | | | | | 2,000 | 2,000 | 2,000 | 2,000 |
| Engineer 1 (quality) | 3,000 | 3,000 | | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | | 3,000 | 3,000 | 3,000 | 3,000 |
| Engineer 2 (quality) | 1,430 | 600 | | 2,000 | | | 2,000 | | | | | | |
| Engineer 3 (project manager) | 6,000 | 6,000 | | 1,500 | 1,500 | | 500 | | | - | | | |
| Engineer 4 (specialist(s)) | | | | 2,000 | 2,000 | | | | | | | | |
| Regulatory affairs | 1,500 | | | 1,500 | | | 1,500 | | | 1,500 | | | 1,500 |
| Reimbursement | 1,500 | | | 1,143 | 1,143 | 1,143 | 1,143 | 1,143 | 1,143 | 1,143 | | | |
| Sales Rep(s) 1 | 2,692 | 2,692 | 2,692 | 2,692 | 2,692 | 2,692 | 2,692 | 2,692 | 2,692 | 2,692 | 2,692 | 2,692 | 2,692 |
| Sales Rep(s) 2 | | | | | | | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Sales Rep(s) 3 (distribution commissions) | | | | 5,000 | | | | | | | 5,000 | | |
| Scientist(s) & chemist(s) | 2,000 | 2,000 | | 2,000 | 2,000 | | 2,000 | | | 2,000 | 2,000 | 2,000 | 2,000 |
| Benefits Mgmt | 36 | | | | | 36 | | | | 36 | | | 36 |
| FICA taxes | 2,628 | | 2,628 | | | 2,628 | | | 2,628 | | 2,628 | | 2,628 |
| Healthcare | 1,707 | 1,707 | 1,707 | 1,707 | 1,707 | 1,707 | 1,707 | 1,707 | 1,707 | 1,707 | 1,707 | 1,707 | 1,707 |
| HSA | 1,383 | | | 1,383 | | | 1,383 | | | 1,383 | | | 1,383 |
| Other Insurance | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 |
| **Subtotal People** | $41,222 | 20,324 | 48,849 | 16,417 | 41,735 | 23,067 | 42,199 | 22,917 | 44,235 | 18,774 | 43,056 | 23,774 | 39,473 |
| **Subtotal Operating Expenses** | | | | | | | | | | | | | |
| Bank and credit card transactions, fees | 300 | 1,391 | | | 300 | | 360 | | 300 | | 360 | | 300 |
| Bookkeeping | 7,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| CPA | | | 10,000 | 10,000 | | | | | | | | | |
| Integration support | 692 | | 692 | | 692 | 692 | 692 | 692 | 692 | 692 | 692 | 692 | 692 |
| Internet | | | | 146 | | | | | | 146 | | | |
| IT: Miscellaneous Equipment | | | | 1,375 | 1,375 | 1,375 | 1,375 | 1,375 | | - | | | |
| IT: System Management | 450 | 450 | 450 | 450 | 450 | | 450 | 450 | 450 | 450 | 450 | 450 | 450 |
| IT: Website Maintenance | 350 | | | | 350 | | | | | 350 | | | |
| Communication/Phone lines | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 |
| Rent/storage/moving | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 | 875 |
| Software: Financial | 189 | | | | 284 | | | | 284 | | | | 189 |
| Software: IT | 188 | 188 | 188 | 188 | 188 | 188 | 188 | 188 | 188 | 188 | 188 | 188 | 188 |
| Software: Clinical | | 599 | | | | | | | | | | | |
| Software: QMS/Inventory | 277 | | 554 | | | 554 | | | | 554 | | | |
| **Subtotal Operating Expenses** | $10,375 | 15,249 | 13,813 | 4,780 | 5,567 | 4,634 | 5,548 | 3,405 | 4,192 | 3,259 | 4,173 | 3,405 | 4,098 |
| **Subtotal Supply chain** | | | | | | | | | | | | | |
| Active Pharmaceutical Ingredient (Primary Invent…) | 1,582 | 1,582 | 1,582 | 1,582 | 1,582 | 1,582 | 1,582 | 1,582 | 1,582 | 1,582 | 1,582 | 1,582 | 1,582 |
| Active Pharmaceutical Ingredient Storage, miscell… | 507 | | | | | | | | | | 507 | | |
| Notified body submission | | | | | | | | | | 4,000 | | | |
| Product assembly; ambulatory program | | | | | | | 6,000 | | | | | | |
| Product assembly: component purchase | 13,500 | | | | | 5,400 | | | | | | | |
| Product assembly: surgical program | | | | 19,185 | | | | | | | | | |
| Product assembly: warehousing, distribution, con… | 923 | 923 | 923 | 923 | 923 | 923 | 923 | 923 | 923 | 923 | 923 | 923 | 923 |
