**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re: | Chapter 11 |
| ARCH THERAPEUTICS, INC., *et al.*,[1] | Case No. 25-40409 |
| Debtors. | Joint Administration Requested |

**AFFIDAVIT OF TERRENCE NORCHI**
**IN SUPPORT OF THE CHAPTER 11 PETITIONS**

I, Terrence Norchi, make the following statements under the pains and penalty of perjury:

1.      I serve as president and director (chairman) of Arch Therapeutics, Inc. ("**Arch**"), a corporation organized under the Nevada revised statutes.  Since approximately November 2006, I have served in similar and additional capacities at Arch and/or its fully owned subsidiary and predecessor company, Arch Biosurgery, Inc., a corporation organized under the laws of the Commonwealth of Massachusetts ("**ABS**", collectively with Arch, the "**Debtors**").

2.      Unless otherwise stated, all statements in this Affidavit are based upon (i) my personal knowledge; (ii) my review of relevant documents, including my records and the Debtors' records in their to the degree that I can access them in their "as is" condition without qualified support, which were kept as part of the Debtors' ordinary course of business; and (iii) my opinion based upon my experience and knowledge of the Debtors' operations and financial affairs.

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Arch Therapeutics, Inc. (4102). and Arch Biosurgery, Inc. (5710).

3.        On April 18, 2025, the Debtors filed petitions for relief under Chapter 11 of the

Bankruptcy Code in the United States District Court for the District of Massachusetts (the

"**Court**").

4.        On April 18, the Debtors filed a motion for entry of interim and final orders

authorizing the Debtors to, among other things, (i) obtain post-petition secured financing, and (ii)

grant liens to the proposed DIP lender [Doc. No. ___] (the "**DIP Financing Motion**").

5.        I submit this affidavit (the "**Affidavit**") in support of the Chapter 11 petitions,

including a going concern enterprise value sale of the Debtors via the Chapter 11 process (the

"**Process**"), and the DIP Financing Motion.

**A. My Role and Experience**

6.        Prior to Arch, I served as the lead portfolio manager of the Health Science Trust

(then-considered to be the second largest healthcare mutual fund globally with $4 billion in

assets under management), and senior equity analyst, and senior vice president for Putnam

Investment Management ("**Putnam**").  Prior to Putnam, I served as the Senior Global Biotech

Analyst, International Pharma Analyst, and Vice President for Citigroup Asset Management

("**Citigroup**").  Prior to Citigroup, I also served as the equity analyst for international

pharmaceuticals at Sanford C. Bernstein and Company ("**Bernstein**").  Prior to Bernstein, I

completed an MBA at the Massachusetts Institute of Technology ("**MIT**") with a focus on

management and entrepreneurship.  At MIT, I developed the relationships which, approximately

a decade later, led to an introduction to the Deshpande Center for Technological Innovation

("**Deshpande Center**"), to my eventual co-founders, and to the MIT-developed intellectual

property that became the initial foundation of Arch as it "spun out" of the Deshpande Center.

7.      Prior to attending MIT, I completed an internal medicine internship and residency at Baystate Medical Center ("**BMC**"), a large tertiary referral teaching hospital and a clinical campus for Tufts University School of Medicine at the time.  I also served as Chief Medical Resident for internal medicine at BMC.  Before my residency at BMC, I attended medical school at the Northeast Ohio Medical University.

8.      Within the Commonwealth of Massachusetts, I have served on the board of Advisors of the Boston Museum of Science for approximately nine years, have guest lectured at three areas universities and taught graduate level pathophysiology.

9.      With respect to Arch, at a high level, I am a founder and an inventor on at least four (4) United States patents, with additional patents pending before the United States Patent and Trademark Office (USPTO), and as such, have appeared before and/or presented to the USPTO and the European Patent Office.

10.     I negotiated Arch's license with MIT and was deeply involved in addressing the technical challenges necessary to develop Arch's novel technology — peptides that self-assemble into a physical mechanical structure after being applied to the body.  I conducted numerous animal and benchtop experiments and negotiated agreements with various academic institutions to perform research in a cost-effective manner, both in the United States and in Ireland, where the Irish government provided matching contributions on a 2:1 basis to support Arch's research and development contributions.

11.     I spearheaded Arch's successful application for a $1,000,000 Massachusetts Life Sciences Center ("**MLSC**") Accelerator Loan, which was awarded to Arch in 2011 and repaid, with interest, in 2017 (totaling $1,361,268).

