# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| In re: | Chapter 11 |
| ARCH THERAPEUTICS, INC., *et al.*,[1] | Case No. 25-40409 |
| Debtors. | Jointly Administered |

### ORDER (I) APPROVING AND AUTHORIZING SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ANY AND ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; AND (II) GRANTING RELATED RELIEF

Upon the motion of Arch Therapeutics, Inc. ("**Arch**") and, its subsidiary, Arch Biosurgery, Inc. ("**ABS**"), as Debtors and Debtors in possession (collectively, the "**Debtors**") [Doc. No. 65] (the "**Sale Motion**")[2] for an Order authorizing the Debtors to sell all their assets as described below and in the APA (as defined below) to Arch Acquisition LLC or another bidder with a higher or better offer free and clear of liens, claims, and encumbrances, and other interests including, but not limited to, Liabilities (as defined in the Sale Motion, collectively, the "**Encumbrances**"); and this Court having determined that the relief requested in the Sale Motion is in the best interests of the Debtors, their estates and creditors, and other parties-in-interest; and no objections having been filed, with two additional bids having been timely submitted, and good and sufficient cause appearing therefore; and adequate notice having been given and a hearing having been held on June 20, 2025 (the "**Sale Hearing**") with all bidders and respective counsel present; and it appearing that no other notice need be given; and this Court having reviewed and considered the Sale Motion and the oral objections presented at the Sale Hearing to the counterbid filed by AT DE Acquisition LLC; and this Court having heard statements of

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Arch Therapeutics, Inc. (4102) and Arch Biosurgery, Inc. (5710).

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Sale Motion or the APA (as defined below).

counsel and the evidence presented in support of the relief requested by the Debtors in the Sale

Motion and at the Sale Hearing; and upon the full record of the Chapter 11 cases, and good cause

otherwise having been shown for the relief requested, THE COURT HEREBY FINDS:[3]

A.    This Court, pursuant to 28 U.S.C. § 1334, has jurisdiction over all assets of the

Debtors and the Chapter 11 estates.  The Sale Motion is a core proceeding as defined in 28

U.S.C. § 157(b)(2).  Venue of the Sale Motion in this district is proper pursuant to 28 U.S.C. §§

1408 and 1409.

B.    After receiving two counteroffers, Arch Acquisition LLC is the successful bidder

(the "**Buyer**") with respect to the sale of the Debtors' assets pursuant to the Sale Motion. The

highest bid received from the auction conducted at the Sale Hearing is $4,000,000.00 plus

payment of the Assumed Contracts (as defined below) (the "**Purchase Price**").

C.    The second highest bid of $3,900,000.00 is from Auxocell Operations, Inc., which

will remain as a backup bid until June 30, 2025.

D.    The Asset Purchase Agreement dated May 14, 2025 between the Debtors and the

Buyer (along with its exhibits) attached to the Sale Motion, and attached hereto as **Exhibit A**

with an amendment dated June 24, 2025 (reflecting the amount of the successful bid at the

auction conducted by the Court at the Sale Hearing) (collectively, the "**APA**") are offered in

good faith, from arm's-length bargaining positions by the parties.

E.    The assumption and assignment of the executory contracts and/or unexpired

leases as set forth in exhibit attached to the sale notice [Doc. No. 87] and attached hereto as

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law
pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the
extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the
extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**Exhibit B** (the "**Assumed Contracts**") are in compliance with section 365 of the Bankruptcy Code.

F.      The purchased assets shall be all right, title and interest of each Debtor in and to all its assets, as set forth in Sections 2.1 and 2.2 of the APA, including, but not limited to, Purchased Intellectual Property, Government Authorizations, Equipment, Inventory, Causes of Action, and Assumed Contracts (as defined below) (the "**Purchased Assets**").

G.      The Debtors provided notice of the sale transaction and served the Sale Notice on all creditors and parties potentially interested in the assets of the Debtors.  The Purchase Price represents and constitutes the highest and best offer obtainable for the Purchased Assets, and constitutes reasonably equivalent value, fair consideration and fair value under the Bankruptcy Code and any applicable nonbankruptcy laws.  The Debtors' determination that the APA constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment.

H.      The Debtors have demonstrated good, sufficient, and sound business purpose and justification and compelling circumstances for the sale of the Purchased Assets pursuant to sections 363 and 365 of the Bankruptcy Code.

I.      The APA must be approved promptly in order to preserve the value of the Purchased Assets.  The APA presents the best opportunity to realize the value of the Purchased Assets and avoid further decline and devaluation of the Purchased Assets.

J.      The Buyer has acted in good faith in this matter and is a good faith purchaser as that term is used in the Bankruptcy Code, and is, accordingly, entitled to the protections set forth in section 363(m) of the Bankruptcy Code.  The Debtors and the Buyer have not engaged in any conduct that would cause or permit the APA or the transactions contemplated thereby to be

avoided or avoidable, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code. The Buyer is not an "insider" or "affiliate" of the Debtors (as such terms are defined in the Bankruptcy Code).

K.      With respect to any and all Persons (as that term is defined in section 101(41) of the Bankruptcy Code), Governmental Units (as that term is defined in section 101(27) of the Bankruptcy Code), or entities asserting any Encumbrance against the Purchased Assets (collectively, the "**Encumbrance Parties**"), (i) applicable non-bankruptcy law permits sale of such property free and clear of such Encumbrance; (ii) each of the Encumbrance Parties have consented to the sale and transfer, license, and assignment as applicable, free and clear of its Encumbrance, with such Encumbrance to attach to the net sale proceeds, subject to any claims and defenses the Debtors and their estates may possess with respect thereto; or (iii) the Encumbrance Parties could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such Encumbrance so that the conditions of section 363(f) of the Bankruptcy Code have been satisfied.  None of the Encumbrance Parties filed any objection to the Sale Motion and the Encumbrance Parties are deemed to have consented to the Sale Motion pursuant to section 363(f)(2) of the Bankruptcy Code.  The Encumbrance Parties fall within one or more of the subsections of section 363(f) of the Bankruptcy Code and, therefore, are adequately protected by having their liens on the Purchased Assets attach solely to the proceeds of the sale transaction ultimately attributable to the sale of the property in which such holders have a Lien, in the same order of priority, and with the same validity, force and effect that such Liens had prior to the consummation of the sale transaction, subject to any rights, claims or defenses of the Debtors and their estates.

L.     The Debtors have full corporate power and authority to execute and deliver the

APA and all other documents contemplated thereby, and no further consents or approvals are

required for the Debtors to consummate the transactions contemplated by the APA.  The transfer

of each of the Purchased Assets to the Buyer will be as of the closing date a legal, valid, and

effective transfer of such Purchased Assets, and shall vest the Buyer with all right and title to the

Purchased Assets free and clear of all Encumbrances.

M.     Under all the circumstances presented, (i) all actions contemplated in the APA,

(ii) consummation of all acts contemplated in this Order, (iii) the transfer of the Purchased Assets

by the Debtors to the Buyer, and (iv) the receipt by the Debtors of the Purchase Price are all in

the best interests of the Debtors and their estates, creditors, and interest holders.

N.     Proper, sufficient, and sound business reasons and other good cause for the entry

of this Order have been shown.

O.     The Debtors have given due and proper notice of the proposed sale of the

Purchased Assets to all parties required to receive notice as set forth in the sale and bidding

procedures order.  A reasonable opportunity to object or be heard with respect to the Sale Motion

and the relief requested therein, and the rights of third parties to submit higher or otherwise

better offers for the Purchased Assets, has been afforded to all interested parties and entities.

P.     The closing and the consummation of the transactions contemplated by the APA

shall not subject the Buyer to any liability whatsoever with respect to the prepetition operation of

the business of the Debtors or the postpetition operation of the business of the Debtors. The

transactions contemplated by the APA do not amount to a consolidation, merger, or *de facto*

merger of the Buyer and the Debtors and/or the Debtors' estates, there is no continuity of

enterprise between the Debtors and the Buyer, the Buyer is not a mere continuation of the

5

Debtors or the Debtors' estates, and the Buyer does not constitute a successor to the Debtors or the Debtors' estates.

Q.     The Buyer's acquisition of the Purchased Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the closing date.  The Buyer's operation and use of the Purchased Assets acquired from the Debtors shall not be deemed a continuation of the Debtors' business.

R.     Time is of the essence in consummating the asset sale.  In order to maximize the value of the Debtors' assets, it is essential that the sale of the Purchased Assets occur within the time constraints set forth in the APA.  Accordingly, the Court finds that there is cause to waive and/or vacate the stay imposed by Bankruptcy Rules 6004(h) and 6006(d), and such stay is hereby vacated and shall have no application to the relief afforded by this Order.  This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rules 9014 and 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:

1.     The Sale Motion is hereby granted as set forth herein.  Any objections (including the objections to whether the counterbid filed by AT DE Acquisition LLC should be considered a qualified bid under the Sale Procedures) and any reservation of rights with regard to the relief sought in the Sale Motion that have not been withdrawn, waived, or settled, are hereby overruled on the merits.

2.     The APA is hereby approved in its entirety; the Purchased Assets are hereby sold to the Buyer. The sale of the Purchased Assets shall be "as is" and "where is" to the Buyer.

6

3.      The Assumed Contracts are assumed by the Debtors and assigned to the Buyer pursuant to section 365 of the Bankruptcy Code.  To the extent an Assumed Contract is not an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors' interests in such agreements will nevertheless be transferred to the Buyer as assets of the Debtors' estates pursuant to section 363 of the Bankruptcy Code.

4.      After closing, the Buyer shall cooperate with and make available to the Debtors all books, records and other materials as may be reasonably required for the administration and closure of the bankruptcy cases.

5.      After closing, the Debtors shall retain or keep copies of all paper records and computer records that are reasonably necessary for the continued administration and closure of the bankruptcy cases, related to the Excluded Assets, and for any reasonable business purpose; such other documents relating to the sale are permitted to be turned over to the Buyer but for which the Debtors shall have access through the closure of the Debtors' bankruptcy cases.

6.      The Debtors are hereby authorized, empowered, directed and, upon entry of this Order, has all the power and authority necessary to:

a.      Fully perform under, consummate, implement, execute, and deliver the APA and all other documents contemplated thereby, to consummate the transactions contemplated by the APA, and to take all other actions required to be taken pursuant to the APA;

b.      Transfer the Purchased Assets to the Buyer and to execute and deliver all the documents necessitated thereby, and to take any action necessary to effectuate the transfer of the Purchased Assets and the Assumed Contracts to the Buyer;

c.      Receive the consideration described in the APA from the Buyer and take any action necessary to effectuate the receipt of such consideration; and

d.      Fully perform and take all action necessary to effectuate the APA, the transactions contemplated thereby, and the obligations contemplated by this Order.

7.      No other or further consents or approvals of this Court are required for the

Debtors to consummate or effectuate (i) the APA, (ii) the transfer of the Purchased Assets and

the Assumed Contracts, and (iii) the receipt of consideration from the Buyer.

8.      The Purchase Price and any cure cost related to the Assumed Contracts shall be

paid by the Buyer without offset, deductions or recoupments; *provided that* the Purchase Price

includes the $900,000.00 credit bid, and the $500,000 carve out for the Prepetition Secured

Parties (as set forth in the Sale Motion and the APA).

9.      The $500,000 carve out for the Prepetition Secured Parties shall be paid out to the

agent for the Prepetition Secured Parties at closing in satisfaction of the Prepetition Carve

Out and partial satisfaction of the Prepetition Secured Parties' claims, with the parties reserving

all rights with respect any interest or other fees, costs or charges alleged to be due and owing to

the Prepetition Secured Parties related to such claims.

10.     The remaining sale proceeds shall be kept in escrow with the Debtors' client trust

account at Riemer & Braunstein LLP, pending separate order(s) of the Bankruptcy Court related

to a Chapter 11 plan, or motion to be filed by the Debtors, including with respect to further

distribution or payment to the Prepetition Secured Parties.

11.     The transfer of each of the Purchased Assets to the Buyer will be as of the closing

date a legal, valid, and effective transfer of such Purchased Assets and shall vest the Buyer with

all right and title to the Purchased Assets.  Pursuant to section 363(f) of the Bankruptcy Code,

the Purchased Assets shall be transferred to the Buyer, and, upon the closing under the APA, the

Purchased Assets shall be free and clear of any and all Encumbrances, Excluded Liabilities, and

interests, including, without limitation, all claims, if any, arising from the operation or cessation

of the Debtors' business, whether arising prior to or subsequent to the commencement of the

8

Debtors' cases under Chapter 11 of the Bankruptcy Code (or any case under Chapter 7 of the Bankruptcy Code that may result from the conversion of the Chapter 11 cases), and whether imposed by agreement, understanding, law, equity, or otherwise (except as otherwise provided in the APA or this Sale  Order), which Encumbrances, if any, shall attach to the net proceeds of the asset sale.

12.     The Encumbrance Parties shall be, and hereby are, barred from asserting such Encumbrance against the Buyer, its successors and assigns, or the Purchased Assets.

13.     All entities that are in possession of some or all of the Purchased Assets on the closing date are directed to surrender possession of such Purchased Assets to the Buyer on the closing date.  All entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Purchased Assets to the Buyer in accordance with the terms of the APA and this Order.

14.     The Encumbrance Parties are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding, against the Buyer (including its successors or assigns) or the Purchased Assets  with respect to any (a) Encumbrance arising under, out of, in connection with or in any way relating to the Debtors, the Buyer, the Purchased Assets, or the operation of the Purchased Assets prior to the closing of the asset sale, or (b) successor liability.

15.     The consummation of the APA shall not subject the Buyer to any liability whatsoever with respect to the prepetition or postpetition operation of the business of the Debtors in any form or manner whatsoever, including, without limitation, by reason of any theory of successor or transferee liability, *de facto* merger, or substantial continuity, whether known or unknown and whether asserted or unasserted as of the closing.

16.     If any person or entity that has filed a financing statement or other documents or agreements evidencing an Encumbrance on the Purchased Assets shall not have delivered, in proper form for filing, termination statements, instruments of satisfaction, releases, and other documents to the Debtors prior to the closing of the asset sale, then the Debtors shall be and hereby are authorized to execute such termination statements, instruments of satisfaction, releases, and other documents on behalf of the person or entity and to file the same with any appropriate registry or public filing office.