| Registered representative | 4,149 | 4,149 | 4,149 | | | | | | 10,000 | | 5,000 | | |
| Release testing and other testing | | | 2,600 | | | | | | 10,000 | 5,000 | | | |
| Shipping | | 200 | 200 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Sterilization and dose audit | | | | | 5,000 | 1,100 | 4,000 | | 8,000 | | | | |
| Supplier audits | | | | | 5,000 | 5,000 | 5,000 | | | | | | |
| Testing | | | | 2,000 | 2,000 | 2,000 | 2,000 | | 5,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Vial filling and testing | 9,296 | | 50,000 | | | 21,690 | | | | | | | 86,230 |
| **Subtotal Supply chain** | $29,957 | 6,855 | 9,455 | 74,191 | 10,005 | 16,505 | 20,005 | 36,695 | 18,005 | 14,512 | 5,005 | 5,005 | 91,235 |
| **Subtotal Intellectual Property** | | | | | | | | | | | | | |
| Arch IP 3, US | | | | 1,866 | | | | | | | | | |
| Arch IP 6, US | | | | 1,866 | | | | | | | | | |
| Arch IP 2b, Ex-US | | | | 822 | | | | | | | | | |
| Arch IP 2, Ex-US | | | | 1,018 | | | | | | | | | |
| Arch IP 9, US | | | | | | | 3,260 | | | | | | |
| Arch IP 10, US | | | | 5,000 | | | | | | | | | |
| Arch IP 10, Ex-US | | | | | | | 2,371 | | | | | | |
| Arch IP 12, Ex-US | | | | | 2,750 | | | | | | | 2,800 | |
| Arch IP, Ex-US | 8,333 | 8,333 | 8,333 | | 5,000 | 5,000 | | | | | | | |
| Arch IP 12, US | | | 2,000 | | | | | | | | | | |
| MIT IP 1, Ex-US | 6,977 | | | | | | | | | | | | |
| MIT IP 2, Ex-US | 4,779 | | | | | | | | | | | | |
| License fees | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 |
| License fees | 769 | 769 | 769 | 769 | 769 | 769 | 769 | 769 | 769 | 769 | 769 | 769 | 769 |
| **Subtotal Intellectual Property** | $21,409 | 11,653 | 16,493 | 5,051 | 9,069 | 11,950 | 1,319 | 1,319 | 1,319 | 1,319 | 1,319 | 4,119 | 1,319 |
| D&O Insurance | $35,472 | | | | | | 24,000 | | 175,000 | | | 24,000 | |
| **Subtotal Insurance** | $35,472 | | | | | | 24,000 | | 175,000 | | | 24,000 | |
| **Subtotal Commercialization, Conferences, Marketing, and T&E** | | | | | | | | | | | | | |
| Clinical sites | | | | 2,500 | | | 2,500 | | | 2,500 | | | |
| Critical supplier audits | | 600 | | 2,000 | | 2,000 | | 2,000 | | | | | |
| Sales and Marketing | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Wound care conference | | 4,000 | | 4,000 | | | | 4,000 | | 4,000 | | | |
| **Subtotal Commercialization, Conferences, Marke…** | 3,000 | 7,600 | 3,000 | 11,500 | 3,000 | 5,000 | 5,500 | 9,000 | 3,000 | 9,500 | 3,000 | 3,000 | 3,000 |
| **Subtotal Legal** | | | | | | | | | | | | | |
| Debtor's Bankruptcy Counsel | 25,000 | 25,000 | 4,545 | 4,545 | 4,545 | 4,545 | 4,545 | 4,545 | 4,545 | 4,545 | 4,545 | 4,545 | 4,545 |
| DIP Lender's Counsel | 50,000 | | | | 50,000 | | | | | | | | |
| **Subtotal Legal** | $75,000 | 25,000 | 4,545 | 4,545 | 54,545 | 4,545 | 4,545 | 4,545 | 4,545 | 4,545 | 4,545 | 4,545 | 4,545 |
| **Subtotal Admin Fees** | | | | | | | | | | | | | |
| Commitment fee | $60,000 | | | | | | | | | | | | |
| Creditors committee | | | | 2,778 | 2,778 | 2,778 | 2,778 | 2,778 | 2,778 | 2,778 | 2,778 | 2,778 | 2,778 |
| Exit Fee | $120,000 | | | | | | | | | | | | |
| Pre-petition loan | $120,476 | | | | | | | | | | | | |
| **Subtotal Admin Fees** | $300,476 | | | 2,778 | 2,778 | 2,778 | 2,778 | 2,778 | 2,778 | 2,778 | 2,778 | 2,778 | 2,778 |
| **US Trustee Quarterly Fee (Combine for Both)** | | | | | | | | | | | | | |
| US Trustee Quarterly Fee (Combine for Both) | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 84 |
| **US Trustee Quarterly Fee (Combine for Both)** | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 84 |