12.     I was instrumental in working with the Food and Drug Administration ("**FDA**") to secure Arch's regulatory clearances to commercialize its product in the United States and in collaborating with Arch's notified body to secure a CE Mark to commercialize Arch's product in Europe — achievements that occurred during a particularly challenging and, in retrospect, potentially existential period for the Debtors.

13.     In addition, I have publicly presented the product scope, breath, and efficacy and as well as Arch's economic potential of Arch to investors at investment conferences and have presented Arch's technology and products to physicians and other medical personnel at wound care conferences, private clinics (often alongside patients), hospital operating rooms, Veterans Affairs hospitals, and other government forums.

**B.  Arch's Technology, Products**

14.     Arch's first commercial product, FDA-cleared wound care product, AC5® Advanced Wound System ("**AC5**"), is a synthetic acellular wound matrix consisting of a proprietary self-assembling peptide cleared by the FDA to manage partial and full-thickness wounds, such as pressure ulcers, venous leg ulcers, diabetic ulcers, and surgical wounds.

15.     AC5 Advanced Wound System is a technologically "differentiated" and innovative wound care treatment that can save limbs, improve care, and be invaluable if not lifesaving for millions of patients with challenging acute or chronic wounds.  AC5 presents an unusual and advanced approach to managing challenging wounds. AC5 is not a tissue, and it creates an extracellular-like matrix in or on a wound after it has been applied, rather than prior to application, further differentiating it from the most common commercially available advanced wound care products in the market.

16.     AC5 provides clinicians with multi-modal support and utility across all phases of wound healing.  Stored at room temperature, AC5 is hydrated at the point of care and applied to a wound where it intercalates into tissue interstices and self-assembles into a biocompatible and resorbable 3-dimensional wound care scaffold enabling re-epithelialization. During self-assembly, AC5's peptide units arrange themselves into higher-ordered structures that culminate in an entangled nanofiber network (i.e., the matrix).  The network resembles the construct of a tissue extracellular matrix. It provides a physical barrier that helps mitigate contamination and modulate inflammation.  It also provides a scaffold and environment conducive to cellular migration and soft tissue regeneration in the wound bed.  AC5 is synthetic and is not derived from animal or human tissue.

17.     AC5 is engineered to assemble into a wound matrix after it is applied to and integrates with tissue, rather than prior to application to the wound, which would interfere with its ability to fully integrate.  This challenging feat of engineering at the nanoscale, synthesis, and formulation levels enables AC5 to exist in three different phases of matter: solid, when shipped and stored (at room temperature); liquid when hydrated at the bedside prior to application to the wound; and semi-solid after it rapidly self-assembles upon application, forming a cohesive structure with mechanical properties (modulus) that allow it to stably integrate with tissue, without cracking or separating.

18.     AC5 has been used to manage wounds in hospital operating rooms, Veterans Health Administration (VA) Hospitals, doctors' offices, wound clinics, home settings, and potentially most critically in a war zone. Although AC5 is a peptide (commonly thought of as a small protein), it is regulated as a medical device.

19.     AC5 can be precisely applied and does not rely on sutures or staples. Once applied to a wound, AC5 rapidly conform to irregular wound geometry, and it incorporates into the wound bed. AC5 is dynamic and self-healing.

20.     Because AC5 possesses self-healing properties, is not a glue, and has visually clear optical characteristics, AC5 enables surgical manipulation through the material itself. A physician can operate through AC5 and interact with underlying or adjacent tissues and grafts—even in the presence of blood—without disrupting its integrity.  This unique capability is referred to as Crystal Clear Surgery™.

21.     AC5 is supported by 1) excellent efficacy outcomes and a strong safety profile, 2) a dedicated HCPCS reimbursement code, 3) documented evidence of reimbursement from both public and private payers, and 4) published, peer-reviewed clinical case studies, including two that received first-place honors at a national wound care conference.

22.     Doctor testimonials have been very supportive.  In addition to utility in the normal array of hard-to-heal of acute and chronic wounds, Arch has consistently received feedback that AC5 is particularly useful and very differentiated in wounds where tissues are not typically a good option (or a cannot be used without a waiting period), such as tunneled wounds; undermined wounds; shallow wounds; and surgical site incisions.  Referencing both the speed and measure of a desired outcome in a previously stalled wound, a reconstructive plastic surgeon commented, "If you can make a peanut butter sandwich, you can heal wounds with this."