17.     Notwithstanding the foregoing, the provisions of this Order authorizing the asset sale and assignment of the Purchased Assets free and clear of Encumbrances shall be self-executing, and notwithstanding the failure of the Buyer, the Debtors, or any other party to execute, file, or obtain releases, termination statements, assignment consents, or other instruments to effectuate, consummate, and/or implement the provisions hereof or the APA with respect to the sale of the Purchased Assets.  The transactions contemplated by the APA authorized herein shall be of full force and effect, regardless of any Debtor's lack of good standing in any jurisdiction in which it is formed or authorized to transact business.  A certified copy of this Order may be filed with the appropriate clerk(s) and/or recorded with the recorder(s) which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of (i) the release of all Encumbrances in the Purchased Assets and (ii) the Buyer's right and title to the Purchased Assets.

18.     This Order is and shall be binding upon and govern the acts of all Persons, entities, and Governmental Units including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registry of motor vehicles, administrative agencies, governmental departments, secretaries of

state, federal and local officials, and all other persons and entities who may be required by

operation of law, the duties of their office, or contract, to accept, file, register or otherwise record

or release any documents or instruments, or who may be required to report or insure any title or

state of title in or to any lease; and each of the foregoing is hereby directed to accept for filing

this Order and any and all of the documents and instruments necessary and appropriate to

consummate the transactions contemplated by the APA.

19.     The Debtors are hereby authorized, empowered, and directed, and, upon entry of

this Order, shall have all the authority necessary, to perform such ministerial acts as may be

required to effectuate and implement the APA and any transaction contemplated thereby.

20.     All of the transactions and actions contemplated by this Order are properly

authorized under sections 363 and 365 of the Bankruptcy Code.

21.     No bulk sales law or any similar law of any state or other jurisdiction applies in

any way to the asset sale.

22.     The transactions contemplated by the APA are undertaken by the Buyer at arms'

length, without collusions, and in good faith, as that term is used in section 363(m) of the

Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization

provided herein to consummate the asset sale shall not affect the validity of the sale to the Buyer,

unless such authorization is duly stayed pending such appeal. The Buyer is a good-faith

purchaser and is entitled to all of the protections afforded by sections 363(m) and (n) of the

Bankruptcy Code.

23.     The terms and provisions of the APA and this Order shall be binding in all

respects upon, and shall inure to the benefit of, the Debtors and the Buyer, and the successors

and assigns of each of the foregoing, and any affected third parties, notwithstanding conversion

11

or dismissal of the Debtors' bankruptcy cases or any subsequent appointment of any trustee under any chapter of the Bankruptcy Code, as to which trustee such terms and provisions likewise shall be binding.

24.     The automatic stay pursuant to Section 362 is hereby lifted with respect to the Debtors to the extent necessary, without further order of this Court, to (i) allow the Buyer to deliver any notice provided for in the APA, and (ii) allow the Buyer to take any and all actions permitted under the APA in accordance with the terms and conditions thereof.

25.     The failure specifically to include or refer to any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the APA be authorized and approved in its entirety.

26.     Nothing contained in any Chapter 11 plan, or order of any type or kind entered in (a) the Chapter 11 cases, (b) any subsequent Chapter 7 case into which any such Chapter 11 case may be converted, or (c) any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions of the APA or the terms of this Order.

27.     The APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by the Debtors and the Buyer, and in accordance with the terms of the APA, without further order of the Court, _provided that_ any such modification, amendment, or supplement does not have a material adverse effect on the estates of the Debtors.

28.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion, the terms of this Order shall govern.  To the extent there are any inconsistencies between the terms of this Order and the APA (including all ancillary documents executed in connection therewith), the terms of this Order shall govern.

29.    Notwithstanding the applicability of Bankruptcy Rules 6004(h), 6006(d), and

7062, as applicable, the terms and conditions of this Order shall be immediately effective and

enforceable upon its entry by the Court.

30.    This Court retains exclusive jurisdiction to enforce and implement the terms and

provisions of this Order and the APA (including all ancillary documents executed in connection

therewith).  The foregoing shall include, but not be limited to, retaining exclusive jurisdiction (a)

to resolve any disputes arising under or related to the APA or between the Debtors and the

Buyer; (b) to protect the Buyer, or the Purchased Assets, from and against any Encumbrances;

and (c) to interpret, implement, and enforce the provisions of this Order.


Dated: June 25, 2025                         _____

                                             ELIZABETH D. KATZ
                                             UNITED STATES BANKRUPTCY JUDGE

EXHIBIT A

(Asset Purchase Agreement)

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "*Agreement*") is made as of May 14, 2025 (the "*Execution Date*") by and among Arch Acquisition LLC, a Delaware limited liability company (the "*Purchaser*"), Arch Therapeutics, Inc., a Nevada corporation ("*Arch Therapeutics*") and Arch Biosurgery, Inc., a Massachusetts corporation ("*Arch Biosurgery*" and together with Arch Therapeutics, collectively, the "*Sellers*"; each, a "*Seller*"). Purchaser and Sellers are referred to collectively as the "*Parties*" (each one of them, a "*Party*").

The Agreement is based upon the following recitals of fact, and each of the Parties acknowledges that each of the following is entirely true and correct:

## RECITALS:

A.      Sellers are engaged in the researching, developing and marketing of products based on Sellers' AC5® self-assembling technology platform in the field of stasis and barrier applications, which includes managing wounds created during surgery, trauma or interventional care, or from disease; stopping bleeding (hemostasis); and controlling leaking (sealant) (such products, collectively, the "*Products*" such activities, collectively, the "*Business*").

B.      Arch Therapeutics leases certain real property in Framingham, Massachusetts on which the Sellers operate.

C.      Purchaser desires to purchase, and Sellers' desire to sell, substantially all of their assets used or held for use in, or relating to the Business, including the Owned Intellectual Property and the Licensed Intellectual Property, upon the terms and subject to the conditions set forth in this Agreement (the "*Transaction*").

D.      On the terms and conditions set forth in this Agreement, the Purchaser desires to purchase from Sellers, and Sellers desire to sell to Purchaser (the "*Proposed Transaction*"), all of the Purchased Assets (as defined below) which include (i) all of the Owned Intellectual Property, the Licensed Intellectual Property, and the Assumed Contracts, and (ii) the other assets, property and business associated with the Business, in each instance, free and clear of all Liens, in accordance with Sections 105, 363, and 365 and other applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

E.      The Parties acknowledge that in every respect, the Proposed Transaction has been negotiated at arm's length and in good faith and without the intent to hinder, delay or defraud creditors of the Sellers.

F.      On April 18, 2025, Arch Therapeutics commenced a chapter 11 bankruptcy case in the United States Bankruptcy Court for the District of Massachusetts (the "*Bankruptcy Court*") as case no. 25-40409 (the "*Arch Therapeutics Bankruptcy Case*"). Also on April 18, 2025, Arch Biosurgery commenced a chapter 11 bankruptcy case in the Bankruptcy Court as case No. 25-40410 (the "*Arch Biosurgery Bankruptcy Case*," and together with the Arch Therapeutics Bankruptcy Case, the "*Bankruptcy Cases*").

G.      Sellers have determined that the offer of Purchaser for the Purchased Assets (i) is the highest and best price for the Purchased Assets, (ii) the sale of the Purchased Assets as a whole is in the best interest of Sellers, the respective creditors of Sellers and their bankruptcy estates and (iii) constitutes a fair and adequate purchase price for the Purchased Assets.

H.      The Parties intend that Purchaser be designated as the Stalking Horse Bidder (as defined in the Bidding Procedures Order).

**NOW, THEREFORE**, for good and valuable consideration and in consideration of the performance of the mutual covenants and agreements contained herein, the receipt and adequacy of which are conclusively acknowledged, the Parties agree as follows:

1.      **Incorporation of Recitals; Definitions and Rules of Construction**

1.1      As used in this Agreement each of the words and phrases that are capitalized shall have the meaning ascribed to them in Schedule 1.1.

1.2      The recitals set forth above are incorporated by this reference.

2.      **Purchase and Sale of Assets**

2.1      Purchased Assets. Except as otherwise specifically provided in Section 2.3, subject to the terms and conditions hereof and on the basis of the representations, warranties and covenants contained herein, Sellers agree to sell, assign, transfer, convey, grant and deliver to Purchaser, and Purchaser agrees to purchase from Sellers all of Sellers' respective right, title and interest in, to and under all of the assets, properties, and rights of Sellers used in or held for use in, or relating to, the Business, wherever located, and whether or not reflected on the books of the respective Seller (collectively, the "***Purchased Assets***") including without limitation all right, title and interests in the assets set forth in Section 2.2, free and clear of, and expressly excluding, any and all liens, claims (including as defined in 11 U.S.C. § 101(5)), losses, damages, penalties, suits, legal actions, expenses, and encumbrances of any kind, character or description whatsoever, including any mortgage, deed of trust, pledge, security interest, hypothecation, assignment, statutory or other lien, charge, or other encumbrance of any kind or nature whatsoever (including, without limitation, pursuant to any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the UCC or comparable law of any jurisdiction to evidence any of the foregoing) on personal or real property or fixtures (collectively, the "***Liens***").

2.2      The Purchased Assets include, but are not limited to, the following:

(a)      All Intellectual Property, including the Owned Intellectual Property and the Licensed Intellectual Property (collectively, the "***Purchased Intellectual Property***");

(b)      All of Sellers' right, title and interest in and to all confidentiality agreements, non-disclosure agreements, non-compete agreements, non-solicitation, restrictive covenant, invention assignment agreements or similar Contracts by current or past employees or independent contractors;

2

(c)      To the extent assignable, all applications, consents, approvals, licenses, permits, franchises, filings or authorizations, including certificates of occupancy (collectively, "***Governmental Authorizations***"), granted by any public or governmental entity, including federal, state or local, department, bureau, commission, agency and similar bodies or authority (collectively, the "***Governmental Entities***" and, individually, each a "***Governmental Entity***") in connection with the operation of the Business and the Purchased Intellectual Property;

(d)      All of the fixed and tangible assets owned or leased by Sellers and used in the maintenance and operation of the Business, including the machinery, vehicles, apparatus, rolling stock, molds, appliances, furniture, fixtures, trade fixtures, signs, computers, computer hardware and computer-related software, information technology systems and servers, services, replacement parts and other physical assets, including the tangible assets, regardless of whether located or stored at the Real Property, and including the specific assets listed on Schedule 2.2(d) (the "***Equipment***");

(e)      All raw materials, work-in-process, finished goods, supplies (including recycled plastics), samples, components, packaging materials used in or held for use in, or relating to, the Business, including what is described on Schedule 2.2(e) (collectively, the "***Inventory***");

(f)      All warranties, guarantees and similar rights related to the Purchased Assets, including warranties and guarantees made by suppliers, manufacturers and contractors under the Purchased Assets, and claims against suppliers and other third parties in connection with the Assumed Contracts;

(g)      All Contracts listed on Schedule 2.2(g) (the "***Assumed Contracts***") to the extent Purchaser has not, in its sole discretion, within sixty (60) days following the Closing Date (or such shorter period of time as permitted by the Bankruptcy Court, but in no event earlier than the Closing Date), elected not to assume such Contract (with Purchaser's right to update such schedule to add or remove any Contract); and if a Cure Amount exceeds an amount acceptable to Purchaser in its sole discretion, such Contract shall not be assumed and assigned, and shall not be an Assumed Contract;

(h)      All accounts receivable (whether billed or unbilled), trade receivables with customers, notes receivable, and other receivables (other than notes or receivables from shareholders), and the right to bill customers for products sold or services provided prior to the Closing;

(i)      All rights to receive vendor rebates accruing in respect of purchases made by either Seller in the Business;

(j)      All prepaid expenses and deposits, deferred charges, advance payments, security deposits and prepaid items relating to the Business or other Purchased Assets, but excluding any such items exclusively relating to Excluded Assets;

(k)      All records and Confidential Information;

3

(l)    All goodwill and going concern rights related to the Business or Purchased Assets;

(m)    All causes of action, demands, judgments, claims (including insurance claims and rights to receive insurance proceeds), indemnity rights (to the extent assignable to Purchaser), setoffs, recoupments, or other similar right of Sellers, including all avoidance or other claims of the Sellers or their bankruptcy estates including without limitation those that may exist against Sellers' prior management pursuant to any provision of the Bankruptcy Code or pursuant to applicable state law (collectively, the "*Causes of Action*"); and

(n)    The right to receive and retain mail and other communications relating to the Business, the Purchased Assets or the Assumed Liabilities.

2.3    Excluded Assets. The Purchased Assets shall not include any and all right, title and interest of Sellers, if any, in and to the following assets (collectively, the "*Excluded Assets*"):

(a)    The corporate seal, minute books, stock books, blank share certificates, tax returns and other records which are not directly related to or reasonably necessary to the conduct of the Business;

(b)    All Indebtedness of the Sellers;

(c)    Except as described in Section 7.10, any insurance policies (including life insurance policies on the lives of shareholders of Sellers and any rights thereto)

(d)    Any lease agreement with respect to real property which is not expressly set forth on Schedule 2.2(g) (the "*Lease Agreement*");

(e)    any Employee Benefit Plan or assets of, or specifically relating to, any Employee Benefit Plan or any employment agreement or arrangement;

(f)    Cash or cash equivalents, including bank accounts and the Purchase Price, as defined below;

(g)    Any tax refunds, tax benefits or other benefits relating to periods prior to the Closing Date, which are and shall remain exclusively the property of Seller;

(h)    All Contracts that are not Assumed Contracts; and

(i)    The assets listed on Schedule 2.3(i).

2.4    Assumed Liabilities. On the terms and subject to the conditions set forth in this Agreement, at the Closing, in consideration for the sale, assignment, conveyance, transfer and delivery of the Purchased Assets to the Purchaser, the Purchaser shall assume from the Sellers and agree to pay, perform, and discharge when due in accordance with their respective terms and subject to the respective conditions thereof, only the following liabilities and obligations (of any nature or kind, and whether based in common law or statute or arising under written contract or

4

otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, asserted or unasserted) of the Sellers (collectively, the "*Assumed Liabilities*"):

(a)   Except as expressly set forth herein, all liabilities and obligations arising from the ownership, possession or use of the Purchased Assets and the operation of the Business, in each case as first arises from and after the Closing;

(b)   All liabilities and obligations arising under the Assumed Contracts, as first arises after the Closing;

(c)   All Cure Amounts that the Purchaser is required to pay pursuant to Section 2.2(g);

The Proposed Transaction contemplated by this Agreement shall in no way expand the rights or remedies of any third party against the Purchaser or Sellers as compared to the rights and remedies that such third party would have had against Sellers absent the Bankruptcy Cases had the Purchaser not assumed such Assumed Liabilities.