23.     AC5 appears to jump start wounds. Published peer-reviewed clinical case reports demonstrate success with chronic wounds, acute surgical wounds, traumatic wounds, and limb

salvage, including wounds previously stalled despite receiving standard of care and advanced

therapies for periods of months, years, and even more than a decade.

24.     Arch has applied to Centers for Medicare and Medicaid Services ("**CMS**") for

and has been granted a unique Healthcare Common Procedure Coding System (HCPCS)

reimbursement code for AC5.  Also, AC5 is listed on government procurement and

reimbursement schedules and is eligible for distribution through Arch's government-authorized

distributor—a Service-Disabled Veteran-Owned Small Business (SDVOSB)—to federal

channels, including Veterans Affairs (VA) hospitals and military treatment facilities.

25.     By way of example of the need for the AC5, chronic wounds—including diabetic

foot ulcers ("**DFUs**"), pressure injuries, and venous leg ulcers—afflict more than 8 million

Medicare beneficiaries each year and result in annual Medicare expenditures estimated between

$28 billion and $96 billion.  These wounds are frequently painful, open ulcers that remain

unhealed for at least one month, and often persist for six months or longer. Fear, pain, delayed

access to appropriate medical care, and the complexity of available interventions often

exacerbate these wounds, leading to additional adverse outcomes. Common complications of

chronic wounds include sepsis, cellulitis, gangrene, and amputation—any of which can result in

long-term disability, chronic physical and mental health burdens, and further increases in

healthcare utilization costs.  Notably, the five-year mortality rate following amputation due to a

chronic wound often exceeds 50%. Mortality among patients with chronic wounds has been

estimated at 28% within two years, substantially higher than the 4% mortality rate reported

among similarly aged patients (aged 75–79) without a chronic wound. According to a 2020

report from the Centers for Disease Control and Prevention ("**CDC**"), approximately 10.5% of

the U.S. population has diabetes, resulting in over $327 billion in direct and indirect costs.

DFUs, a common and severe complication of diabetes, are the most prevalent type of wound in

the U.S. and are associated with a mortality rate comparable to that of colorectal cancer.  Delays

in treating DFUs cause unnecessary pain, prolonged suffering, and preventable complications.

26.     Patients suffering from chronic or complex wounds frequently have additional

co-morbidities, which further complicate diagnosis, treatment, and recovery.  These patients are

often marginalized due to challenges with reimbursement systems and a lack of effective

advocacy.  Arch believes its technology offers a meaningful opportunity to address these unmet

clinical needs, providing better outcomes for patients and physicians.

**C. Events Leading to the Chapter 11 Filing**

27.     Arch Therapeutics previously traded on the OTCQB market but was recently

downgraded to the OTC Expert Market, due to inadequate capital necessary to remain compliant

with listing requirements and where there is currently no active trading volume. To unlock

broader capital markets access, Arch pursued uplisting to a national exchange such as Nasdaq or

the New York Stock Exchange on multiple occasions. Despite substantial efforts, these attempts

were ultimately unsuccessful.  During this time, Arch entered into several vintages of convertible

notes, which contained covenants requiring the Debtors to continue pursuing an uplist.  As

uplisting remained elusive, the convertible instruments became increasingly challenging to

secure, let alone service.

28.     These capital market challenges compounded the difficulty of supporting even a

modest commercial presence, despite the strong clinical and regulatory foundation of Arch's lead

product, AC5.

29.     As an example of Arch's efforts and associated financial burden, Arch incurred

approximately $1.6 million in legal fees over an 18-month period beginning in January 2023,

associated with supporting multiple S-1 filings in connection with planned equity raises, as well as processing its convertible notes and maturity extensions and meeting related SEC disclosure requirements.

30.     The noteholders—many of whom were also long-term shareholders—became increasingly reluctant or unable to provide new financing.  The timing of new note investments became unpredictable, and the proposed terms were frequently such that Arch could not satisfy them.  As a result, the Debtors' liquidity position deteriorated to the point where it was unable to meet payroll or satisfy other obligations.  Currently, Arch consists of a single full-time employee who has been unpaid, supported only by a small number of consultants.

## D. Arch's value

31.     Arch is ISO 13485 certified and Arch has been granted patents in a range of jurisdictions and continues to prosecute patent applications.