2.5   Excluded Liabilities.   Notwithstanding anything contained in this Agreement to the contrary, Purchaser shall not assume, be obligated to assume, be deemed to have assumed, or be obligated to pay, perform, or otherwise discharge, and the Sellers shall be solely and exclusively liable with respect to any liabilities or obligations (or any nature, and whether based on common law or statute or arising under written contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, asserted or unasserted) of the Sellers other than the Assumed Liabilities (such liabilities and obligations other than Assumed Liabilities, the "*Excluded Liabilities*"). Without limiting the foregoing, Purchaser does not assume or agree to pay, perform or otherwise discharge the liabilities or obligations (whether known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, asserted or unasserted) of the Sellers with respect to, arising out of or relating to, the following Excluded Liabilities:

(a)   Any acts, omissions, events, facts or circumstances in existence prior to the Closing;

(b)   Any actual or alleged (i) violation of Law, (ii) breach, default under, failure to perform, torts related to the performance of, infringements or indemnities under, guaranties pursuant to and overcharges, underpayments or penalties on the part of the Sellers under any Contract, agreement, arrangement or understanding to which Sellers are a party prior to the Closing; (iii) tortious conduct; (iv) claims predicated on strict liability or any similar legal theory, including any product liability claim arising out of any product sold or service rendered prior to the Closing Date;

(c)   Any claims, choses in action, causes of action, rights of recovery, rights of set-off of any kind by any third party arising out of or related to the business, the Purchased Assets or the Assumed Liabilities, pending or threatened or based on facts, actions, omissions, circumstances or conditions existing, occurring or accruing before the Closing Date;

(d)   All Indebtedness of the Sellers;

5

(e)     Taxes of any kind or character;

(f)     All guarantees of third-party Indebtedness made by the Sellers and reimbursement obligations to guarantors of the Sellers' obligations or under letters of credit or similar agreements or instruments;

(g)     All liabilities or obligations to any current or former owner of capital stock or other equity interests of the Sellers or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of the Sellers, any current or former holder of Indebtedness of the Sellers or, in respect of obligations for indemnification or advancement of expenses, any current or former officer or director of the Sellers;

(h)     All drafts or checks outstanding at the Closing under which the Sellers are obligated;

(i)     The ownership, operation, possession, use, disposal or disposition of the Excluded Assets;

(j)     All fees, charges, expenditures, and costs incurred or otherwise payable by the Sellers in connection with the administration of the Bankruptcy Cases, including the fees and expenses of financial advisors and legal counsel, whether incurred, accrued or payable on, prior to, or after the date of this Agreement or the Closing Date;

(k)     All liabilities or obligations (x) under Environmental Laws to the extent relating to (i) facts, actions, omissions, circumstances or conditions existing, occurring or accruing, or noncompliance with or violations of Environmental Laws by the Sellers on or before the Closing Date, (ii) the transportation, off-site storage or off-site disposal of any Hazardous Substances generated by or on behalf of the Sellers on or before the Closing Date or (iii) real property, including any real property formerly owned, operated or leased by Sellers prior to the Closing Date; and (y) for toxic torts arising as a result of or in connection with loss of life or injury to Persons (whether or not such loss or injury was made manifest on or after the Closing Date);

(l)     Any liability relating to any Product that is or has been manufactured, tested, distributed, held or marketed by or on behalf of the Sellers arising from any recall, withdrawal, or suspension (whether voluntarily or otherwise), except to the extent that such recall, withdrawal or suspension results from Purchaser's operation of the business or the Purchased Assets following the Closing;

(m)     All trade payables;

(n)     All intercompany accounts payable, liabilities and obligations that are owed or payable to any Seller as to which any Seller is an obligor or is otherwise responsible or liable;

(o)     Any employee compensation or employee benefits, including any liability for unpaid wages, severance pay, overtime pay, commission, unemployment compensation, vacation, sick leave, termination pay and related employer taxes, whether or not pursuant to a written agreement;

6

(p)     Any employee compensation, employee benefit or other liability relating to any Employee Benefit Plan, change of control, retention, sale of business or similar transaction-related bonus arrangement, whether or not pursuant to a written agreement, including without limitation employer any payroll taxes, payroll and any other payroll-related costs for employees in respect of employee service and costs of the participation of the employees of the Sellers in, and any required or discretionary contributions to, any Employee Benefit Plans; and

(q)     Any liability relating to any employment agreement or arrangement.

2.6     Method of Conveyance. The sale, transfer, conveyance, assignment and delivery by Sellers of the Purchased Assets shall occur on the Closing Date by Sellers' execution and delivery to Purchaser of one or more bills of sale, assignments, and special warranty deeds in form and scope satisfactory to Purchaser. At the Closing, Sellers shall transfer, assign, convey and deliver good, valid and indefeasible title to the Purchased Assets free and clear of all Liens.

3.     **Consideration**

3.1     Purchase Price. The aggregate consideration (collectively, the "***Purchase Price***") to be paid by Purchaser for the purchase of the Purchased Assets shall be: (i) the assumption of Assumed Liabilities, (ii) a credit bid pursuant to section 363(k) of the Bankruptcy Code in the aggregate amount of up to $900,000 consisting of, on a dollar for dollar basis, the Capped DIP Obligations outstanding as of the Closing Date (the "***Credit Bid Amount***") and (iii) $500,000. At the Closing, Purchaser shall forgive and discharge, or cause to be forgiven and discharged, the Credit Bid Amount and pay to the Prepetition Secured Parties $500,000 (collectively, the "***Closing Date Payment***") and shall assume the Assumed Liabilities. Any payment required to be made in cash pursuant to this or any other provision of this Agreement shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made at least two business days prior to the date such payment is to be made.

3.2     Cure Amounts. Purchaser shall pay the Cure Amounts for Assumed Contracts as provided by order of the Bankruptcy Court and Section 10.3 below.

4.     **Closing**

4.1     Closing. The Transaction shall close (the "***Closing***") on the second day (the "***Closing Date***") (or as soon thereafter as may be practicable) after the conditions set forth herein in Sections 8 (with respect to the Purchaser) and 9 (with respect to the Sellers), as applicable, shall have been satisfied or (if permissible) waived (except for such conditions that, by their nature, are to be satisfied at the Closing) or such later date as the Parties shall mutually agree.

4.2     Utilities. Sellers shall cause any and all services for water, electric, oil, gas, telephone and other utilities to take a final reading in respect of the Business as of the Closing Date, to cause the charges therefor incurred through the Closing Date to be paid by Sellers.

4.3     Expenses. Purchaser shall be solely liable for and shall pay on the Closing Date all documentary or transfer taxes, recording charges and similar taxes and charges with

7

respect to the transfer of the Purchased Assets. Each Party shall be responsible for its own attorneys' fees and costs.

### 5. **Representations and Warranties of Sellers.**

As an inducement to Purchaser to enter into this Agreement and to consummate the Proposed Transaction contemplated hereby, each Seller, jointly and severally, makes the following representations and warranties to Purchaser relating to itself and the Purchased Assets, each of which is true and correct on the Execution Date and the date of Closing:

5.1     Organization; Good Standing. Each Seller is duly organized, validly existing and in good standing under the Laws of the state of its formation. Each Seller is duly authorized, qualified, to do business and in good standing under all applicable laws of any jurisdiction (domestic and foreign) in which the character or the location of the assets owned or leased by it or the nature of the business conducted by it requires such authorization or qualification. Subject to entry of the Approval Order, each Seller has the full power and authority, corporate or otherwise, to enter into this Agreement, to carry out its obligations hereunder and to consummate the respective transactions contemplated to be consummated hereunder. The execution, delivery and consummation of this Agreement has been duly and validly authorized by each Seller through all necessary corporate actions on the part of Seller, none of which actions have been modified or rescinded and all of which actions remain in full force and effect.

5.2     Authorization. Subject to entry of the Approval Order, as applicable, each Seller has all necessary power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its respective obligations hereunder and thereunder. The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the Proposed Transactions have been duly authorized by all requisite corporate or similar action on the part of the respective Seller. This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party has been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby or thereby to be delivered at or prior to Closing will be duly and validly executed and delivered, by each Seller and (assuming the due authorization, execution and delivery by the other Parties and the entry of the Approval Order) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party constitutes legal, valid and binding obligations of Seller enforceable against each Seller in accordance with its respective terms, subject to equitable principles of general applicability (whether considered in a proceeding at law or in equity).

5.3     Non-Contravention. Except as set forth on Schedule 5.3, each Seller's execution and delivery of this Agreement and compliance with and fulfillment of the terms of this Agreement do not (i) violate or conflict with any of the terms, conditions or provisions of any organizational or governing documents of Seller; (ii) violate any Laws applicable to Seller; (iii) subject to the entry of the Approval Order, require any approval of or any other action to be taken by any Regulatory Authority; (iv) require any approval or any other action under, conflict with, or result in any violation of or default under (with or without notice or lapse of time or both), or give rise to a right of termination, cancellation, acceleration or augmentation of any obligation, or loss

8

of a material benefit under, or result in the creation of any Liens upon any of the Purchased Assets; or (v) impair the Purchaser's ability to operate the Business.

     5.4     <u>Title to Purchased Assets</u>. Sellers have good and valid legal title and beneficial ownership to the Purchased Assets. At Closing and pursuant to the Approval Order, the Sellers shall convey to Purchaser good, valid, marketable and insurable title to the Purchased Assets, free and clear of all Liens pursuant to sections 363(b), 363(f), and 365 of the Bankruptcy Code. No Person other than Sellers owns or holds in its name any assets, real, personal or mixed, whether tangible or intangible, used or held for use in, or otherwise relating to, the Business. Except for the Permitted Encumbrances, there are no outstanding rights (including any rights of first refusal or right of first offer), options or agreements giving any Person any current or future right to require Sellers to sell or transfer to such Person or to any third party any interest in any of the Purchased Assets. The Purchased Assets constitute all of the assets used in or necessary to operate, and are adequate for the purpose of operating, the Business in the manner in which it has been operated prior to the Execution Date. There are no facts or conditions affecting the Purchased Assets that could, individually or in the aggregate, interfere in any material respect with the use, occupancy or operation of the Purchased Assets as currently used, occupied or operated, or their adequacy for such use.

     5.5     <u>Governmental Authorizations</u>. <u>Schedule 5.5</u> sets forth a list of all Governmental Authorizations that are required in connection with the operation of the Business as presently conducted. Sellers have previously delivered to Purchaser true, correct and complete copies of all such Governmental Authorizations.

     5.6     <u>Contracts</u>. <u>Schedule 5.6</u> sets forth an accurate and complete list of each material contract and agreement to which any Seller is party or by which it or any Purchased Asset is bound, including those that fall within the following categories (collectively, the "***Material Contracts***"; each, a "***Material Contract***"):

     (a)     Any lease or sublease of real property;

     (b)     any Contract for the purchase or supply of goods or services providing for either (i) annual payments by the Business of $10,000 or more; or (ii) annual receipts by the Business of more than $15,000 in any calendar year;

     (c)     any Contract relating to the licensing of any Intellectual Property (whether granted by or to any Seller), in each case, other than (i) non-exclusive licenses of Intellectual Property granted by suppliers or vendors to any Seller that are incidental to a services or other agreement or arrangement, the primary purpose of which is something other than the grant of rights under Intellectual Property or (ii) licenses of commercially available off-the-shelf software entered into in the ordinary course of business with an aggregate fee of less than $50,000;

     (d)     any Contract relating to the development or assignment of any Intellectual Property, including contracts with work for hire or invention assignment provisions;

     (e)     any Contract containing restrictive covenants in favor of or otherwise benefitting (directly or indirectly) the Sellers, the Business or the Purchased Assets, including all confidentiality agreements, non-disclosure agreements, non-compete agreements,

non-solicitation, restrictive covenant, invention assignment agreements or similar Contracts by current or past employees or independent contractors;

(f)     any partnership agreement, joint venture agreement, strategic alliance, stockholders' agreement or limited liability company agreement;

(g)     any Contract relating to the acquisition or disposition of any material business (whether by merger, sale of stock, sale of assets, or otherwise) pursuant to which a Seller or Purchaser would have continuing obligations applicable to the Business or the Purchased Assets following the Closing Date;

(h)     any Contract where the Business is, and Purchaser would be required to become, obligor or guarantor relating to Indebtedness;

(i)     any Contract (i) containing covenants limiting, individually or in the aggregate, in any respect the freedom of the Business or Purchased Assets to engage in any business, compete with any Person in a product or line of business or operate in any jurisdiction, (ii) granting an option to acquire any Purchased Asset or (iii) granting any right of first offer, right of first refusal or right of first negotiation in respect of any Purchased Asset;

(j)     any collective bargaining agreement or other labor-related Contract with a union, works council, or other employee representative;

(k)     any Contract, except for any lease that is not material, containing "most favored nation" provisions or granting any exclusivity right to any third party, in each case, applicable to the Business or the Purchased Assets;

(l)     any Contract among any Seller, on the one hand, and any of its affiliates, on the other hand;

(m)     any manufacturing, vendor, supplier, outsourcing or other Contracts;

(n)     any Contracts or other arrangements with Employees.

True and correct originals or, where originals are not available, copies of all Material Contracts of Sellers relating to the Purchased Assets have been delivered by Sellers to Purchaser. Schedule 5.6 also discloses to Purchaser the Sellers' good faith estimate of the Cure Amounts for all Material Contracts and Assumed Contracts. Each Material Contract and Assumed Contract is valid and binding on Sellers in accordance with its terms and is in full force and effect. With the exception of the Bankruptcy Cases, Sellers have properly conducted and otherwise performed all material obligations required to be performed by Sellers under each Material Contract and Assumed Contract, and Sellers have not received any notice of termination, cancellation, breach of default under any contractor agreement of Sellers, including, without limitation any Material Contracts and Assumed Contracts. With the exception of the Bankruptcy Cases, to the Knowledge of Sellers, no event has occurred that, with the passage of time or the giving of notice or both, would result in a default, breach or event of noncompliance by Sellers under any contract or agreement, including, without limitation any Material Contracts and Assumed Contracts, or result in the

10

termination thereof, or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder. To the Knowledge of Sellers, no other party to any contract or agreement is in breach thereof or default thereunder. Seller does not have any contracts with Governmental Entities.