32.     Arch's value proposition lies in the strategic synergy of its foundational assets: its intellectual property portfolio; regulatory clearances; quality management systems; product inventory; and its specialized expertise in treating complex wounds and managing the behavior of its self-assembling peptide platform.  This includes a deep understanding of the mechanism of action, influencer dynamics of self-assembly, peptide performance across varied conditions, and end-to-end supply chain operations.  Each of these components contributes distinct and irreplaceable value.  However, it is the integrity of the system as a whole—these assets working in concert—that defines the company's value and maximizes the area under the curve of future cash flow generation.

33.     The viability of the platform depends on its elements remaining healthy, functional, and aligned.  Disruption to any one component—whether regulatory, operational, or

scientific—threatens the viability of the others.  Moreover, many of Arch's key partnerships rely on validated, non-generic methods developed over time, and cannot be easily replicated.

34.     The principal reason that companies like Arch invest millions of dollars over the course of many years long before generating any revenue is because such investment is an essential necessary precursor to building value, and continued support of resulting collective components is required to subsequently retain that value, let alone further advance it. This approach has informed all aspects of our operations, including the development of our supply chain; the protection of our intellectual property; and the creation and preservation of our proprietary GMP manufactured peptide inventory; the security of our supply chain; support of doctors, hospitals and their patents; maintenance of <u>Arch's</u> fully functional and compliant quality management system; and support of regulators and audits; among others.  Only through the integration of all of these interdependent components, as Arch has readied, can meaningful therapeutic and commercial value be realized.

**E.  Need for DIP Financing and Search for Alternative Funding**

35.     Sustained, adequate funding is essential not only to preserve Arch but to protect the holistic value of the operational and development enterprise itself.  To ignore these distinct but cohesive components would dramatically reduce and could completely eliminate any potential for preserving the going-concern value or any return to the Debtors' creditors.

36.     Arch has engaged in extensive efforts to secure funding, capital and resources by actively pursuing potential strategic partners (public and private), investment bankers, hedge funds, private equity firms, and other financial stakeholders.  Despite substantial outreach, securing capital was extremely challenging for many reasons, including uncertain re-imbursement dynamics for many wound product companies, adverse financing market

conditions, restrictions on OTC-traded companies, a difficult environment for uplisting to a

national exchange (e.g., Nasdaq), and other factors, including piecemeal, and earmarked

directives for only limited funding from the convertible noteholders.

37.     Beginning at least last summer, Arch prioritized identifying a strategic partner or

acquirer with the resources and operational expertise necessary to resolve its funding gap.  A

significant number of these discussions progressed to advanced stages, but were typically

delayed or terminated when counterparties paused pending CMS  reimbursement developments

affecting their own wound care portfolios (often focused on tissue-based products) or because

they had their own capital concerns.  The Debtors also held discussions with financial investors

and capital providers.  In those conversations, the most frequently cited concerns were the

broader market environment and the perceived complexity of Arch's outstanding convertible

debt.

38.     Additionally, Arch engaged with a number of Nasdaq- and NYSE-listed

companies seeking either to potentially pivot their strategy or to obtain a product to sell. While

these conversations initially appeared promising, they ultimately stalled for reasons including,

the counter party was unable or unwilling to proceed in a timely fashion; the counterparty

pivoted its own priorities; or deal conditions were not feasible given Arch's circumstances—such

as requiring firm assurances of capital sufficiency to preserve value, possessing limited relevant

knowhow (which is more problematic if they are undercapitalized), or proposing vague and

impracticable mechanisms for transferring secured assets.

39.     Despite considerable efforts, and over a considerable period of time, Arch has

been unable to secure adequate funding and/or required capital to operate and to commercialize

its products.

40.     Given Arch's current lack of sufficient funding to sustain its operations independently, a Chapter 11 sale represents the optimal and likely only viable path to preserving and maximizing the value of the estate for the benefit of creditors and stakeholders.  However, realizing this potential requires the post-petition financing while the Debtors pursue value-maximizing sale transactions.  As set forth in the budget attached to the DIP Financing Motion, the Debtors will use the post-petition financing to pay necessary expenses, such as obligations related to maintaining and/or supporting adequate inventory supply, regulatory clearances, intellectual property obligations, elements necessary for product certified for commercialization for use in humans, and related personal to support such activities.

41.     Unless the Debtors have access to the post-petition financing, going concern value of the Debtors' business would likely be depleted.

42.     I believe that this Process provides the only realistic mechanism for the Debtors to survive and/or  the best prospects for Arch to ensure future success for its products and technology, which would provide life changing benefits to suffering patients.

        Dated: April 18, 2025

                                    Terrence W. Norchi, MD
                                    Terrence Norchi, President

4321520.3

12