        5.7    Compliance with Laws. Sellers have been in material compliance with any material Laws applicable to it or the Business. Sellers have not received any notice, correspondence or other written or oral communication of any violation, alleged violation or potential violation of any Laws applicable to it or the Business or to the effect that Sellers, or any Person acting on behalf of Sellers, are or could potentially be under investigation or inquiry with respect to any violation or alleged violation of any Law applicable to Sellers. To the Knowledge of Sellers, no event has occurred, and no condition exists, that would reasonably be expected to (with or without notice or lapse of time) constitute or result directly or indirectly in a violation by Sellers of, or a failure on the part of Sellers to comply with, any Law relating to the operation and conduct of the Business.

        5.8    Intellectual Property.

        (a)    Neither the current use of any Intellectual Property by Sellers in the Business, nor the operation of the Business conflicts with, infringes upon, misappropriates or violates in any respect any rights of any third party, and neither Seller has liability for past infringement. To Seller's Knowledge, there are no facts which indicate a likelihood of any infringement, misappropriation or violation by, or conflict with, any Person with respect to any Intellectual Property, including any demand or request that either Seller license rights from, make royalty payments to, or provide any monetary or non-monetary consideration to any Person in exchange for the use of any Intellectual Property. No Person has infringed, diluted, misappropriated, or otherwise violated any Owned Intellectual Property or Licensed Intellectual Property.

        (b)    Sellers own the entire right, title and interest in and to the Owned Intellectual Property, free and clear of all Liens and without payment of any royalty or similar amount or other liability to any third party. None of the Intellectual Property owned or used by either Seller was developed under any grant associated with, or equipment provided by, any federal, state and/or local Governmental Entity (including any public university). The consummation of the transactions contemplated hereunder will not result in the loss or impairment of, or obligation to pay any additional amounts with respect to, nor require the consent of any other Person in respect of, Purchaser's right to own, use, hold for use, or license any Intellectual Property as heretofore owned, used, held for use or licensed by Sellers in the conduct of the Business.

        (c)    Schedule 5.8(c) lists all Owned Intellectual Property, including (i) each Patent (including any U.S. and non-U.S. patent, utility model, industrial design, design patent, continuation, continuation-in-part, divisional, reissue and reexamination), patent application or invention identified in an invention disclosure, (ii) registered or unregistered trademark, design mark, service mark, trade dress, logos, corporate name or trade name, and any application to register any of the foregoing, (iii) copyright registration or application for copyright registration, (iv) software in any form, including internet websites, web content and links, source code, object code and mobile applications, (v) domain name registrations and (vi) social media handle held by

or on behalf of Sellers in respect of the Business. Schedule 5.8(c) also separately identifies for each item of Intellectual Property, each Seller who is owner thereof and with respect to Intellectual Property registrations or applications, specifies as to each, as applicable: the title, mark, or design; the jurisdiction where the application or registration is located; the patent, registration or application serial number; the issue, registration or filing date; and the current status. Each Seller is the sole and exclusive legal and beneficial, and with respect to the Intellectual Property registrations, record, owner of all right, title and interest in and to the Owned Intellectual Property which are listed next to such Seller's name on Schedule 5.8(c), and the Sellers have the valid and enforceable right to use all other Intellectual Property (including the Licensed Intellectual Property) used or held for use in or necessary for the conduct of the Business as currently conducted or as proposed to be conducted, in each case, free and clear of Liens.

(d)    Schedule 5.8(d) lists all Licensed Intellectual Property, including all licenses related to the foregoing. Schedule 5.8(d) specifies for each Intellectual Property license or Contract the date, title, and parties thereto, and separately identifying the Intellectual Property licenses or Contracts: (i) under which a Seller is a licensor or otherwise grants to any Person any right or interest relating to any Owned Intellectual Property; (ii) under which a Seller is a licensee or otherwise granted any right or interest relating to the Intellectual Property of any Person; and (iii) which otherwise relate to any Seller's ownership or use of any Intellectual Property in the conduct of the Business as currently conducted or proposed to be conducted, in each case identifying the Intellectual Property covered by such Intellectual Property license or Contract. All of the Owned Intellectual Property and the Licensed Intellectual Property are valid and enforceable, and all Intellectual Property registrations subsisting and in full force and effect and are compliance with all formal requirements of applicable Laws. The Owned Intellectual Property and Licensed Intellectual Property are all of the Intellectual Property necessary to operate the Business as historically conducted, and all such Intellectual Property is sufficient for the unimpaired continued operation of the Business by Purchaser following the Closing as heretofore conducted by Sellers. Sellers have acquired a license for the Licensed Intellectual Property without payment of any royalty or similar amount or other liability to any third party. The Sellers have provided Purchaser with true, correct and complete copies (or in the case of any oral agreements, a complete and correct written description) of all such Intellectual Property licenses or Contracts, including all modifications, amendments, exhibits, annexes, supplements and attachments thereto and waivers thereunder. Each Intellectual Property license or Contract is valid and binding on the applicable Seller in accordance with its terms and is in full force and effect. No Seller nor any other party thereto is, or is alleged to be, in breach of or default under, or has provided or received any notice of breach of, default under, or intention to terminate (including by non-renewal), any Intellectual Property license or Contract.

(e)    Sellers have not used and do not currently use, any software for the conduct of the Business, except for such off-the-shelf, non-customized, third party software as may be readily obtained by license from third party vendors.

(f)    No current or former employee or independent contractor of either Seller or other Person has any right to payment with respect to the respective Sellers's use of any Intellectual Property. Each Seller has entered into binding, valid and enforceable written Contracts with each current and former employee, independent contractor or any other Person who is or was involved in or has contributed to the invention, creation, or development of any Intellectual

Property during the course of employment or engagement with any Seller or any affiliate of any Seller, whereby such employee, independent contractor or other Person: (i) acknowledges such Seller's exclusive ownership of all Intellectual Property invented, created or developed by such Person within the scope of his or her employment or engagement with such Seller; (ii) grants to such Seller a present, irrevocable assignment of any ownership interest such Person may have in or to such Intellectual Property; and (iii) irrevocably waives any right or interest, including any moral rights, regarding such Intellectual Property, to the extent permitted by applicable Law. Sellers have provided Purchaser with true, correct and complete copies of all such Contracts. All assignments and other instruments necessary to establish, record, and perfect Sellers' ownership interest in the Intellectual Property registrations have been validly executed, delivered, and filed with the relevant Governmental Entities and authorized registrars.

(g)     Each Seller has taken reasonable measures to protect the confidentiality of its Intellectual Property used in the Business and other proprietary information, the value of which is contingent upon maintaining the confidentiality thereof, and of third party confidential information provided to such Seller under an obligation of confidentiality, which measures are commercially reasonable in the industry and jurisdictions in which such Seller operates. With respect to any trade secret or other proprietary know-how of the Sellers relating to the Business: (1) the documentation relating to such trade secret or know-how is current, accurate and is sufficient in detail and content to identify and explain it and to allow its full and proper use without reliance on the knowledge or memory of any individual; and (2) such trade secret or know-how has not been used, divulged or appropriated either for the benefit of any Person or to the detriment of the Business.

(h)     There are no pending or, to Sellers' Knowledge, threatened proceedings against either Seller by any Person alleging a violation of such Person's privacy, personal or confidential rights. No investigation relating to the privacy or data security practices of Seller is being conducted by any Governmental Entity. There have been no unauthorized intrusions or breaches of either Seller's data or security or any data collected by such Seller, including Personal Information, nor has there been a written complaint alleging or otherwise relating to an improper use, disclosure or breach of Seller's data or security or any data collected by Seller, including Personal Information.

(i)     Each Seller has implemented and currently maintains a commercially reasonable security plan which complies in all material respects with all applicable Laws, including privacy Laws, and is designed to (i) identify internal and external risks to the security of confidential information included in the Intellectual Property of such Seller, including Personal Information collected by the respective Seller; (ii) implement, monitor and provide adequate and effective administrative, electronic and physical safeguards to control those risks; and (iii) maintain notification procedures in compliance with applicable Laws in the case of any breach of security compromising Personal Information. Each Seller is and has been in material compliance with the foregoing plan.

(j)     Each Seller and its respective representatives, independent contractors, subcontractors and suppliers and the services they provide (including the software, systems, servers, computers and related equipment used to provide the services) are in compliance with the requirements of any agreement with processors of Payment Card Data and the Payment

Card Industry Data Security Standards (including the payment application data security standards) as amended, updated, superseded or replaced from time to time by the PCI Security Standards Counsel (the "*PCI Standards*"), including with respect to the collection, storage, retention, processing, usage, transmission and destruction of Payment Card Data. Payment Card Data is only used by such Persons for assisting in completing a card transaction, for fraud control services, or as otherwise specifically permitted in writing by a duly authorized representative of the owner of such Payment Card Data. Each Seller maintains appropriate business continuity procedures and systems to ensure the security of Payment Card Data in the event of a disruption, disaster or failure of any primary data systems that involve a risk to Payment Card Data. For purposes of this Section 5.8(j), "*Payment Card Data*" means any data associated with a payment card or otherwise protected under the PCI Standards, including: (a) "card holder data" which includes (i) primary account number; (ii) cardholder name; (iii) service code; and (iv) expiration date; (b) "sensitive authentication data" which includes (i) magnetic strip data; (ii) CVC2, CVV2, CID; (iii) PIN and PIN Block information; and (iv) any security-related information; and (c) other information used to authenticate cardholders and/or authorize payment card transactions.

(k)     The information technology systems, including the software, firmware, hardware, networks, interfaces, and related systems used by each Seller (collectively, "*Information Systems*") are sufficient for the current operation of the business of such Seller, and neither Seller has experienced any material interruption or material disruption to the use thereof. Each Seller uses commercially reasonable means to protect the security, operation and integrity of all Information Systems from any unauthorized, use, access, interruption or modification by any Person and to ensure that all Information Systems are functional and operate and run in a reasonable and sufficient business manner. There has not been any actual, alleged, or suspected data breach or other security incident involving the Information Systems or other cyber incident, including any cyber attack or other impairment of the Information Systems that has resulted or is reasonably likely to result in disruption or damage to the Business. The Information Systems contain no material viruses, trojan horses, backdoors or other potentially harmful program codes. Each Seller has taken commercially reasonable actions to remediate all material bugs, failures, malfunctions, breakdowns, or substandard performance identified with respect to the Information Systems.

5.9     Real Property.

(a)     Neither Seller owns, or has ever owned, any real property. The Real Property constitutes all of the lots, tracts and parcels of real property occupied, used or held for use by either Seller in the Business. Arch Therapeutics holds a valid leasehold interest in the Real Property, free and clear of all Liens.

(b)     Neither Seller is in breach in any material respect of the terms of an easement with respect to the Real Property or the conduct of the Business.

(c)     Neither Seller is indebted to any contractor, laborer, mechanic, materialman, architect, engineer or any other Person for work, labor or services performed or rendered, or for materials supplied or furnished, in connection with the Real Property for which any such Person could claim a Lien against any other assets of the Sellers.

14

5.10   Environmental Matters.

(a)   Neither Seller has: (i) entered into or been subject to any consent decree, compliance order, or administrative order pursuant to applicable Environmental Laws or relating to any environmental condition; (ii) received any written request for information, notice, demand letter, administrative inquiry, or formal or informal complaint or claim with respect to any environmental condition (including under the citizen suit provision of any Environmental Law); or (iii) been the subject of, or, to Seller's Knowledge, threatened with, any governmental enforcement action or third party claim under any Environmental Law, and there is no basis to believe that any of the above is reasonably likely to be forthcoming.

(b)   Each Seller is presently in compliance, and have complied, in all material respects, with all Environmental Laws applicable to the Real Property or the Business.

(c)   Neither Seller has generated, manufactured, refined, transported, treated, stored, handled, disposed, transferred, produced, recycled, or processed any Hazardous Substances or wastes except, in each case, in compliance with all applicable Environmental Laws, and there has been no Release or threat of Release of any Hazardous Substances at or in the vicinity of the Real Property.

(d)   To Sellers' Knowledge, there are no past or present events, conditions, circumstances, activities, practices, incidents, actions, omissions or plans that (i) could interfere with or prevent continued compliance with any Environmental Law with respect to the operation of the Business, (ii) may give rise to any environmental liability in respect of the Real Property, or (iii) that otherwise may form the reasonable basis of any Causes of Action against either Seller (A) under any Environmental Laws, (B) based on or related to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling, or the emission, discharge, Release or threat of Release, of any Hazardous Substance, or (C) resulting from exposure to work place hazards.

(e)   Neither Seller is obligated to make any capital or other expenditure to remain in compliance with any Environmental Law nor is there any reasonable basis on which any Governmental Entity would take any action that would require any such capital or other expenditure.

(f)   Neither Seller has received written notice of, or otherwise has any knowledge concerning, any environmental condition at any off-site location, including any location at which Sellers previously conducted business or to which Sellers transported or arranged for the transportation of Hazardous Substances.

(g)   At no time has any Seller produced, manufactured, sold or otherwise placed in commerce any product containing asbestos or respirable crystalline silica or any material containing asbestos or respirable crystalline silica. There is no asbestos or respirable crystalline silica or any material containing asbestos or respirable crystalline silica present on the Real Property nor has there been since the Sellers occupied the Real Property.

5.11   Employment Matters.

15

(a)     Except as set forth on Schedule 5.11(a): (i) all Employees are employees at-will, terminable on one-month's notice or less without penalty; and (ii) there are no outstanding agreements or arrangements with respect to severance payments to current Employees or former employees of either Seller.

(b)     To the knowledge of Sellers, (i) neither Seller nor any of their respective managers, officers, directors, or employees has been charged, or to the Seller's Knowledge, threatened with the charge of, any unfair labor practice; (ii) each Seller is, and has been, in compliance with all applicable Laws concerning the employer-employee relationship and with all agreements relating to the employment of the Employees, including applicable wage and hour laws, workers' compensation laws, occupational safety laws, worker eligibility laws, unemployment laws and social security laws, in each case in all material respects; (iii) all of the Employees are legally eligible to work in the United States; and (iv) no allegations of sexual harassment have been made against any employee, officer or director of either Seller, and Neither Seller has entered into any settlement agreements related to allegations of sexual harassment or misconduct by an employee, officer or director of the respective Seller.

5.12    Labor Relations Matters.

(a)     To the Knowledge of Sellers, with respect to the Business, (a) no Seller is a party to any collective bargaining agreement and has no relationship with any labor organization; (b) to the Knowledge of Sellers, no labor organization has filed any representation petition or made any oral or written demand for recognition; and (c) to the Knowledge of Sellers, no union organizing efforts are underway or threatened.

(b)     Since January 1, 2022, none of Sellers have effectuated (i) a "plant closing" (as defined in the Worker Adjustment and Retraining Notification Act or any similar state or local plant closing or layoff Law (the "*WARN Act*")) in connection with the Business; or (ii) a "mass layoff" (as defined in the WARN Act) of individuals employed at or who primarily provided service to the Business, without first complying with the requirements of the WARN Act.

5.13    SEC Documents; Financial Statements.

(a)     Except as set forth on Schedule 5.13(a), Arch Therapeutics has filed all reports, schedules, forms, statements and other documents (including exhibits and all other information incorporated by reference therein) required to be filed by Arch Therapeutics with the United States Securities Exchange Commission (the "*SEC*") between January 1, 2022 and the Execution Date pursuant to the Securities Exchange Act of 1934, as amended, and the regulations promulgated thereunder (the "*Exchange Act*") (collectively, the "*SEC Documents*"), each of which, as finally amended prior to the date hereof, has complied as to form in all material respects with the applicable requirements of the Securities Act and the Exchange Act as of the date filed with the SEC. None of the SEC Documents contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(b)     Except as set forth on Schedule 5.13(b), the consolidated balance sheets, statements of operations and statements of cash flows of Arch Therapeutics and its

consolidated subsidiaries included in the SEC Documents complied, as of the date of filing, in all material respects with applicable accounting requirements and the published rules and regulations of the SEC applicable thereto, were prepared in all material respects in conformity with GAAP (except, in the case of unaudited statements, as permitted by the rules and regulations of the SEC) applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto), and present fairly (subject, in the case of unaudited statements, to normal year-end audit adjustments and the absence of footnotes) in all material respects the consolidated financial position, results of operations and cash flows of Arch Therapeutics and its consolidated subsidiaries as of the dates thereof and for the periods indicated therein.

      5.14   Taxes.

      (a)   Each Seller has filed (or had filed on its behalf) all material Tax Returns that it was required to file in respect of the Purchased Assets or the Business and all such Tax Returns were correct and complete in all material respects. Other than as excused or prohibited from being paid as a result of the Bankruptcy Code or the Bankruptcy Court, with respect to the Purchased Assets and the Business, each Seller has paid (or had paid on its behalf) (i) all material Taxes that are shown to be due by such Seller on any such Tax Returns or pursuant to any written assessment received by such Seller from any Governmental Entity for any period preceding the Closing Date, and (ii) all other material Taxes due on or before the Closing Date (whether or not shown on a Tax Return).

      (b)   There are no pending, proposed in writing or threatened in writing Action with respect to any material Taxes payable by or asserted against any Seller related to the Purchased Assets or the Business.

      (c)   There are no Liens with respect to Taxes, Liens that will be released by the Approval Order, and Liens for Taxes not yet due and payable or Taxes that are being diligently contested and for which adequate reserves have been set aside in accordance with GAAP) upon the Purchased Assets or the Business.

      (d)   No Seller is a party to any Tax indemnity, Tax allocation or Tax sharing agreement, other than any such agreement entered into in the ordinary course of business the principal purpose of which is not related to Tax, that could result in a Lien upon the Purchased Assets or the Business.

      (e)   There are no requests for rulings pending between any Seller and any Governmental Entity in respect of any Tax that could result in a Lien upon the Purchased Assets or the Business.

      5.15   Litigation. Except as described in this Agreement or filed in the Bankruptcy Cases, there are no actions, suits or proceedings pending or threatened against either Seller or the Purchased Assets, at law or in equity, or before any governmental or administrative body or agency which would impede the Proposed Transaction, or which would prevent Sellers from being able to perform their obligations under this Agreement.

      5.16   No Broker. Sellers have no liability for any finder's fee, brokerage commission or similar payment with respect to the Proposed Transaction.

6. **Purchaser's Representations and Warranties.**

Purchaser hereby makes the following representations and warranties, each of which is true and correct on the Execution Date:

6.1     Organization; Good Standing. Purchaser has all power and authority to enter into and perform its obligations under this Agreement and to consummate the Proposed Transaction.

6.2     Authorization. The execution, delivery and performance of this Agreement have been duly authorized by Purchaser and no further authorization, approval or consent is required. This Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms.

6.3     Litigation. Except as described in this Agreement, there are no actions, suits or proceedings pending or threatened against Purchaser or to which its properties, rights or assets are the subject, at law or in equity, or before any governmental or administrative body or agency which would impede the Proposed Transaction, or which would prevent Purchaser from being able to perform its obligations under this Agreement.

6.4     Non-Contravention. Except as otherwise contemplated by this Agreement, the Purchaser's execution and delivery of this Agreement and compliance with and fulfillment of the terms of this Agreement do not require any authorization, consent, approval, exemption or other action by or notice to any Governmental Entity, or conflict with or result in a breach of the terms, conditions or provision of any applicable organizational and governing documents of Purchaser, or any material contract to which Purchaser is a party.

6.5     Purchaser's Acknowledgement. Purchaser recognizes that the Purchased Assets are being sold at a Chapter 11 Section 363 sale due to financial distress, and therefore Purchaser acknowledges that it has conducted its own due diligence, and except for the representations and warranties contained in this Agreement or in the other Proposed Transaction documents, Purchaser is not relying on any other express or implied representation or warranty of Seller with respect to the Business, the Purchased Assets or the Excluded Assets, and that except for the representations and warranties contained in this Agreement or in the other documents relating to the Proposed Transaction, all Purchased Assets are conveyed on an "As Is" and "Where Is" basis.

6.6     No Brokers. Purchaser has no liability for any finder's fee, brokerage commission or similar payment with respect to the Proposed Transaction.

7. **Covenants**

7.1     Investigation; Access.

(a)     During the period from the Execution Date until the Closing Date, in order to prepare for the transition of the Business, and upon reasonable request and at reasonable times, Purchaser's representatives, attorneys and accountants shall have access to: (i) the Purchased Assets; (ii) the books, records, documents and files of the Sellers which relate to the

Purchased Assets or business, legal and accounting due diligence matters; and (iii) certain employees and representatives of Sellers (with a designated representative of Sellers present during such access). If the sale and purchase contemplated by this Agreement is not consummated, the Purchaser shall return to the Sellers or destroy (at Seller's option) all copies of documents received from Sellers as it may reasonably request.

(b)     During the sixty (60) day period following the Closing Date, upon reasonable request and at reasonable times, Sellers shall provide to Purchaser, its affiliates and their respective representatives, attorneys and accountants access to the Real Property and any other location at which any Purchased Assets are located or stored for the purpose of removing any such Purchased Assets not delivered on the Closing Date.

7.2     Conduct of Business. Except as otherwise expressly contemplated by this Agreement or with the prior written consent of Purchaser, from the Execution Date until the Closing Date, Sellers shall use commercially reasonable efforts to preserve intact the Purchased Assets. Without limiting the generality of the foregoing (but subject to the express limitation set forth in the immediately preceding sentence), Sellers will, other than in the ordinary course of business or with Purchaser's consent, refrain from doing any of the following in respect of the Purchased Assets: (i) disposing of, or transferring, any Purchased Asset, (ii) transferring any tangible Purchased Asset to any other location to the extent that such other location is not otherwise part of the Purchased Assets, or (iii) except as otherwise provided or required in this Agreement, terminating, amending or modifying the material terms of any of the Assumed Contracts; provided, however, notwithstanding anything to the contrary in the preceding sentence, Sellers may, in their reasonable discretion and upon prior written notice to Purchaser take such actions in connection with or as a result of the consequences (adverse or otherwise) of filing the Bankruptcy Case, if any, to cure defaults in respect of the Assumed Contracts.

7.3     Insurance. Each Seller currently maintains general liability insurance on the Business that is customary for businesses such as the Business. Schedule 7.3 sets forth a complete and correct list of all insurance policies of any kind currently in force relating to the Business and wherein a Seller is an insured or beneficiary.

7.4     Employees.

(a)     At Closing, Purchaser may hire the Designated Employee(s), and, effective as of the Closing Date, Arch Therapeutics or Arch Biosurgery, as applicable, shall terminate any such Employee(s) who accept Purchaser's offer.

(b)     Each Seller shall pay each of their respective Employees in full in respect of any periods through and including the Closing Date, including all wages or salary, commissions, bonuses, vacation or paid time off, sick leave or other paid time off and other benefits (including any employer 401(k) plan contributions, whether or not discretionary) for such employees through the Closing Date in each case, that are accrued or attributable to periods prior to and through the Closing Date, whether or not then due and payable.

(c)     Nothing contained in this Section 7.4, express or implied: (i) is intended to confer upon any Employee or any other Person any right to continued employment or

19

any particular term or condition of employment for any period, (ii) will prohibit or limit the ability of Purchaser or any of its affiliates from amending, modifying or terminating any benefit or compensation plan, program, policy, contract, agreement or arrangement at any time assumed, established, sponsored or maintained by any of them, or (iii) will constitute an amendment to or any other modification of any Employee Benefit Plan or other benefit or compensation plan, program, policy, contract, agreement or arrangement. Further, this Section 7.4 will be binding upon and inure solely to the benefit of each of the parties to this Agreement, and nothing in this Section 7.4, express or implied, is intended to confer upon any other Person any rights or remedies of any nature whatsoever (including any third-party beneficiary rights) under or by reason of this Section 7.4.

(d)    Sellers shall provide at the Purchaser's request, an employee census of (i) all present Employees (including any leased or temporary employees) of either Seller and independent contractors providing services to the Business; (ii) each Employee's or independent contractor's employer, current rate of compensation (including bonus opportunity and most recent bonus) and their exempt/non-exempt status; and (iii) each Employee's accrued vacation, sick leave or personal leave if applicable, (iv) all present employees (including any leased or temporary employees) of either Seller who provide support to the Business but are not primarily engaged in the Business, including a description of the services such employees provide to the Business, and (v) the names any Employee who is absent from work due to a work-related injury, is receiving workers' compensation or is receiving disability compensation.

7.5    Further Assurances. Following the Closing, the Parties shall execute and deliver such documents and take such other action as shall be reasonably requested by any other Party to carry out the Proposed Transaction. Sellers shall take all reasonable actions necessary to facilitate the orderly transition of the ownership of the Purchased Assets to Purchaser.

7.6    Existing Restrictive Covenant Agreements. All non-compete, non-solicitation and restrictive covenant agreements and arrangements between Sellers and any of its personnel who are retained by Purchaser are assigned to the Purchaser as part of the Purchased Assets to the extent that the Purchaser may enforce same. To the extent (and only to the extent) of benefit and not of burden to Purchaser and to the extent permitted by legal requirements, all invention assignments and work-made-for-hire provisions regarding Sellers arising by operation of law or contract with respect to the relationship between Sellers and any of its employees or independent contractors are hereby assigned by Sellers to Purchaser.

7.7    Availability of Records. After the Closing, the Sellers and the Purchaser shall make available to each other Party and their respective Representatives during normal business hours when reasonably requested, all information, records and documents in any media that are in their respective possession. The Purchaser and the Sellers shall also make available for consultation to each other during normal business hours, when reasonably requested, personnel responsible for preparing or maintaining information, records and documents, in connection with tax matters, governmental matters, healthcare regulatory matters, or litigation as it relates to any pre- or post-Closing issue.

7.8    Accounts Receivable. Excluded Assets are and shall after Closing remain the property of the Sellers and shall be collected by the Sellers subsequent to the Closing. In the

event that, following the Closing, the Purchaser receives any payments from any obligor with respect to an account receivable of the Seller, then Purchaser shall within fifteen (15) business days of receipt of such payment remit the full amount of such payment to the Sellers. In the event that, following the Closing, the Sellers receive any payments from any obligor with respect to an account receivable of the Purchaser, then Sellers shall within fifteen (15) business days of receipt of such payment remit the full amount of such payment to the Purchaser.

7.9    Confidentiality. Purchaser acknowledges that Confidential Information has been, and in the future will be, provided to it in connection with this Agreement, including under Section 7.1, and is subject to the terms of the confidentiality agreement between the Sellers and Purchaser (the "*Confidentiality Agreement*"), the terms of which are incorporated herein by reference. Purchaser acknowledges and understands that this Agreement and related documents may be publicly filed in the Bankruptcy Court and further made available by Sellers to prospective bidders or contract counterparties and that, such disclosure will not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise.

7.10    Tail Policies.

(a)    Prior to the Closing, the Sellers shall purchase, at the sole cost of the Purchaser, fully-paid, irrevocable "tail insurance policies" on terms and conditions reasonably satisfactory to the Purchaser (collectively, the "*Tail Policies*") for the Sellers' directors' and officers', fiduciary and employment practices liability insurance, (i) to be effective as of the Closing, with a claims period of at least six (6) years after the Closing Date, (ii) covering those persons who are currently covered by the Sellers' existing directors' and officers', fiduciary and employment practices liability insurance policies in effect as of the Closing Date for matters, acts or omissions occurring at or prior to the Closing Date and (iii) contains other coverage terms comparable to those under the Sellers' existing directors' and officers', fiduciary and employment practices liability insurance policies.

(b)    If requested by Purchaser and at the expense of the Purchaser, the Sellers shall in good faith cooperate with the Purchaser and take all actions reasonably requested by the Purchaser that are necessary or desirable to permit the Purchaser to have available to it following the Closing the benefits (whether direct or indirect) under all of Sellers' insurance policies in effect prior to the Closing Date to the extent related to the Business, the Purchased Assets or the Assumed Liabilities, including naming the Purchaser as an additional named insured thereunder).

7.11    Schedule Updates.

(a)    Purchaser shall have the right (but not the obligation) from time to time prior to the Closing to unilaterally supplement or amend Schedules 2.2(d), 2.2(e), 2.2(g) and 2.3(i).

(b)    During the Interim Period, Sellers may, with the Purchaser's prior approval, supplement or amend the Disclosure Schedules referenced in Article 5 with respect to any matter arising prior to the Closing that would otherwise constitute a breach of the

representations set forth in Article 5 (each a "**Schedule Supplement**"). Any disclosure in any such Schedule Supplement shall not be deemed to have cured any inaccuracy in or breach of any representation or warranty contained in this Agreement, including for purposes of the termination rights contained in this Agreement or of determining whether or not the conditions set forth in Section 7.11(b) have been satisfied.

## 8.   Conditions to Obligations of Purchaser.

The obligations of the Purchaser under this Agreement are subject to the fulfillment of the following conditions precedent, each of which may be waived in writing in the sole discretion of the Purchaser (unless other specified, these conditions must be fulfilled on or before the Closing Date):

8.1    Bankruptcy Court Approval. The Proposed Transaction shall be approved by the Bankruptcy Court as described in Section 10 hereof, and the Approval Order shall be in full force and effect and shall not have been stayed, vacated, reversed, amended, or modified by the Bankruptcy Court or any court of competent jurisdiction without Purchaser's prior written consent.

8.2    Continued Truth of Representations and Warranties of the Sellers. Each of the representations and warranties of Sellers contained in this Agreement (disregarding all "materiality" or "Material Adverse Change" qualifications set forth therein) shall be true and correct as of the Closing, as if made on the Closing Date (except for any such representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such specific date), except where the failure of the representations and warranties to be true and correct, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Change, and Purchaser shall have received a certificate signed by an authorized officer of each Seller on behalf of such Seller, dated the Closing Date, to the foregoing effect.

8.3    Compliance with Covenants. Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to or on the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of each Seller on behalf of such Seller, dated the Closing Date, to the forgoing effect;

8.4    Governmental Approvals. All Governmental Entities, the consent, authorization or approval of which is necessary under any applicable law, rule, order or regulation for the consummation by the Sellers of the Proposed Transaction shall have consented to, authorized, permitted or approved such transactions.

8.5    Adverse Proceedings. No action or proceeding by or before any court or Governmental Entity shall have been instituted by any court or Governmental Entity whatsoever which shall seek to restrain, prohibit or invalidate the Proposed Transaction contemplated by this Agreement or which is likely to affect the right of the Purchaser to own or use the Purchased Assets after the Closing Date.

  8.6  Closing Deliveries.

  The Purchaser shall have received at or prior to the Closing Date each of the following documents:

    (a)  the Approval Order, in form and substance reasonably acceptable to the Purchaser and its counsel;

    (b)  such bills of sale, assignment agreements, endorsed certificates of title, conveyance documents, tax clearances and other documents, instruments, and certificates in connection with the transactions contemplated by this Agreement, with respect to the Purchased Assets, as Purchaser may reasonably request, in form and substance reasonably acceptable to Purchaser and its counsel;

    (c)  assignment agreement(s) executed by Sellers assigning its rights to Purchaser in and to the Purchased Intellectual Property;

    (d)  a closing statement in form and content reasonably acceptable to the Purchaser;

    (e)  a certificate of the Secretary of State of the state of each Seller's organization as to the legal existence and good standing of each Seller in such jurisdiction;

    (f)  a certificate from a secretary or equivalent officer of Arch Therapeutics, dated as of the Closing Date, attesting to (A) resolutions of the board of directors of Arch Therapeutics authorizing the execution, delivery and performance of the agreements applicable to the Proposed Transaction by Company, (B) incumbency of Persons executing any agreement on behalf of Arch Therapeutics, and (C) copies of the organizational documents of Arch Therapeutics, as in effect on the Closing Date;

    (g)  a certificate from a secretary or equivalent officer of Arch Biosurgery, dated as of the Closing Date, attesting to (A) resolutions of the board of directors of Arch Biosurgery authorizing the execution, delivery and performance of the agreements applicable to the Proposed Transaction by Company, (B) incumbency of Persons executing any agreement on behalf of Arch Biosurgery, and (C) copies of the organizational documents of Arch Biosurgery, as in effect on the Closing Date;

    (h)  possession of all of the Purchased Assets including, but not limited to, all computer, software and/or document access codes (to the extent in the possession or control of Sellers);

    (i)  endorsed certificates of title with respect to any vehicles included in the Purchased Assets;

    (j)  any approvals, consents or waivers listed on or required to be listed on Schedule 5.3;

(k)      (i) acknowledgement, consent and estoppel, in form and substance satisfactory to Purchaser, from Massachusetts Institute of Technology related to the assignment of that certain Amended and Restated Exclusive Patent License Agreement, dated May 16, 2011, by and between Massachusetts Institute of Technology, a Massachusetts corporation and Arch Therapeutics, Inc. (f/k/a Clear Nano Solutions, Inc.), a Massachusetts corporation, as amended from time to time and any related agreements (collectively, the "MIT License"); and (ii) evidence that the Cure Amount with respect to the MIT License will be acceptable to Purchaser in its sole discretion; and

(l)      such other documents which Purchaser may request to effectuate the terms and conditions of this Agreement.

8.7      Access to Regulatory Files. Within 3 business days after the Execution Date, the Sellers shall have provided Purchaser access to all regulatory files for the Products and the Business, including inspection reports by any third party or Governmental Entity.

8.8      Due Diligence. Purchaser shall have completed its due diligence investigation of the Sellers and the Business, and shall, in Purchaser's sole discretion, be satisfied with the results of such due diligence investigation.

9.      **Conditions to Obligations of the Sellers**.

The obligations of the Sellers under this Agreement are subject to the fulfillment of the following conditions precedent, each of which may be waived in writing at the sole discretion of the Sellers (unless otherwise specified, these conditions must be fulfilled before the Closing Date):

9.1      Bankruptcy Court Approval. The transactions involving the Sellers contemplated by this Agreement shall be approved by the Bankruptcy Court as described in Section 10 hereof, and the Approval Order, as hereinafter defined, shall be in full force and effect and shall not have been stayed by the Bankruptcy Court or any court of competent jurisdiction.

9.2      Continued Truth of Representations and Warranties of the Purchaser. Each of the representations and warranties of Purchaser contained in this Agreement (disregarding all "materiality" or "Material Adverse Change" qualifications set forth therein) shall be true and correct as of the Closing, as if made on the Closing Date (except for any such representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such specific date), except where the failure of the representations and warranties to be true and correct, individually or in the aggregate, has not had and would not reasonably be expected to prevent Purchaser from consummating the transactions contemplated hereby, and Sellers shall have received a certificate signed by an authorized officer of Purchaser on behalf of Purchaser, dated the Closing Date, to the foregoing effect.

9.3      Compliance with Covenants and Obligations. Purchaser shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by Purchaser prior to or on the Closing Date, and Sellers shall have received a certificate signed by an authorized officer of Purchaser on behalf of Purchaser, dated the Closing Date, to the foregoing effect.

24

9.4     Governmental Approvals. All Governmental Entities, the consent, authorization or approval of which is necessary under any applicable law, rule, order or regulation for the consummation by the Sellers of the Proposed Transaction shall have consented to, authorized, permitted or approved such transactions.

9.5     Adverse Proceedings. No action or proceeding by or before any court or Governmental Entity shall have been instituted by any court or Governmental Entity whatsoever which shall seek to restrain, prohibit or invalidate the transactions contemplated by this Agreement or which is likely to affect the right of the Purchaser to own or use the Purchased Assets after the Closing Date.

9.6     Closing Deliveries. The Sellers shall have received at or prior to the Closing each of the following documents duly executed by Purchaser (if applicable):

(a)     an assumption and assignment agreement providing for Purchaser's assumption of the Assumed Liabilities;

(b)     a closing statement in form and content acceptable to the Sellers;

(c)     such other documents which Sellers may reasonably request to effectuate the terms and conditions of this Agreement.

## 10.     Bankruptcy Court Approval

10.1     The Agreement. Execution of this Agreement by Purchaser shall constitute Purchaser's bid for the Purchased Assets. This Agreement is subject to approval by the Bankruptcy Court.

10.2     Bankruptcy Court Documents. Sellers shall deliver or cause to be delivered to Purchaser for review and comment all documents to be filed by Sellers with the Bankruptcy Court that relate to the transactions contemplated by this Agreement, as soon as commercially reasonable and in any event not less than one (1) business day prior to filing, including all motions, proposed orders, applications, and supporting papers prepared by Sellers, prior to filing such documents. The Sale Motion shall only be amended with the approval of Purchaser, which will not be unreasonably withheld.

10.3     Approval Order

(a)     Sellers have filed a motion (the "*Sale Motion*") with the Bankruptcy Court seeking approval of the Proposed Transaction. It is a material inducement to Purchaser to be able to acquire the Purchased Assets pursuant to the provision of § 363 of the Bankruptcy Code, including in particular free and clear of Liens pursuant to § 363(f) of the Bankruptcy Code. Therefore, any and all obligations of the Purchaser under this Agreement are subject to the entry of an order of the Bankruptcy Court (the "*Approval Order*"), in form reasonably satisfactory to the Purchaser, approving this Agreement and the Proposed Transaction, and ordering, finding and concluding that, among other things, (i) notice of the Sale Motion and the Proposed Transaction was proper and sufficient to all parties entitled to such notice; (ii) the sale of the Purchased Assets to the Purchaser is approved pursuant to § 363(b) of the Bankruptcy Code; (iii) the assumption and

assignment the Assumed Contracts; (iv) the sale of the Purchased Assets to the Purchaser pursuant to this Agreement will be free and clear of all Liens pursuant to § 363(f) of the Bankruptcy Code with the Liens, if any, to attach to the Purchase Price or proceeds of the sale; (v) Purchaser has acted in good faith within the context of and is entitled to the protections of § 363(m) of the Bankruptcy Code; and (vi) authorizing and approving this Agreement as the highest and best offer for the Purchased Assets.

(b)     Sellers shall use their best efforts to gain approval by the Bankruptcy Court of this purchase and sale of the Purchased Assets and the assumption and assignment of the Assumed Contracts and Assumed Liabilities contemplated hereby to the fullest extent required by Sections 363 and 365 and all other applicable provisions of the Bankruptcy Code within the terms of the Sale Motion. Sellers have timely served on all non-Seller counterparties to all of the Assumed Contracts a notice specifically stating that Sellers may be seeking the assumption and assignment of such Assumed Contracts and shall timely notify such non-Seller counterparties of the deadline for objecting to the Cure Amounts stated in such notices, if any, in compliance with the Bidding Procedures Order. Sellers and Purchaser shall cooperate to reasonably resolve any issues in connection with the Cure Amounts and Assumed Contracts.

(c)     From and after the date hereof and until the Closing Date or the termination of this Agreement, Sellers shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Motion or this agreement. If Purchaser is the successful Bidder, Sellers shall not take any action which is intended to (or reasonably likely to), or fail to take any action the intent (or reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Approval Order or this Agreement.

(d)     The Approval Order shall contain the following provisions:

(i)     Approval of this Agreement, including the sale of the Purchased Assets by Sellers to Purchaser, which shall vest in Purchaser all right, title and interest of Sellers to the Purchased Assets free and clear of all Liens, Excluded Liabilities, and interests pursuant to Section 363(f) of the Bankruptcy Code;

(ii)     A finding that Purchaser has acted in good faith within the meaning of Section 363(m) of the Bankruptcy Code, the Proposed Transaction have been undertaken by Sellers and Purchaser at arms' length and without collusion, Purchaser is entitled to the protections of Section 363(m) of the Bankruptcy Code, and that the Proposed Transaction is not avoidable under Section 363(n) of the Bankruptcy Code;

(iii)     To the fullest extent allowed by law, all Persons shall be enjoined from taking any actions against Purchaser or the Purchased Assets to recover any claim that such Person has filed against Sellers;

(iv)     To the fullest extent allowed by law, Purchaser shall have no successor liability on account of the purchase or sale of the Purchased Assets, except on account of Assumed Liabilities;

26

(v)     Due notice of the bidding procedures motion, Bidding Procedures Order, Sales Motion, Approval Order and this Agreement have been provided;

(vi)     There shall be sufficient cause to lift the stay contemplated by Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedures with regards to the Proposed Transaction;

(vii)     The Bankruptcy Court retains exclusive jurisdiction to interpret and enforce the provisions of this Agreement and the Approval Order in all respects; and

(viii)     Such other and further terms as are reasonable and customary in orders approving a Section 363(f) sale of assets.

10.4     Appeal/Reconsideration. If an appeal is taken, or a stay pending appeal is requested or reconsideration sought, from any order approving bid procedures in connection herewith or the Approval Order, then Sellers will immediately notify Purchaser of such appeal, stay or reconsideration request and will provide to Purchaser within one (1) business day a copy of the related notice of appeal or order of stay or motion for reconsideration. The Sellers will also provide Purchaser with written notice and copies of any other or further notice of appeal, motion or application filed in connection with any appeal from, or application for reconsideration of, any of such orders and related briefs.

10.5     Bidding Procedures and Order.

(a)     The purchase and sale of the Purchased Assets will be subject to competitive bidding in accordance with the terms of the Bidding Procedures Order. In accordance with the terms of the Bidding Procedures Order, Sellers will seek entry of the Approval Order. Sellers and Purchaser agree that, in the event that (i) Purchaser is not the Successful Bidder (as defined in the Bidding Procedures Order), (ii) the transaction with the Successful Bidder does not close, and (iii) Purchaser is designated as the Back-Up Bidder (as defined in the Bidding Procedures Order), Purchaser shall promptly consummate this Agreement upon the terms and conditions set forth herein (or as such terms may be amended at the Auction (as defined in the Bidding Procedures Order)); provided that, Purchaser's obligation to remain as the Back-Up Bidder shall not terminate until the closing of the transaction with the Successful Bidder (and for the avoidance of doubt, the Outside Closing Date for the Back-Up Bidder shall be extended by thirty days). Purchaser acknowledges that time is of the essence in achieving the Closing and shall take all commercially reasonable efforts to reach the Closing as quickly as possible.

(b)     In accordance with the Bidding Procedures Order, in the event Purchaser is not in breach of this Agreement and has not terminated this Agreement before the Outside Closing Date, and (i) the Bankruptcy Court approves a sale of all or some of the Purchased Assets to a purchaser other than Purchaser which is consummated by Sellers, (ii) Sellers enter into a definitive agreement for a transaction other than the Proposed Transaction which is consummated by Sellers; (iii) Sellers file a plan of reorganization that does not contemplate a sale of the Purchased Assets to Purchaser and a plan is confirmed, or (iv) Sellers otherwise breach this Agreement and subsequently sell all or some of the Purchased Assets to a purchaser other than Purchaser which is consummated by Sellers, Sellers shall be required to pay to Purchaser an

expense reimbursement in an amount equal to $200,000 (the "***Expense Fee***"). The Expense Fee will be deemed an allowed superpriority administrative expense claim of Purchaser under Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of any kind, including, without limitation, those specified in Sections 503(b) and 507(b) of the Bankruptcy Code and shall be paid at closing from the sales proceeds prior to the payment of any other amounts.

(c)    The Sellers shall use their best efforts in the exercise of their discretion under (or to amend) the Bidding Procedures Order to require that any bid that includes a cash component of at least an amount equal to the sum of the absolute value of the Capped DIP Obligations, plus $750,000, and otherwise complies with the Bidding Procedures Order will be deemed a Qualified Bid (as defined in the Bidding Procedures Order); except that any bid by the Prepetition Secured Parties will include a cash component of at least an amount equal to the sum of the Capped DIP Obligations, plus $200,000, and otherwise complies with the Bidding Procedures Order, will be deemed a Qualified Bid.

## 11.    Termination

11.1    Termination. This Agreement may be terminated and the transactions contemplated hereby may be abandoned:

(a)    by mutual written consent of the Purchaser and the Sellers;

(b)    by either the Sellers or the Purchaser if a Governmental Entity has issued a final and non-appealable order or taken any other final and non-appealable action, in any case having the effect of permanently restraining, enjoining or otherwise prohibiting the Proposed Transaction;

(c)    by either the Sellers or the Purchaser if the Closing does not occur on or before June 20, 2025 (such date, the "***Outside Closing Date***"); provided, however, that a Party is not entitled to terminate this Agreement pursuant to this Section 11.1(c) if such Party's material breach of one or more of its covenants hereunder is the cause of or results in the failure of the Closing to occur on or before the Outside Closing Date, or if the failure to close is the result of a failure to obtain authorization, consent, approval, exemption or other action by any Governmental Entity, in which case the Parties shall use their reasonable efforts to agree upon a new Outside Closing Date and to procure any authorization, consent, approval, exemption or other action by any Governmental Entity.

(d)    by Purchaser if there shall occur a material breach of any of the representations, warranties, covenants or agreements of the Sellers that would give rise to the failure of a closing condition in Section 8, provided however that Purchaser agrees to provide notice thereof and a right to cure any such breach within ten (10) business days thereafter;

(e)    by Purchaser if the Bankruptcy Cases are converted to cases under Chapter 7 of the Bankruptcy Code; and

(f)    by Sellers if there shall occur a material breach of any of the representations, warranties, covenants or agreements of Purchaser, provided however that Sellers

agree to provide notice thereof and a right to cure any such breach within ten (10) business days thereafter, with the act of Closing automatically curing any such breach.

11.2   Effect of Termination. If the Agreement is terminated pursuant to Section 11.1 then this Agreement will become void and of no further force and effect, with no liability or obligation on the part of the Parties. Termination and Purchaser's right to the Expense Fee shall be the sole and exclusive remedy of Purchaser against Sellers.

11.3   No Survival. No representations or warranties shall survive the Closing Date, but all covenants and agreements contained in this Agreement intended or anticipated to be performed post-closing shall survive the closing indefinitely.

12.   **General**

12.1   No Agreement to Assign. Except to the extent that non-assignment of any Contract would constitute a Material Adverse Change, this Agreement shall not constitute an agreement to assign or transfer and shall not affect the assignment or transfer of any Purchased Asset if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto would constitute a breach thereof or (b) the Bankruptcy Court shall not have approved assumption and assignment of any Assumed Contract for any reason, including without limitation, that the Cure Amount is not acceptable to Purchaser (each such action in (a) and (b), a "*Necessary Consent*"). In such event, Sellers and Purchaser shall use their commercially reasonable efforts, to obtain the Necessary Consents with respect to any such Assumed Contract after the Closing; provided that the failure to obtain any Necessary Consent shall not delay the Closing or give rise to a reduction in the Purchase Price.

12.2   **WAIVER/JURISDICTION. TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW, SELLERS AND PURCHASER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING THAT RELATES TO OR ARISES OUT OF THIS AGREEMENT. IF ANY ACTION, SUIT OR PROCEEDING IS BROUGHT BY EITHER SELLERS OR PURCHASER ARISING OUT OF THIS AGREEMENT, SELLERS AND PURCHASER AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER THE ACTION, SUIT OR PROCEEDING.**

12.3   Governing Law; Construction

This Agreement shall be construed and enforced in accordance with the internal laws of the State of Massachusetts without regard to principles of conflicts of laws.

The Disclosure Schedules, Schedules, Annexes and Exhibits attached to this Agreement are incorporated herein by reference. Unless the context requires otherwise, references herein (a) to any Article, Section, Disclosure Schedule, Schedule, Annex or Exhibit means such Articles or Section of, or such Disclosure Schedule, Schedule, Annex or Exhibit attached to, this Agreement, (b) to any Law means such Law as amended from time to time and including any successor provisions thereto and all rules and regulations promulgated thereunder and (c) to any agreement, instrument or other document means such agreement, instrument or other document as amended,

restated, supplemented or otherwise modified from time to time in accordance therewith and, as applicable, herewith. For purposes of this Agreement, (i) the words "include, "including" and "including" will be deemed to be followed by the words "without limitation," (ii) the word "or" is disjunctive but not necessarily exclusive, (iii) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole and (iv) each reference to "ordinary course of business" will be deemed to mean "ordinary course of business consistent with past practice". This Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision in this Agreement. All accounting terms not specifically defined in this Agreement will be construed in accordance with GAAP. All words in this Agreement will be construed to be of such gender or number as the circumstances require. References in this Agreement to time periods in terms of a certain number of days mean calendar days unless expressly stated herein to be business days. In interpreting and enforcing this Agreement, each representation and warranty will be given independent significance of fact and will not be deemed superseded or modified by any other such representation or warranty. If any time period for giving notice or taking action hereunder expires on a day which is not a business day, the time period shall automatically be extended to the business day immediately following such day. The phrases "delivered to the Purchaser" or "made available to the Purchaser" or phrases of similar import or effect used in this Agreement mean, with respect to each subject document, that such subject document was posted in the electronic data room hosted by Drop Box, at least three business days prior to the Closing Date.

12.4   Notices. Any notices or other communications required or permitted hereunder shall be in writing and shall be considered to have been duly given, when received, if delivered by hand, email, telegram, overnight courier:

(a)   If to Sellers, to:

c/o Arch Therapeutics, Inc.
235 Walnut St., Suite 6
Framingham, MA 01702
Attention: Terrence Norchi
Email: tnorchi@archtherapeutics.com

With a copy (which shall not constitute notice) to:

Riemer Braunstein LLP
100 Cambridge Street, Floor 22
Boston, Massachusetts 02114-2527
ATTN: Alan L Braunstein
Phone: (617)-880-3516
Email: ABraunstein@riemerlaw.com

(b)   If to the Purchaser, to:

Arch Acquisition LLC c/o: Vivex Biologics, Inc.
2430 NW 116th Street
Miami, FL 33167

Attention: Co-President and General Counsel; Executive Chairman
Emails: rey@vivex.com; john@jamcapitalpartners.net

With a copy (which shall not constitute notice) to:

Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309
Attn: Colin Bernardino
Phone: (404) 532-6949
Email: cbernardino@ktslaw.com

12.5    Entire Agreement and Amendments. This Agreement, together with the Schedules attached hereto, and all documents contemplated by this Agreement, contain all of the terms agreed upon by the Parties with respect to the subject matter hereof, and supersede all prior agreements and understandings among the parties and may not be changed or terminated orally, except as set forth in Section 2.2(g) or Section 7.11. Except as set forth in Section 2.2(g) or Section 7.11, no attempted amendment, change, termination or waiver of any of the provisions hereof shall be binding unless in writing and signed by the party against whom the same is sought to be enforced.

12.6    Additional Documents. After the Closing Date, each Party shall, at the request of any other, furnish, execute and deliver such documents and instruments as the requesting Party shall reasonably require as necessary or desirable to carry out the transactions contemplated hereunder.

12.7    Paragraph Headings. Paragraph headings herein have been inserted for reference only and shall not be deemed to limit or otherwise affect, in any matter, or be deemed to interpret in whole or part, any of the terms or provisions of this Agreement.

12.8    Third Parties. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies on any persons other than the parties hereto and their respective successors and permitted assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement.

12.9    Severability. If any one or more of the provisions contained in this Agreement shall be invalid, illegal or unenforceable in any respect of any reason, the validity, legality and enforceability of any provision in every other respect and of the remaining provisions of this Agreement shall not be in any way impaired.

12.10   Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.11   Jurisdiction and Venue. This Agreement shall be subject to the jurisdiction of the Bankruptcy Court, and if the Bankruptcy Court lacks jurisdiction for any reason, then the state and federal courts in the State of Massachusetts.

31

12.12  Time is of the Essence. Time is of the essence of each provision hereof.

12.13  Construction. Should any provision of this Agreement require judicial interpretation, it is agreed that the court interpreting or construing the same shall not construe this Agreement against one party more strictly by reason of any rule of interpretation which relates to preparation of a document, it being agreed that the agents of all parties have participated in the preparation of this Agreement and that legal counsel was consulted by each party prior to its execution hereof.

12.14  Assignment. Neither of the Parties may assign its rights and obligations under this Agreement without the consent of the other Party, which consent shall not be unreasonably withheld; provided that subject to providing notice to Sellers, Purchaser may assign its rights and obligations hereunder to one or more wholly owned subsidiaries of Purchaser, or affiliates of Purchaser that are wholly owned by the same entity that wholly owns Purchaser directly or indirectly. Regardless of any assignment, Purchaser shall remain liable to Sellers hereunder (jointly and severally with any permitted assignees).

*(Signature Pages Follow)*

32

      **IN WITNESS WHEREOF**, the parties have executed this Asset Purchase Agreement as of the day and year first above written.

                        **PURCHASER:**

                        **ARCH ACQUISITION LLC**

By: _____
Name: <u>Reinaldo Pascual</u>
Title: <u>Co-President</u>

[Signature Page to Asset Purchase Agreement]

**SELLERS:**

**ARCH THERAPEUTICS, INC.**

By: _____

Name: Terrence Norchi

Title:  President

**ARCH BIOSURGERY, INC.**

By: _____

Name: Terrence Norchi

Title:  President

## SCHEDULE 1.1

### Defined Terms

For purposes of this Agreement, the following terms shall be defined as follows:

"*Actions*" means any claim, hearing, charge, action, suit, arbitration, litigation, mediation, grievance, audit, examination, inquiry, proceeding or investigation by or before any Governmental Entity.

"*Agreement*" has the meaning set forth in the Preamble.

"*Approval Order*" has the meaning set forth in Section 10.3.

"*Arch Biosurgery*" has the meaning set forth in the Preamble.

"*Arch Biosurgery Bankruptcy Case*" has the meaning set forth in the Recitals.

"*Arch Therapeutics*" has the meaning set forth in the Preamble.

"*Arch Therapeutics Bankruptcy Case*" has the meaning set forth in the Recitals.

"*Assumed Contract*" has the meaning set forth in Schedule 2.2(g).

"*Bankruptcy Cases*" has the meaning set forth in the Recitals.

"*Bankruptcy Code*" means title 11 of the United States Code.

"*Bankruptcy Court*" has the meaning set forth in the Recitals.

"*Bidding Procedures Order*" means the Bankruptcy Court's bidding procedures order approving, among other things, the execution, delivery, and performance of this Agreement by Sellers, other than the performance of those obligations to be performed at or after the Closing, Seller's designation of Purchaser as the "Stalking Horse Bidder" for the Purchased Assets and the Bidding Procedures (as defined therein), which order shall be reasonably satisfactory to the Purchaser.

"*Business*" has the meaning set forth in the Recitals.

"*Capped DIP Obligations*" has the meaning set forth in paragraph 38 of the Interim Financing Order.

"*Closing*" has the meaning set forth in Section 4.1.

"*Closing Date*" has the meaning set forth in Section 4.1.

"*Closing Date Payment*" has the meaning set forth in Section 3.1.

"*Confidential Information*" means any and all technical, business and other information

of or relating to the Purchased Assets or the Business that derives value, actual, potential, economic or otherwise, from not being generally known to other Persons, including technical or non-technical data, compositions, devices, methods, techniques, drawings, inventions, processes, financial data, financial plans, product plans, lists of, or information relating to, actual or potential customers or suppliers, acquisition and investment plans and strategies, marketing plans, business plans or operations of the Business. Confidential Information includes information of third parties relating to the Business that either Seller is obligated to or does keep or treat as confidential.

"***Contract***" means any contract, agreement, commitment, promise or undertaking (including any indenture, note, bond or other evidence of indebtedness, lease, instrument, license, lease, purchase order or other legally binding agreement), regardless of whether written or oral.

"***Cure Amounts***" means, with respect to any of the Assumed Contracts, the amount required to be paid under Section 365 of the Bankruptcy Code to effectuate the assumption and assignment of such executory contract or unexpired lease by the Sellers to the Purchaser, as determined by the agreement of the parties to such executory contract or lease or by order of the Bankruptcy Court.

"***Designated Employee(s)***" means Terrence W. Norchi.

"***DIP Obligations***" means all obligations, liabilities, and indebtedness of the Sellers arising from or related to that certain priming, super-priority senior secured term loan facility provided pursuant to the DIP Order, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due. DIP Obligations shall also include any unpaid fees and expenses payable to Purchaser of any Purchaser affiliate.

"***DIP Order***" means, as applicable, the interim or final order of the Bankruptcy Court setting forth the terms of the debtor-in-possession financing.

"***Employee Benefit Plan***" means any plan, policy, agreement, fund or arrangement providing bonuses, profit sharing benefits, pension benefits, compensation and incentives, deferred compensation, stock options, stock or other equity or phantom equity purchase rights, fringe benefits, severance payments, post-retirement benefits, scholarships, disability benefits, sick leave pay, vacation pay, commissions, payroll practices, retention payments, health or welfare plan benefits or other similar benefits, including any "employee benefit plan" within the meaning of Section 3(3) of ERISA.

"***Employees***" means the employees of the Sellers as of the date of this Agreement, a list of which shall be provided to Purchaser upon request pursuant to Section 7.4(d).

"***Environmental Laws***" means any and all applicable Laws which (a) regulate or relate to the protection or clean-up of the environment, the use, treatment, storage, transportation, handling, disposal or Release of Hazardous Substances, the preservation or protection of waterways, groundwater, drinking water, air, wildlife, plants or other natural resources, or the health and safety of persons or property, including protection of the health and safety of employees or (b) impose liability or responsibility with respect to any of the foregoing, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 *et seq.*), or any other Law of similar effect.

"**Excluded Assets**" has the meaning set forth in <u>Section 2.3</u>.

"**Excluded Liabilities**" has the meaning set forth in <u>Section 2.5</u>.

"**Execution Date**" has the meaning set forth in the Preamble.

"**Expense Fee**" has the meaning set out in <u>Section 10.5(b)</u>.

"**Governmental Authorizations**" has the meaning set forth in <u>Section 2.2(c)</u>.

"**Governmental Entity**" has the meaning set forth in <u>Section 2.2(c)</u>.

"**Hazardous Substances**" means any noxious, toxic, or hazardous substance, material or waste, and any contaminant, chemicals, pollutant or constituent thereof including petroleum, or petroleum products, asbestos or any asbestos containing material, or lead containing paint or coating material.

"**Indebtedness**" means with respect to any person, all obligations for borrowed money.

"**Intellectual Property**" means all intellectual property, including (a) Patents, (b) registered or unregistered trademarks, design marks, service marks, trade dress, logos, corporate names and trade names, together with the goodwill associated with any of the foregoing, and all applications and registrations therefor, (c) copyrights, copyrightable works, rights in databases, data collections, copyright registrations and copyright applications and corresponding rights in works of authorship, (d) trade secrets, (e) software in any form, including internet websites, web content and links, source code, object code and mobile applications, (f) rights of publicity and personality, (g) internet domain name registrations, and (h) social media accounts owned by, currently being applied for, or registered in the name of any Person.

"**Interim Financing Order**" means the *Interim Order (I) Authorizing Debtors to (A) Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code, (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* ECF No. 57 entered in the Arch Therapeutics Bankruptcy Case.

"**Interim Period**" means the time period between the Execution Date and the Closing Date.

"**Inventory**" has the meaning set forth in <u>Section 2.2(e)</u>.

"**Knowledge of Sellers**" or "**Sellers' Knowledge**" or any other similar knowledge qualification means the actual or constructive knowledge of any director or officer of each Seller, in each case after due inquiry.

"**Law**" means any law (including common law), statute, requirement, code, rule, regulation, order, ordinance, judgment or decree or other pronouncement of any Governmental Entity.

"**Licensed Intellectual Property**" means all Intellectual Property in which any Seller holds any rights or interests granted by other Persons, including any affiliates of any Seller, that is used

or held for use in either the conduct of the Business as currently conducted or proposed to be conducted or in any of the Purchased Assets.

"*Liens*" has the meaning set forth in <u>Section 2.1</u>.

"***Material Adverse Change***" means any state of facts, change, event, effect, condition, change or occurrence that is, has, or reasonably is expected to have, a material adverse effect on the Business or the Purchased Assets, the ability of the Sellers to consummate the transactions contemplated hereby, or the business, financial condition or results of operations of the Sellers taken as a whole, other than any state of facts, change, event, effect or occurrence resulting from (i) economic, financial market or geopolitical conditions in general (including the cost and availability of debt or equity financing), unless such conditions have a disproportionate effect on the Business or the Purchased Assets, (ii) changes in law or applicable accounting regulations or principles or interpretations thereof, (iii) conditions in the plastics or recycling industry generally, (iv) any outbreak or escalation of hostilities or war or any act of terrorism, (v) any weather condition, earthquake or natural disaster, (vi) epidemic, pandemic or disease outbreaks (including the COVID-19 virus), public health emergencies (as declared by an applicable Governmental Entity) or quarantine restrictions implemented by any applicable Governmental Entity, whether negatively affecting the Business specifically or negatively affecting economic conditions generally, (vii) the execution of this Agreement, the announcement of this Agreement and the Transaction (including any action or inaction as a result thereof by the employees, customers, vendors or competitors of the Sellers), or (viii) Sellers' status as a debtor in bankruptcy and ordinary course or typical events taking place during the bankruptcy.

"***Outside Closing Date***" has the meaning set forth in <u>Section 11.1(c)</u>.

"***Owned Intellectual Property***" means all Intellectual Property that is owned or purported to be owned by any Seller or any pending applications currently being applied for by any Seller, together with all (A) royalties, fees, income, payments, and other proceeds now or hereafter due or payable to any Seller with respect to such Intellectual Property; and (B) claims and causes of action with respect to such Intellectual Property, whether accruing before, on, or after the date hereof/accruing on or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal or equitable relief for past, present, or future infringement, misappropriation, or other violation thereof.

"***Parties***" or "***Party***" has the meaning set forth in the Preamble.

"***Patents***" includes (a) all national, regional, and international patents and patent applications, including provisional patent applications and any and all rights to claim priority thereto, (b) all patent applications filed from such patents, patent applications, or provisional applications or from an application claiming priority from any of these, including divisionals, continuations, continuations-in-part, provisionals, converted provisionals, and continued prosecution applications, (c) any and all patents that have issued or in the future issue from the foregoing patent applications ((a) and (b)), including utility models, petty patents, and design patents and certificates of invention, (d) any and all extensions or restorations by existing or future extension or restoration mechanisms, including revalidations, reissues, re-examinations, and extensions (including any supplementary protection certificates and the like) of the foregoing

patents or patent applications or other patents resulting from post-grant proceedings, and (e) any substantially equivalent government-issued patent rights.

"***Permitted Encumbrances***" means the following: (a) encumbrances for Taxes not yet due and payable or which are being contested in good faith, (b) mechanics, carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business and relating to amounts not yet due and payable, but which in each case have been fully accrued on the books of Seller and which, either individually or in the aggregate, do not interfere with the use of the Purchased Assets in a manner consistent with the current use thereof by Sellers or their affiliates, and (c) any encumbrances created by or consented to by Purchaser.

"***Person***" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Entity, unincorporated organization, trust, association or other entity.

"***Personal Information***" means any information that can identify a person, which may include, but not be limited to, (i) name, address, telephone number, health information, driver's license number, government-issued identification number, or any other data that can be used to precisely identify, contact or locate an individual, (ii) any nonpublic, personally identifiable financial information, such as information relating to a relationship between an individual person and a financial institution, and/or related to a financial transaction by such individual person with a financial institution or (iii) Internet Protocol addresses or other persistent device identifiers.

"***Prepetition Secured Parties***" has the meaning set forth in the Interim Financing Order.

"***Products***" has the meaning set forth in the Recitals.

"***Proposed Transaction***" has the meaning set forth in the Recitals.

"***Purchase Price***" has the meaning set forth in Section 3.1.

"***Purchased Assets***" has the meaning set forth in the Recitals.

"***Purchaser***" has the meaning set forth in the Preamble.

"***Real Property***" has the meaning set forth in the Recitals.

"***Regulatory Authority***" means any national, supranational, state or local governmental authority, with responsibility for granting any Regulatory Authorizations with respect to the Products.

"***Regulatory Authorizations***" means any approvals, clearances, authorizations, registrations, certifications, licenses or permits granted by any Regulatory Authority.

"***Release***" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"*Schedule Supplement*" has the meaning set forth in <u>Section 7.11(b)</u>.

"*Tax*" or "*Taxes*" means any and all U.S. federal, state, local and non-U.S. taxes, assessments, levies, duties, tariffs, imposts and other similar charges and fees imposed by any Governmental Entity, including income, franchise, windfall or other profits, gross receipts, property, sales, use, net worth, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation, excise, withholding, ad valorem, stamp, transfer, value-added, occupation, environmental, disability, real property, personal property, registration, alternative or add-on minimum, or estimated tax, including any interest, penalty, additions to tax and any additional amounts imposed with respect thereto.

"*Tax Return*" means any report, return, certificate, claim for refund, election, estimated Tax filing or declaration filed or required to be filed with any Governmental Entity with respect to Taxes, including any schedule or attachment thereto, and including any amendments thereof.

## SCHEDULE 2.2(d)

Equipment

Office furniture

Laptops

External hard drives

## SCHEDULE 2.2(e)

Inventory

Arch Therapeutic's self-assembling peptide inventory that has been synthesized by and is currently stored in bulk at -20°C at its GMP peptide manufacturer (the "***Peptide Inventory***"). The Peptide Inventory as-is would fill approximately 15,000 units of AC5 Advanced Wound System.

## SCHEDULE 2.2(g)

Assumed Contracts

Massachusetts Institute of Technology Amended and Restated Exclusive Patent License Agreement, dated May 16, 2011, by and between Massachusetts Institute of Technology, a Massachusetts corporation and Arch Therapeutics, Inc. (f/k/a Clear Nano Solutions, Inc.), a Massachusetts corporation, as amended from time to time.

## SCHEDULE 2.3(i)

Specific Excluded Assets

None.

**SCHEDULE 7.3**

Insurance

| No. | Type of Policy | Carrier | Policy No. | Effective Date | Policy Expiration | Limits |
|---|---|---|---|---|---|---|
| 1. | Commercial General Liability | Federal Insurance Company (NAIC 20281) | 3604-85-14 EUC | 6/25/2024 | 6/25/2025 | Each Occurrence $1,000,000<br><br>Damages to Rented Premises (per occurrence) $1,000,000<br><br>Medical Expenses (any one person) $10,000<br><br>Personal & Adv Injury $1,000,000<br><br>General Aggregate $2,000,0000 |
| 2. | Automobile Liability<br><br>Hired Autos Only<br><br>Non-Owned Autos Only | Federal Insurance Company (NAIC 20281) | (24) 7359-84-96 | 6/25/2024 | 6/25/2025 | Combined Single Limit (each accident) $1,000,000 |
| 3. | Umbrella Liability | Federal Insurance | 93648066 | 6/25/2024 | 6/25/2025 | Each Occurrence $2,000,000 |

| No. | Type of Policy | Carrier | Policy No. | Effective Date | Policy Expiration | Limits |
|-----|----------------|---------|-----------|----------------|-------------------|--------|
|     |                | Company (NAIC 20281) |            |           |           | Aggregate $2,000,000 |
| 4.  | Workers Compensation and Employers' Liability | Federal Insurance Company (NAIC 20281) | (25) 7176-52-19 | 6/25/2024 | 6/25/2025 | Per Statute<br><br>E.L Each Accident $500,000<br><br>E.L. Disease – Each Employees $500,000<br><br>E.L. Disease – Policy Limit $500,000 |
| 5.  | Product Liability – Claims Made | Federal Insurance Company (NAIC 20281) | 36086669 | 6/25/2024 | 6/25/2025 | Occ/Agg $5,000,000 |
| 6.  | Transit | Imperium Insurance Company (NAIC 35408) | RBJ-1002538-04 | 6/25/2024 | 6/25/2025 | $500,000 per any one vessel and connecting conveyance or aircraft<br><br>$50,000 shipments on desk and subject to an on-deck bill of lading while stowed on board any one vessel<br><br>$25,000 any one package shipped by registered mail or governmental insured parcel post |

46

| No. | Type of Policy | Carrier | Policy No. | Effective Date | Policy Expiration | Limits |
|-----|----------------|---------|------------|----------------|-------------------|--------|
|     |                |         |            |                |                   | $10,000 any one package shipped by ordinary parcel or first class mail<br><br>$100,000 any one barge or any one tow |

47

## AMENDMENT NO. 1
## TO
## ASSET PURCHASE AGREEMENT

**THIS AMENDMENT NO. 1**, dated as of June 24, 2025 (this "***Amendment***"), amends that certain Asset Purchase Agreement (the "***Purchase Agreement***"), entered into as of May 15, 2025, by and among (i) Arch Acquisition LLC, a Delaware limited liability company ("***Purchaser***"), (ii) Arch Therapeutics, Inc., a Nevada corporation ("***Arch Therapeutics***"), and (iii) Arch Biosurgery, Inc., a Massachusetts corporation ("***Arch Biosurgery***" and together with Arch Therapeutics, collectively, the "***Sellers***"; each, a "***Seller***"). Purchaser and Sellers may be referred to hereinafter collectively as "***Parties***" and each individually a "***Party***".

**WHEREAS**, the parties hereto desire to amend the Purchase Agreement as provided herein to reflect the results of the auction conducted by the Bankruptcy Court on June 20, 2025.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and obligations hereinafter set forth, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. <u>Definitions</u>. All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Purchase Agreement.

2. <u>Purchase Price</u>. Section 3.1 of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

   a. <u>Purchase Price</u>. The aggregate consideration (collectively, the "***Purchase Price***") to be paid by Purchaser for the purchase of the Purchased Assets shall be: (i) the assumption of Assumed Liabilities, (ii) a credit bid pursuant to section 363(k) of the Bankruptcy Code in the aggregate amount of $900,000 consisting of, on a dollar for dollar basis, the Capped DIP Obligations outstanding as of the Closing Date (the "***Credit Bid Amount***") and (iii) $3,100,000 (the "***Cash Payment***"). At the Closing, Purchaser shall forgive and discharge, or cause to be forgiven and discharged, the Credit Bid Amount and pay to the Prepetition Secured Parties the Cash Payment (collectively, the "***Closing Date Payment***") and shall assume the Assumed Liabilities. Any payment required to be made in cash pursuant to this or any other provision of this Agreement shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made at least two (2) business days prior to the date such payment is to be made.

3. <u>Ratification as Amended</u>. Except as expressly amended by this Amendment, the terms and conditions of the Purchase Agreement are hereby confirmed, approved, and ratified, and the Purchase Agreement, as amended by this Amendment, shall continue in full force and effect. Any reference to the Agreement in the Purchase Agreement as amended by this Amendment shall mean the Purchase Agreement as amended by this Amendment.

4. <u>General Provisions</u>. The terms of Article 12 of the Purchase Agreement are incorporated herein by reference, *mutatis mutandis*. This Amendment shall be deemed an integral part of, and construed together with, the Purchase Agreement.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be duly executed by their respective authorized officers as of the day and year first above written.

**PURCHASER:**

**ARCH ACQUISITION LLC**

By: _Rey Pascual_ _____

Name: Reinaldo Pascual

Title: Co-President

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**SELLERS:**

**ARCH THERAPEUTICS, INC.**

By: _____
      Name: Terrence Norchi
      Title: President


**ARCH BIOSURGERY, INC.**

By: _____
      Name: Terrence Norchi
      Title: President

4385469.1

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

EXHIBIT B

(Assumed Contracts- and Cure Cost)

| *Non-debtor Contract Parties* | *Agreement* | *Cure Cost* | *Debtor* |
|---|---|---|---|
| Massachusetts Institute of Technology | Amended and Restated Exclusive Patent License Agreement, dated as of May __ 2011 (as amended from time to time)* | $244,421.71 | Arch Therapeutics, Inc. (f/k/a Clean Nano Solutions, Inc.), a Massachusetts corporation |
| | | | |

\* Assumption and assignment of the agreement to the extent section 365 of the Bankruptcy Code is applicable, or with the consent or no objection of the non-debtor contract parties.

4381262.8